**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HC2 HOLDINGS 2, INC. and CONTINENTAL GENERAL INSURANCE COMPANY,<br><br>                Plaintiffs,<br><br>      v.<br><br>MOTORSPORT GAMES INC. (f/k/a MOTORSPORT GAMING US LLC); MIKE ZOI; JONATHAN NEW; and DMITRY KOZKO,<br><br>                Defendants. | Civil Action No. |

## COMPLAINT

Plaintiffs HC2 Holdings 2, Inc. ("HC2") and Continental General Insurance Company ("Continental" and, collectively with HC2, "Plaintiffs"), by their undersigned attorneys, as and for their complaint against defendants Motorsport Games Inc. ("Motorsport"), Mike Zoi ("Zoi"), Jonathan New ("New"), and Dmitry Kozko ("Kozko" and, collectively with Motorsport, Zoi and New, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.     This is a classic case of a controlling stockholder abusing its fiduciary position to defraud minority investors and snap up their shares at a deep discount—only for the controlling stockholder to turn around and immediately realize an enormous profit on the deal.

2.     Defendant Motorsport, the controlling stockholder of 704Games Company, a Delaware corporation ("704Games" or the "Company"), told Plaintiffs, the Company's minority investors, a false tale of woe and unprofitability—when, in fact, the Company was in the midst of a groundbreaking year of success and profitability, and Motorsport fully expected to realize a bonanza profit when it conducted an initial public offering.

3.      Relying on Defendants' false assurances, Plaintiffs accepted a paltry $1.2 million in return for their 26.2% share of the Company.

4.      Mere months later, Defendants conducted a spectacularly successful IPO that valued 26.2% of the Company, the percentage share of the Company Plaintiffs owned before the sale to Motorsport, at a whopping $206 million—***more than 170 times*** the amount Motorsport paid Plaintiffs for their shares.

5.      This action arises under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, for violation of Securities and Exchange Commission ("SEC") Rule 10b-5, codified at 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), as well as for breach of contract, fraud in the inducement, breach of fiduciary duty, unjust enrichment, and constructive trust under Delaware law.

6.      The Company is a developer and publisher of video games for a variety of platforms, including the PlayStation 4 and Xbox One game consoles, Windows PCs, and mobile phones. It holds the exclusive license to be the official video game developer and publisher for the NASCAR® video game racing franchise. To date, the Company has sold well over a million copies of its NASCAR video games for game consoles and PCs, its NASCAR Heat Mobile application for iOS- and Android-based mobile devices has had approximately five million installs, and the Company is developing two additional NASCAR games for mobile devices with projected release dates in 2021.

7.      HC2's investment in NASCAR games dates back to 2015, when HC2's subsidiary, DMi, Inc., acquired certain exclusive rights to build a NASCAR games business. HC2 paid $6.0 million to acquire the DMi, Inc. business.

8.     Motorsport was formed in 2018 as a holding company and wholly owned subsidiary of Motorsport Network, LLC ("Motorsport Network").

9.     In August 2018, HC2 and Continental, along with other investors in the Company, entered into a Stockholders' Agreement with Motorsport in connection with Motorsport's purchase of 217,352 shares of the Company's common stock (the "Stockholders' Agreement," a copy of which is attached hereto as Exhibit 1). Motorsport's acquisition made Motorsport the controlling stockholder of the Company, leaving HC2 with 54,807 shares of common stock and Continental with 51,500 shares of common stock.

10.    After the 2018 transaction, Motorsport owned approximately 53.5% of the Company's common stock, while HC2 owned approximately 13.5% and Continental owned approximately 12.7%. As controlling stockholder, Motorsport and its agents, including Zoi, Kozko, and New, exercised control over the flow of financial and operational information to Plaintiffs.

11.    Since acquiring control of the Company, Motorsport has derived nearly all of its total net revenues from its ownership interest in the Company.

12.    Motorsport, its controlling owner Zoi, its CEO Kozko, and its CFO New owed fiduciary duties to Plaintiffs by virtue of Motorsport's position as the controlling majority stockholder of the Company.

13.    During 2020, Defendants misrepresented and concealed the financial results and prospects of the Company, leading Plaintiffs and other minority stockholders to believe that the Company was unprofitable and would require additional investment by Plaintiffs. In addition, Defendants claimed that there had been a "substantial" revenue overstatement in 2018 and

demanded either $1.1 million in additional cash or 15% of all other stockholders' equity shares in consideration for the alleged overstatement.

14.     In June 2020, Defendants approached Plaintiffs and offered to purchase Plaintiffs' shares of the Company for a price far below what, upon information and belief, Defendants knew was the fair market value for those shares.

15.     Defendants controlled the information flow to Plaintiffs concerning the Company's results and prospects. Plaintiffs relied on Defendants' statements, including Defendants' statements concerning the Company's lack of profitability and the need for additional capital contributions, in deciding to sell Plaintiffs' stock to Motorsport.

16.     Plaintiffs and Motorsport thereafter entered into a Stock Purchase Agreement dated August 18, 2020 (the "SPA," a copy of which is attached hereto as Exhibit 2), pursuant to which Plaintiffs sold their shares in the Company to Motorsport for $11.2881 per share, for a total sale price of $1.2 million.

17.     Contrary to Defendants' misrepresentations that the Company was in dire financial straits, the Company was making a profit. The financial information reported in the Motorsport Prospectus, which was based almost exclusively on the financials of 704Games, indicated positive EBITDA of $3,278,706 for the nine months ended September 30, 2020.

18.     On January 13, 2021, less than five months after acquiring Plaintiffs' shares at a steep discount, Defendants and their affiliates held an initial public offering of stock in Motorsport on the NASDAQ stock exchange (the "IPO"). As reflected in the prospectus and other materials issued in connection with the IPO, the Company is the primary asset of Motorsport.

19.     Defendants had, in fact, been planning the IPO well in advance of their purchase of Plaintiffs' shares. In January 2020, Motorsport entered into an employment agreement with Kozko

that contemplated a lucrative IPO. In preparation for the IPO and prior to their acquisition of Plaintiffs' shares, Defendants signed a confidential Promotional Services Agreement with Fernando Alonso Diaz, a prominent Formula One racecar driver, and were negotiating to obtain exclusive licenses to develop multi-platform games for Automobile Club de l'Ouest, including games based on the FIA World Endurance Championship and the 24 Hours of Le Mans. The first confidential filing in support of the IPO was made mere weeks after Defendants purchased Plaintiffs' shares in the Company.

20.     The IPO was initially priced at $20.00 per share, but traded much higher, reaching $38.00 per share during initial trading on January 13, 2021. Based upon the peak trading price, the implied value of the Company is approximately $786 million. The 26.2% share of the Company that Motorsport acquired from Plaintiffs for $1.2 million is accordingly worth at least approximately $206 million.

21.     Defendants' actions violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 thereunder because Defendants misrepresented and failed to disclose material facts in connection with their purchase of securities from Plaintiffs. Motorsport is also liable under Section 20A of the Exchange Act for insider trading, purchasing Plaintiffs' shares while in possession of material confidential information belonging to the Company without disclosing that information to Plaintiffs.

22.     Defendants' material misrepresentations and omissions, and their failure to provide timely and accurate financial information concerning the Company, also breached their obligations to Plaintiffs under the Stockholders' Agreement.

23.     Defendants' material misrepresentations and omissions fraudulently induced Plaintiffs to enter into the SPA and sell Plaintiffs' shares of the Company to Motorsport for less than fair market value.

24.     Defendants' actions also breached the fiduciary duties that Motorsport, as majority stockholder of the Company, owed to Plaintiffs, as minority stockholders, by failing to disclose key financial and other information about the Company, and by diverting corporate opportunities for the benefit of Defendants.

## JURISDICTION AND VENUE

25.     This Court has original subject-matter jurisdiction over this action pursuant to Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a), because it is an action at law and suit in equity brought to enforce liabilities and duties created by Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as well as under 28 U.S.C. Section 1331 because this is a civil action arising under the laws of the United States, specifically the Exchange Act and Rule 10b-5.

26.     This Court has and may properly exercise supplemental jurisdiction over Plaintiffs' claims for breach of contract, fraud in the inducement, breach of fiduciary duty, unjust enrichment, and constructive trust under Delaware law pursuant to 28 U.S.C. § 1367 because all such claims are so related to Plaintiffs' claims under the Exchange Act and Rule 10b-5 thereunder that they form part of the same case or controversy under Article III of the U.S. Constitution.

27.     This Court has personal jurisdiction over Defendant Motorsport because Motorsport (a) is a Delaware corporation and (b) expressly agreed in Section 17 of the SPA that:

> Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Delaware in each case located in the State of Delaware, and each party irrevocably submits to the exclusive jurisdiction of

such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

Ex. 2 § 17.

28.     This Court has personal jurisdiction over Defendant Kozko pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief, Kozko is a citizen and domiciliary of the United States and, as alleged herein, personally participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder. This Court also has personal jurisdiction over Defendant Kozko pursuant to Delaware's director and officer consent statute, 10 Del. Code § 3114, because Kozko is Chief Executive Officer and Executive Chairman of Defendant Motorsport and served as a Director of the Company, signed the SPA containing the Delaware forum selection clause quoted above on behalf of Defendant Motorsport, and, based on his conduct alleged herein, is a necessary and proper party to this action.

29.     This Court has personal jurisdiction over Defendant New pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief, New is a citizen and domiciliary of the United States and, as alleged herein, personally participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder. This Court also has personal jurisdiction over Defendant New pursuant to Delaware's director and officer consent statute, 10 Del. Code § 3114, because New is Chief Financial Officer of Defendant Motorsport, acted as chief financial officer for the Company, and, based on his conduct alleged herein, is a necessary and proper party to this action.

30.     This Court has personal jurisdiction over Defendant Zoi pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief, Zoi is a citizen and domiciliary of the United States and, as alleged herein, personally participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

31.     Venue for this action is proper in this Court with respect to Defendant Motorsport pursuant to the SPA's forum selection clause quoted above as well as Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because Motorsport, as a Delaware corporation, is deemed to be an inhabitant of Delaware, and, upon information and belief, transacts business in Delaware.

32.     Venue also is proper in this Court with respect to all Defendants pursuant to 28 U.S.C. § 1391(b)(3) because, although all Defendants are, upon information and belief, residents of Florida, the exclusive forum selection clause contained in Section 17 of the SPA, which Defendant Kozko signed on behalf of Defendant Motorsport, precludes bringing this action in the U.S. District Court for the Southern District of Florida. Since this Court has personal jurisdiction over all Defendants with respect to this action and proceeding in this Court is consistent with the SPA's exclusive forum selection clause, this Court is the most appropriate venue for this action.

## THE PARTIES

33.     Plaintiff HC2 is a Delaware corporation with its principal place of business at 450 Park Avenue, 29th Floor, New York, New York 10022.

34.     Plaintiff Continental is a Texas insurance company with its principal place of business at 11001 Lakeline Boulevard, Suite 120, Austin, Texas 78717.

35.     Defendant Motorsport is a Delaware corporation with its principal place of business at 5972 NE 4th Avenue, Miami, Florida 33137. Upon information and belief, prior to January 8,

2021, Motorsport was a Florida limited liability company known as Motorsport Gaming US LLC with its principal place of business at the same address. Upon information and belief, on January 8, 2021, Motorsport converted from a Florida limited liability company to a Delaware corporation pursuant to a statutory conversion and changed its name to Motorsport Games Inc.

36.     Upon information and belief, Defendant Zoi is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

37.     Defendant Zoi is the Manager of Motorsport Network. As the Manager, Zoi has sole voting and dispositive power with respect to the shares of Defendant Motorsport held by Motorsport Network. Motorsport Network was the sole shareholder of Motorsport until the IPO of Motorsport stock on January 13, 2021, and continues to own a controlling interest in Motorsport.

38.     Upon information and belief, Defendant Kozko is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

39.     Defendant Kozko is the principal executive officer of Motorsport, having served as its Chief Executive Officer since January 2020 and as its Executive Chairman since December 2020. Kozko previously served as Senior VP of Operations and COO of Motorsport's corporate parent, Motorsport Network, which he joined in January 2018.

40.     Upon information and belief, Defendant New is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

41.     Defendant New is the principal financial officer of Motorsport, having served as its Chief Financial Officer since January 2020. Upon information and belief, New also acted as chief financial officer for the Company since January 2020.

## FACTUAL ALLEGATIONS

## THE PARTIES' INITIAL INVESTMENTS IN THE COMPANY

42.     HC2 made its initial investment in NASCAR games in 2014, when HC2 formed its subsidiary, DMi, Inc., which subsequently acquired certain exclusive rights to build a NASCAR games business. At the time of HC2's initial investment, Blake Davidson, NASCAR Vice President of Licensing and Consumer Products, publicly announced that "[w]e share a strategic vision with [HC2 subsidiary] DMi to broaden NASCAR Interactive Entertainment and deliver a first-class gaming experience to our fans, who are deeply passionate about NASCAR games". As noted in HC2's annual report for the fiscal year ended December 31, 2015, HC2 paid $6.0 million to acquire the DMi, Inc. business.

43.     Over time and a series of investments, HC2's initial investment developed into the Company today, 704Games. On April 11, 2016, PlayFast Games, LLC ("PlayFast") and Leo Capital Holdings, LLC ("Leo"), acquired minority positions in DMi, Inc. In 2017, the Company completed its transition from DMi, Inc. into 704Games.

44.     The Company is a developer and publisher of video games for a large and growing variety of platforms, including the PlayStation 4 and Xbox One game consoles, Windows PCs, and mobile phones. It holds the exclusive license to be the official video game developer and publisher for the NASCAR video game racing franchise. To date, the Company has sold well over a million copies of its NASCAR video games for game consoles and PCs. The products offered by the Company also include NASCAR Heat Mobile for iOS and Android, which has had approximately five million installs to date, and the Company is developing two additional NASCAR games for mobile devices with projected release dates in 2021. In addition, the Company holds the exclusive right to create and organize e-sports leagues and events for

NASCAR using the Company's NASCAR racing video games, subject to certain limited exceptions.

45.     At the time the Company completed its transition from DMi, Inc. to 704Games, the Company's board of directors approved a fair market valuation of the Company's shares of $88.76 per share, based on an analysis provided by an independent third-party valuation firm. In August 2017, HC2 and Leo extended a $1.4 million term loan to fund the Company's operations, based on the Company's promising results and bright prospects.

46.     As early as May 2018, Zoi and Motorsport Network met with then-CEO of 704Games, Paul Brooks, regarding potential collaboration with and investment in the Company. Zoi wanted Motorsport to have a controlling stake in the Company from the first meeting.

47.     In August 2018, Motorsport was formed as a holding company and purchased a controlling interest consisting of 217,352 shares of the Company's common stock at a price of $50.61 per share. At the time of the Motorsport acquisition, the Company's board of directors determined that the fair market value of the Company was $50.61 per share.

48.     Motorsport's acquisition made Motorsport the controlling stockholder of the Company, leaving HC2 with 54,807 shares of common stock and Continental with 51,500 shares of common stock. After the 2018 transaction, Motorsport owned approximately 53.5% of the Company's common stock, while HC2 owned approximately 13.5% and Continental owned approximately 12.7%.

### DEFENDANTS' DUTIES TO PLAINTIFFS

49.     In connection with Motorsport's acquisition of approximately 53.5% of the Company's shares, on August 14, 2018, Motorsport and the minority stockholders of the Company

(including HC2 and Continental) entered into the Stockholders' Agreement, which specified certain rights of the Stockholders vis-à-vis the Company and each other.

50.     Pursuant to Section 7.1 of the Stockholders' Agreement, the Company, as controlled by Defendants, was obligated to provide Plaintiffs and the other minority stockholders with quarterly unaudited and annual audited financial statements of the Company. All such financial statements were to be prepared in accordance with generally accepted accounting practices (GAAP).

51.     At all times from August 2018 through the present, Plaintiffs and Defendants understood that Plaintiff Continental would communicate and receive information about the Company via Plaintiff HC2. Defendants did not communicate directly with Plaintiff Continental, but at all times understood that any representations that Defendants made to HC2 were equally made to Continental. Further, all such representations were received and relied upon by Continental.

52.     As controlling majority stockholder of the Company, Motorsport and its agents owed fiduciary duties to the Company and its minority stockholders, including duties of care, loyalty, and disclosure.

**DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS**

**Defendants Asserted Control and Improperly Excluded Minority Stockholders**

53.     Defendants systematically removed representatives of the minority stockholders from positions of influence with the Company and failed to provide information and financial reporting to the minority stockholders as required by the Stockholders' Agreement.

54.     On January 1, 2019, Motorsport requested that then-CEO Paul Brooks step down from his position as CEO of the Company. Motorsport made this request unilaterally and without consulting the Company's Board of Directors, which included Wayne Barr, Jr., a director of HC2's

corporate parent, HC2 Holdings, Inc. ("HC2 Holdings"), and current CEO of HC2 Holdings, as a legacy board member and representative of Plaintiff HC2.

55.     From January 2019 forward, Defendants operated as if they owned 704Games in full, largely ignoring the rights of legacy board members to be apprised of decisions and approve changes to agreements.

56.     Also beginning in January 2019, Kozko instructed 704Games employees that all major decisions should be approved by representatives of Defendants.

57.     Throughout 2019 and the first half of 2020, Plaintiffs repeatedly requested to be informed of board actions, provided with financial reporting, and generally informed of the status of the Company per the terms of the Stockholders' Agreement.

58.     Despite Plaintiffs making numerous requests to multiple representatives of the Company and Defendants over several months, Defendants never delivered audited financial results for 2019. Defendants also failed to deliver regular quarterly financial reports prepared in accordance with GAAP.

59.     In response to Plaintiffs' requests, Defendants represented to Plaintiffs that financial results—audited or otherwise—were unavailable and that Defendants would provide results to Plaintiffs as and when they were completed.

60.     Defendants delayed providing results between November 2019 and June 2020. On June 4, 2020, when Defendants did finally provide limited summary financial results for 2019 and the first quarter of 2020, those statements were not detailed financial statements prepared in accordance with US GAAP and did not satisfy Defendants' obligations to disclose financial information.

**Defendants Set the Stage at the Company's November 2019 Board of Directors Meeting**

61.     On November 12, 2019, the Company held a special meeting of its Board of Directors, of which HC2 Holdings director Wayne Barr, Jr. was a member, via Zoom telephone/video conference. Defendant Kozko chaired the meeting and HC2 employee AJ Stahl attended the meeting on behalf of Plaintiff HC2 as a minority stockholder with observer rights under the Stockholders' Agreement.

62.     At that meeting, the financial review of the Company indicated a $5 million reduction in revenue from the prior forecast and a reduction in EBITDA (earnings before interest, taxes, depreciation and amortization, a common measure of cash flow) from a projected $1.3 million to *negative $1.6 million*—portraying the Company as a money-losing entity that was likely to require additional capital infusions from its investors with little hope of near-term profitability.

63.     Defendants' dire predictions for the Company were a significant departure from prior expectations for a company whose shares Motorsport had acquired for $50.61 per share just two years earlier. Defendants' reports and projections portrayed the Company as a weak enterprise whose fair market value had suffered during Motorsport's tenure as controlling majority stockholder.

64.     In fact, upon information and belief, Defendants believed that the Company's results were promising and would yield an attractive valuation in an IPO. This belief culminated in the execution of a January 1, 2020 employment agreement between Motorsport and Kozko (the "Kozko Employment Agreement"), a copy of which is attached hereto as Exhibit 3, targeting a Company valuation of at least $100 million, ranging all the way up to beyond $1 billion.

**Defendants' 2020 Company Budget Falsely Indicated Millions in 2020 EBITDA Losses**

65.     On December 26, 2019, Defendant Kozko emailed a spreadsheet purporting to be the 2020 Consolidated Budget for 704Games to Mr. Stahl (the "2020 Consolidated Budget").

66.     In the 2020 Consolidated Budget, Defendants estimated that in 2020 the Company would generate an EBITDA loss of over $3,094,400 for the year.

67.     After providing the 2020 Consolidated Budget to Mr. Stahl, Defendant Kozko then initiated a Zoom conference with Stahl in which they discussed the 2020 Consolidated Budget, including the projected losses, the reasons for lower sales and high expenses, and the potential necessity for additional investment in the Company.

68.     Upon information and belief, the 2020 Consolidated Budget prepared and provided by Defendants was not accurate and included material misstatements and omissions, including, in particular, Defendants' estimate that the Company would generate an EBITDA loss in 2020.

69.     In fact, the Company reported positive EBITDA in the millions for 2020 in connection with the IPO.

70.     Upon information and belief, the 2020 Consolidated Budget was not merely a poor prediction but was a material misstatement of Defendants' true knowledge and expectations concerning the Company's performance in 2020—which significantly altered the total mix of information made available to Plaintiffs in deciding to sell their shares. Plaintiffs have formed this belief because, immediately after providing the misleading 2020 Consolidated Budget to Plaintiffs, Motorsport entered into the Kozko Employment Agreement—the effective date of which was contemporaneous with the Defendants' representations to minority investors that the Company was *losing* over $3 million per year. The Kozko Employment Agreement provided for incentive compensation to Kozko in the event of an IPO that valued Motorsport at "at least One Hundred Million ($100,000,000)" and contained additional equity awards for Kozko starting at a market capitalization of $150 million, ranging all the way up to a valuation of $1 billion—metrics that are irreconcilable with Defendants' inaccurate portrayal of the Company at the Company's November

2019 Board of Directors meeting and in the 2020 Consolidated Budget. Upon information and belief, Motorsport and Kozko based the metrics in the Kozko Employment Agreement upon their true knowledge of the value of Motorsport—which derived nearly all of its value from the Company.

**Defendants Fail to Disclose Their Expectation That an IPO Would Yield a Company Valuation of Over $100 Million**

71.     On January 1, 2020, immediately after the November 12, 2019 Board meeting and the December 26, 2019 Consolidated Budget, Motorsport and Kozko agreed to the lucrative new Kozko Employment Agreement, which targeted a Company value of at least $100 million in an IPO or other valuation event, and rewarded Kozko with additional compensation at value increments all the way up to $1 billion.

72.     Defendants failed to disclose the existence of the new Kozko Employment Agreement, or its valuation targets, to Plaintiffs—a critical omission of important information that further altered the total mix of information made available to Plaintiffs in deciding to sell their shares. Plaintiffs first learned of the valuation terms of the Kozko Employment Agreement after selling their shares, when Motorsport attached the text of the Kozko Employment Agreement to public SEC filings.

73.     Other contemporaneous evidence also shows that Defendants intended, throughout 2020, to engage in a highly lucrative IPO. One of the exhibits to Motorsport's prospectus is a curiously backdated employment agreement between Motorsport and New, which states that it is "dated October 19, 2020, but effective as of January 3, 2020", and claims that the letter "is confirming the offer extended to you prior to [January 3, 2020]" (the "New Employment Agreement"). The New Employment Agreement provides that New would be rewarded with a $150,000 bonus if Motorsport "consummates and closes the initial public offering of its securities".

The New Employment Agreement suggests that New was hired specifically to implement a lucrative IPO.

74.     Defendants did not disclose the terms of the New Employment Agreement, including the IPO bonus provisions, to Plaintiffs prior to acquiring Plaintiffs' stake in the Company.

**In Spring 2020, Defendants Secure a $10 Million Line of Credit from Motorsport's Parent Company to Fund Acquisitions**

75.     Despite portraying the Company as a money-losing entity, in early 2020 Defendants secretly lined up financing to fund additional acquisition activity.

76.     On April 1, 2020, Motorsport entered into a promissory note with Motorsport's parent, Motorsport Network, providing for a $10 million line of credit, payable on demand, to fund "working capital, operations, acquisitions, investments or any other purposes of [Motorsport]" (the "April 2020 Note").

77.     Upon information and belief, the April 2020 Note was made available, and intended, to fund the acquisition of minority investors' holdings in the Company. The April 2020 Note also provided Motorsport Network with a way to immediately profit off Motorsport's IPO by calling in the April 2020 Note, which would be immediately due and payable on demand, and deeming pre-IPO investments to be "Advances" under the note.

78.     Upon information and belief, the $10 million face value of the April 2020 Note reflects Defendants' expectation that it would cost substantially more per share to acquire Company stock from its minority investors than the $1.2 million Motorsport ultimately paid for Plaintiffs' shares.

79.     Defendants did not disclose the April 2020 Note, or the fact that they had secured a $10 million line of credit to fund investments and acquisitions, to Plaintiffs—yet another

omission of important information altering the total mix of information made available to Plaintiffs in deciding to sell their shares. Plaintiffs learned of the April 2020 Note through public SEC filings in connection with the Motorsport IPO.

## Defendants' 2019 Quarterly Financials for the Company Showed Massive Increases in EBITDA Losses

80.     On June 4, 2020, after numerous requests for updated financial information from Plaintiffs, Michelle Baker Dillon of 704Games finally provided a spreadsheet purporting to show the 2019 Quarterly Financials for 704Games to Mr. Stahl (the "2019 Quarterly Financials").

81.     The 2019 Quarterly Financials show quarterly results for the Company in 2018 and 2019 and the variance year over year. These figures indicated that EBITDA losses increased by 684% in 2019 as compared to such losses in 2018.

82.     The 2019 Quarterly Financials do not conform to GAAP and did not satisfy Defendants' disclosure obligations because they are simply overview EBITDA calculations, which are non-GAAP accounting measures, and do not include reconciliations showing net earnings according to GAAP.

83.     Mr. Stahl and Ms. Baker Dillon thereafter discussed the contents of the 2019 Quarterly Financials. Mr. Stahl reiterated Plaintiffs' rights to audited financial results prepared in accordance with the requirements of GAAP and asked when those would be provided. Ms. Baker Dillon could not provide an answer as to when audited GAAP financials for 2019 would be available.

## Defendants' Presentation at the Company's 2020 Board of Directors Meeting Falsely Indicated a Multimillion-Dollar Cash Shortfall Even If the Company Achieved All Goals

84.     Also on June 4, 2020, Amanda LeCheminant, VP and Deputy General Counsel of Motorsport Network, sent an email to the directors and stockholders of 704Games attaching a Meeting Agenda and Presentation for the Company board meeting set to take place on June 5,

2020 (the "June 2020 BOD Presentation"). Ms. LeCheminant also attached the minutes of the November 12, 2019 meeting of the 704Games Board of Directors for approval.

85.     The June 2020 BOD Presentation included CEO Remarks on page 3, including the estimation that the Company would "***run out of money next year*** around launch [of a new product], ***even if we hit our current projections***" (emphasis added).

86.     The 2019 Financials reflected on page 13 of the June 2020 BOD Presentation indicated that the Company ran a deficit of EBITDA of $3,234,000, dramatically worse than in 2018, and noted that "Expenses [are] almost flat, EBITDA drop is primarily due to Console Revenue."

87.     The Q1-20 Financials reflected on page 14 of the June 2020 BOD Presentation indicated that EBITDA was positive for that quarter, but noted a decrease in mobile revenue with the explanation "Mobile game content needs a refresh" and that a number of expenses had been cut in the first quarter of 2020, including dramatic decreases in the categories of "Development Costs," "Sales & Marketing," and "T&E".

88.     The 2021 Monthly Forecast on page 16 of the June 2020 BOD Presentation indicated that, even assuming all product launches and sales targets were accomplished, the Company would hit a major cash shortfall in July 2021.

89.     The Cash Shortfall Projections on page 17 of the June 2020 BOD Presentation indicated that, even with no delays, there would be a cash shortfall of $1,190,000. In a high impact scenario, the cash shortfall estimate was $4,705,000.

90.     At the meeting of the Board of Directors on June 5, 2020, Defendants reiterated that there would likely be a capital call in the near future because of the predicted cash shortfall. Defendants continued to project a pessimistic view of the prospects of the Company.

91.     Upon information and belief, the June 2020 BOD Presentation was not accurate and included material misstatements and omissions of material facts regarding the financial condition of the Company and the prospects for the finances of the Company going forward, including, in particular, the repeated indications of a cash shortfall even if the Company achieved all of the goals set forth in the June 2020 BOD Presentation. This misrepresentation, like Defendants' other misrepresentations and omissions alleged herein, concerned important information and altered the total mix of information made available to Plaintiffs in deciding to sell their shares.

92.     Plaintiffs have formed this belief about the June 2020 BOD Presentation based on the Company's actual reported 2020 performance, the success of the IPO, and the Kozko Employment Agreement, all of which are inconsistent and irreconcilable with Defendants' dire portrayal of the Company in the June 2020 BOD Presentation.

**Defendants Placed Pressure on Plaintiffs to Agree to a Sale by Demanding Cash or Equity to Cure an Alleged Financial Misstatement**

93.     On June 11, 2020, Defendant New, the CFO and principal financial and accounting officer of Motorsport, sent an email to the stockholders of 704Games identifying an alleged revenue overstatement for 2018 of $1.1 million and requesting that the other stockholders either (1) consent to Motorsport Network (Motorsport's parent company) withdrawing $1.1 million from the Company's accounts or (2) contribute 15% additional equity to Motorsport pursuant to the August 2018 Stock Purchase Agreement by which Motorsport had acquired its interest in the Company. New provided only five days for Plaintiffs to respond.

94.     On June 15, 2020, AJ Stahl replied, disputing that any money or equity was owed to Motorsport or its parent company.

95.     On June 18, 2020, Mr. New replied to Mr. Stahl's email and requested a phone call.

96.    Defendants also failed to disclose that, via the April 2020 Note, Motorsport Network had recently agreed to extend **additional** credit to Motorsport, rather than require the cash payment suggested by New.

97.    Defendants' sudden assertion in June 2020 that revenue had been overstated was self-serving and highly aggressive, especially in light of the fact that **Defendants themselves** controlled the accounting for the Company and had never raised any problem with the 2018 financials prior to summer 2020.

98.    Defendants' extortionate demand highlighted Defendants' failure to disclose material information to Plaintiffs. In response to New's demand, Mr. Stahl specifically requested "backup and cites to GAAP supporting a restatement of financials" and noted that "in Section 7.1 of the Investor Rights Agreement, the company is currently in breach in that it has failed to provide [audited financial statements] for 2019. As such, we request an update to the timing of AFS for 2019." Defendants never provided sufficient information supporting their demand, in violation of (a) Defendants' fiduciary obligation to disclose all material facts to minority stockholders, and (b) the Company's contractual obligation, under Defendants' management, to provide audited financial statements.

99.    Upon information and belief, New's representation that a revenue overstatement necessitated consent from Plaintiffs to Motorsport Network withdrawing $1.1 million from the Company's accounts or Plaintiffs to contribute additional equity to Motorsport constituted material misstatements and entailed omissions of material facts regarding the financial conditions of the Company, as no such consent or contribution was required.

100.    Upon information and belief, Defendants' demand for additional cash or equity was designed to—and did—place pressure on Plaintiffs to sell their shares to Motorsport. The pressure

was intensified by the fact that, as the controlling majority stockholder of the Company, Motorsport had control over the information provided to Plaintiffs and had the power to hold Plaintiffs' investment hostage if Plaintiffs did not agree to Defendants' demands.

101.    Plaintiffs have formed these beliefs about Defendants' demand for additional cash or equity based on the Company's actual reported 2020 performance, the success of the IPO, and the Kozko Employment Agreement, all of which are utterly inconsistent and irreconcilable with Defendants' inaccurate portrayal of the Company in the June 2020 BOD Presentation.

102.    Moreover, as shown by the New Employment Agreement, New had been hired specifically in anticipation of preparing the Company for a profitable IPO and stood to gain a windfall upon the consummation of such an IPO (and additional bonus at Kozko's discretion), giving New a financial motive to acquire Plaintiffs' shares to maximize Defendants' IPO profits.

**Defendants Falsely Claimed that the Company Would Soon Require a Capital Call**

103.    As early as December 2019, Kozko indicated that the Company would likely require additional investment in order to succeed.

104.    At the June 5, 2020 Board of Directors meeting, Defendants indicated to Plaintiffs that the Company was facing a cash shortfall and that a capital call was likely.

105.    On June 23, 2020, AJ Stahl had another call with Zoi and New. On that call, Zoi and New indicated to Mr. Stahl that there would be a capital call in the near future, and that Plaintiffs, as the largest of the Company's minority stockholders, should be aware of this. They also suggested to Mr. Stahl that if Plaintiffs were not going to participate in a capital call, perhaps Motorsport should acquire Plaintiffs' interest in the Company.

106.    On June 23, 2020, after their phone call, Zoi sought to capitalize on the pressure on Plaintiffs by sending a formal offer letter to AJ Stahl. The offer letter again indicated that a capital

call would occur in the near-term and suggested that Plaintiffs should sell their interests in the Company to Motorsport in lieu of making a capital contribution. A copy of that letter is attached hereto as Exhibit 4.

107.    Upon information and belief, Defendants' representations about the need for additional investment by Plaintiffs, including, in particular, New's representation that there would be a capital call for the Company in the near future, were not accurate and were material misstatements regarding the financial conditions of the Company and the prospects for the finances of the Company going forward, and no such capital call was required or occurred. The New Employment Agreement's financial incentives upon the consummation of an IPO shows that, contrary to anticipating a cash shortfall and capital call, New had every reason to expect an imminent IPO.

108.    Plaintiffs have formed this belief about these representations, and in particular this representation by New, based on the absence of such a capital call, the Company's actual reported 2020 performance, the success of the IPO, the Kozko Employment Agreement, the New Employment Agreement, and the April 2020 Note extending in which Motorsport Network extended additional credit to Motorsport, all of which are utterly inconsistent and irreconcilable with the Company requiring a capital call after June 23, 2020.

109.    Moreover, the timing of Motorsport's proposal to acquire Plaintiffs' shares, when coupled with Defendants' misleading portrayal of the Company as a financial disaster, and with Motorsport's sudden extortionate demands for additional cash or equity, strongly suggest that Defendants' pressure campaign was designed to induce Plaintiffs to sell their Company stock at a low valuation.

**Defendants Continue to Conceal Material Information and Opportunities from Plaintiffs**

110.    In the midst of negotiations to acquire Plaintiffs' stock at a bargain basement valuation, Defendants continued to prepare for a lucrative IPO and diverted corporate opportunities to their own benefit.

111.    On July 20, 2020, less than one month before Motorsport acquired Plaintiffs' shares, Motorsport entered into a confidential Promotional Services Agreement with Fernando Alonso Diaz, a prominent Formula One racecar driver (the "Alonso Agreement").

112.    The Alonso Agreement provided that Alonso would not provide services until Motorsport had consummated an IPO, and that Alonso's compensation would take the form of a grant of "3% of the Company's issued and outstanding Class A Stock as of the effective date of the IPO".

113.    By entering into the Alonso Agreement, Defendants both (a) commandeered a business opportunity belonging to the Company for their own benefit, and (b) ensured that Plaintiffs would not realize any benefit from the Alonso relationship prior to, or as a part of, their stock sale to Motorsport.

114.    Defendants did not disclose the Alonso Agreement to Plaintiffs prior to acquiring Plaintiffs' stock. In fact, the Alonso Agreement contained a strict confidentiality provision providing for legal remedies against Alonso if he were to disclose the existence of the Alonso Agreement to any person without Motorsport's written consent.

115.    The existence of the Alonso Agreement—a high-profile promotional agreement with a world-famous racecar driver—was squarely contrary to the image of a struggling Company that Defendants were portraying to Plaintiffs, and knowledge of the Alonso Agreement would have been material to Plaintiffs' decision whether to sell their stock at the price paid by Motorsport.

116.    Upon information and belief, concurrent with Motorsport's negotiations to acquire Plaintiffs' stock in the Company, Motorsport was also in the process of obtaining the exclusive licenses to develop multi-platform games for Automobile Club de l'Ouest, including games based on the FIA World Endurance Championship and the 24 Hours of Le Mans.

117.    On January 25, 2021, Motorsport did, in fact, enter into an Amendment of its existing Le Mans Esports Series Ltd. Joint Venture Agreement with Automobile Club de l'Ouest and a series of related license agreements, which together enable Motorsport to develop games related to, themed as, or containing the FIA World Endurance Championship and the 24 Hours of Le Mans (together, the "Le Mans Agreements").

118.    Upon information and belief, the original Le Mans Esports Series Ltd. Joint Venture Agreement with Automobile Club de l'Ouest included only an agreement to facilitate the Le Mans Esports Series and not the rights to develop video games related to Le Mans.

119.    The Le Mans Agreements are for development of racing video games. Motorsport has no assets or relationships that relate to video game development other than its ownership of 704Games.

120.    By entering into the Le Mans Agreements, Defendants both (a) commandeered a business opportunity belonging to the Company for their own benefit, and (b) ensured that Plaintiffs would not realize any benefit from the Automobile Club de l'Ouest relationship prior to, or as a part of, their stock sale to Motorsport.

121.    Defendants did not disclose to Plaintiffs that Defendants were pursuing the Le Mans Agreements prior to acquiring Plaintiffs' stock.

122.    Defendants' pursuit of the Le Mans Agreements—an agreement to develop games related to two world-famous race events that would open up new markets for the Company—was

squarely contrary to the image of a struggling Company that Defendants were portraying to Plaintiffs, and knowledge of negotiations for the Le Mans Agreements would have been material to Plaintiffs' decision whether to sell their stock at the price paid by Motorsport.

### DEFENDANTS MADE THEIR MATERIAL MISREPRESENTATIONS AND OMISSIONS ABOUT THE COMPANY WITH SCIENTER

123.    Contemporaneous documents and subsequent events indicate that Defendants made the material misstatements and omissions alleged above with the intent to deceive, manipulate, and defraud Plaintiffs, and are inconsistent with any plausible innocent explanation for Defendants' actions.

124.    Upon information and belief, Defendants knowingly and intentionally (or at the very least recklessly) made the material misrepresentations and omissions alleged above in connection with the Company's November 2019 Board of Directors Meeting, the Company's 2020 Consolidated Budget, the Company's 2019 Quarterly Financials, and Defendants' June 2020 BOD Presentation, and, through Defendants Zoi, Kozko, and New, made the statements alleged above concerning the need for additional investment by Plaintiffs, a revenue overstatement, and a looming capital call for the Company, to induce Plaintiffs to sell their ownership interests in the Company to Motorsport for what Defendants knew to be a fraction of their fair market value.

125.    Contrary to Defendants' repeated misrepresentations that the Company was in dire financial straits, in fact Defendants were, upon information and belief, already planning a public offering or other liquidity event based on a much higher valuation.

126.    Defendants selectively disclosed to Plaintiffs that they wanted to pursue a liquidity event or initial public offering of the parent company. Plaintiffs understood this to mean that Defendants planned a liquidity event for Motorsport Network, the parent company of Motorsport. In making their self-serving and selective disclosure, Defendants concealed that the transaction

would be based exclusively on the value of 704Games. They similarly failed to disclose any facts regarding the timeline for such a liquidity event or the anticipated value of that event.

127.    As alleged above, the Kozko Employment Agreement was contemporaneous with Defendants' provision of their misleading 2020 Consolidated Budget to Plaintiffs, preceded Defendants' other material misstatements and omissions alleged above, and may even have been negotiated prior to or contemporaneously with Defendants' misleading financial review of the Company at the Company's November 2019 Board of Directors meeting.

128.    The Kozko Employment Agreement's contemplation of an IPO valuing Motorsport at "at least One Hundred Million ($100,000,000)", and potentially over $1 billion, cannot be reconciled with Defendants' portrayal of the Company in 2020 as losing millions of dollars and being in imminent danger of running out of money.

129.    Similarly, the New Employment Agreement states that its terms, and the specific financial incentives for a successful IPO, were discussed with New prior to his January 3, 2020 employment start date. New's pressure campaign, his contentions that the Company required a capital call, and his demands for immediate agreements to transfer cash or equity to Motorsport Network, all occurred at the same time that New ***knew for a certainty*** that he would be rewarded for a successful IPO.

130.    Defendants' actions in the weeks and months following their fraudulently induced purchase of Plaintiffs' ownership interests in the Company are equally impossible to reconcile with their dire portrayal of the Company's financial status to Plaintiffs. On September 4, 2020— mere weeks after acquiring Plaintiffs' shares in the Company—Motorsport had already filed a confidential draft prospectus with the SEC for the IPO.

131.    Upon information and belief, on January 8, 2021, Motorsport converted from a Florida limited liability company to a Delaware corporation pursuant to a statutory conversion in preparation for the IPO. As a result of the corporate conversion, Motorsport Network became the sole holder of the Class A common stock and Class B common stock of Motorsport Games Inc.

132.    On January 13, 2021, Motorsport filed an updated prospectus with the SEC pursuant to Rule 424(b)(4) under the Securities Act of 1933 (the "Securities Act"), codified at 17 C.F.R. § 230.424(b)(4) (the "Motorsport Prospectus," a copy of which is attached hereto as Exhibit 5).

133.    Contrary to Defendants' misrepresentations to Plaintiffs about the Company, the Motorsport Prospectus reported positive EBITDA of $3,279,706 for the nine months ended September 30, 2020.

134.    The wildly successful results of Motorsport's January 13, 2021 IPO speak for themselves and belie Defendants' prior representations about the Company to Plaintiffs in inducing Plaintiffs to sell their Company stock.

135.    The Motorsport Prospectus indicates that essentially all of the assets of Motorsport are derived from its interest in the Company, and that the value of Motorsport is approximately equivalent to its 82.2% interest in the Company.

136.    Per the Motorsport Prospectus, following the IPO there would be approximately 10 million shares of Class A common stock and 7 million shares of Class B common stock outstanding, of which Motorsport Network owns approximately 96.3% of the combined voting power.

137.    On January 13, 2021, Defendants successfully launched the IPO, which was priced at $20.00 per share.

138.     The IPO raised more than $60 million in proceeds for 3 million shares of Motorsport. The price immediately skyrocketed, reaching $38 per share on the first day of trading.

139.     At the $20 per share IPO price, multiplied by the 17 million authorized shares, the implied value of Motorsport would be approximately $340 million. At the $38.00 peak trading price on January 13, 2021, the implied value of Motorsport is approximately $646 million.

140.     The implied value of the Company, based on the fact that Motorsport's profitability is based upon its 82.2% ownership of the Company, is approximately $414 million based on the IPO price, or $786 million based on the peak trading price on January 13, 2021.

**DEFENDANTS ARE NOT ENTITLED TO A SAFE HARBOR FOR THEIR FALSE AND MISLEADING STATEMENTS**

141.     The statutory safe harbor provided by the Private Securities Litigation Reform Act ("PSLRA") for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

142.     The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

143.     The PSLRA safe harbor also does not apply because the claims alleged herein are covered by statutory exceptions to the safe harbor, including 15 U.S.C. § 77z–2(b)(2) because the statements were made in connection with an initial public offering, insofar as Defendants' misstatements and omissions were made in anticipation of the undisclosed planned IPO.

144.     To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking statements, they were not identified as "forward-looking

statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

145.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by individuals who knew that the statement was false when made.

### PLAINTIFFS RELIED ON DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS IN SELLING THEIR COMPANY SHARES TO DEFENDANTS

146.    Plaintiffs did not wish to contribute to a capital call for the Company, which they believed, based on the material misrepresentations and omissions by Defendants alleged above, to be unprofitable and to have limited prospects for future profitability.

147.    Plaintiffs, as non-controlling minority stockholders, were not positioned to ascertain independently the truth, falsity, or completeness of Defendants' representations concerning the Company's results and prospects.

148.    Plaintiffs relied on the material misrepresentations and omissions by Defendants alleged above, including, in particular, New's statement about an upcoming capital call, in determining that it would be best to sell Plaintiffs' ownership interests in the Company.

149.    On July 14, 2020, Plaintiffs reached out to Defendant Kozko to resume discussions regarding a potential sale of Plaintiffs' interest in the Company. Plaintiffs also spoke with Defendant Zoi on July 15, 2020 to reach agreement on the price for the purchase of Plaintiffs'

shares. Plaintiffs asked to delay closing until October 2020, in order to determine whether Motorsport would acquire other minority interests at a higher price. Defendants refused to wait.

150.    Upon information and belief, Defendants resisted a delay in closing because, at the time they initiated the purchase of Plaintiffs' shares, Defendants already knew that a lucrative IPO was imminent and were well under way in preparing for the IPO. Indeed, Defendants filed their initial draft registration statement with the SEC on September 8, 2020, less than three weeks after executing the SPA to acquire Plaintiffs' shares.

151.    On July 24, 2020, counsel for Defendants at Snell & Wilmer L.L.P. provided a draft Stock Purchase Agreement to Plaintiffs.

152.    Defendant Zoi was intimately involved in structuring the deal, engaging via email and phone calls with Plaintiffs and the parties' respective counsel.

153.    Plaintiffs and Motorsport thereafter entered into the SPA effective as of August 18, 2020, pursuant to which Plaintiffs sold all of their shares in the Company to Motorsport at a price of just $11.2881 per share.

154.    Section 4(h) of the SPA included a representation by Plaintiffs (defined therein as "Seller" or "Sellers") regarding Plaintiffs' access to information about Motorsport and the Company:

> The Seller has sufficient knowledge and experience with and information about Buyer (including Buyer's business objective and current efforts to consummate a liquidity event or an initial public offering of Buyer as soon as practicable) and the Company in order to be fully familiar with Buyer, the Company and its current business, operations, assets, finances, financial results, financial condition and prospects and so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement, (ii) has full access to all books and records of the Company and all of its contracts, agreements and documents and (iii) has had an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company and its current business, operations, assets, financing, operating results, financial condition and prospects in order to make an informed decision to sell the Shares.

Ex. 2 § 4(h).

155.    As of the date of that representation in the SPA, Plaintiffs mistakenly believed, in reliance on, and due to, Defendants' false and misleading statements and material omissions, that the contemplated "liquidity event or an initial public offering of Buyer" would be an offering of Motorsport's parent company and/or would include substantial assets other than those of the Company.

156.    As of the date of that representation in the SPA, Plaintiffs mistakenly believed, in reliance on, and due to, Defendants' false and misleading statements and material omissions regarding the unavailability of audited financials, and the information that Defendants did provide, that Plaintiffs did, in fact, have access to all the information necessary to make a decision to sell Plaintiffs' shares in the Company.

157.    On October 6, 2020, Motorsport entered an agreement to purchase additional shares of the Company from minority stockholder Leo Capital Holdings, LLC at an identical price per share as they had paid Plaintiffs.

## PLAINTIFFS' ECONOMIC LOSSES AND LOSS CAUSATION

158.    Defendants fraudulently induced Plaintiffs to accept just $1.2 million for their 26.2% stake in the Company. At the peak trading price on Motorsport's first day of trading, that stake is actually worth at least approximately $206 million.

159.    Plaintiffs would not have entered into the SPA had they been aware that the financial condition of the Company indicated a much higher fair market value than the price per share that Defendants offered and paid for Plaintiffs' shares in the Company, or that Defendants intended to offer shares in Motorsport (the only substantial asset of which is the Company) in the impending IPO.

160.    Plaintiffs would have retained their ownership interests in the Company if Defendants had not represented to Plaintiffs, mere months before the IPO, that the Company was in dire financial condition and that a capital call was forthcoming.

161.    Defendants' material misstatements and omissions damaged Plaintiffs by causing Plaintiffs to sell their ownership interests in the Company for far less than fair market value, depriving Plaintiffs of the true value of those ownership interests.

**The Company's Remaining Minority Stockholders Have Filed Suit Against Motorsport Arising from Motorsport's Theft of Corporate Opportunities**

162.    Upon information and belief, on or about December 23, 2020, representatives of Ascend FS, Inc. ("Ascend") and PlayFast, both minority stockholders of the Company, sent a letter to Defendants alleging that the SPA and the October 6, 2020 transaction were made in breach of the Stockholders' Agreement. That letter also demanded certain documents relating to Motorsport.

163.    On December 29, 2020, Jennifer Hadley Catero of Snell & Wilmer L.L.P., counsel for Motorsport, replied via letter to Ascend and Playfast, denying that the SPA or the October 6, 2020 transaction breached the Stockholders' Agreement and refusing to provide information about Motorsport.

164.    On January 11, 2021, Ascend filed a derivative suit on behalf of the Company against Motorsport and Kozko in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Local Case Number 2021-000705-CA-01, alleging breaches of fiduciary and contractual duties and theft of corporate opportunities from the Company in excess of $94 million, based on Motorsport's acquisition of stock in the Company from Plaintiffs and Leo via the SPA and the October 6, 2020 transaction, respectively. Ascend's complaint alleges, among other things, that Motorsport purchased Plaintiffs' stock "at a 98.6% discount" and at a price "far below its value", which Motorsport anticipated would lead to "***a return of approximately 72 times***

the price it paid" (emphasis in original). Ascend's complaint further alleges that Defendants "concealed . . . their inside information about the IPO from . . . minority shareholders until they were a *fait accompli*."

## COUNT I
### FOR VIOLATION OF EXCHANGE ACT § 10(b)
### AND RULE 10b-5 THEREUNDER
### *(*AGAINST MOTORSPORT)

165.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

166.    Defendant Motorsport, in its capacity as the majority stockholder of the Company, and by the use of various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, intentionally made untrue statements of material facts to Plaintiffs relating to the financial condition and future prospects of the Company.

167.    In the course of using various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, Defendant also intentionally or recklessly omitted to state material facts relating to the financial condition and future prospects of the Company that were necessary in order to make Defendants' statements made concerning the Company, in the light of the circumstances under which they were made, not misleading.

168.    At each time Defendants made the false statements and omissions of material fact alleged herein, Defendants knew, or recklessly disregarded, that such statements were false and/or incomplete, and that Plaintiffs would rely on those statements.

169.    Plaintiffs justifiably relied upon the statements by Defendants in deciding to sell their ownership interests in the Company to Motorsport at a price of $11.2881 per share.

170.   Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact. At least with respect to several of the allegations, the claims primarily allege omissions and where there was an affirmative duty to disclose information.

171.   But for Defendants' material false statements and omissions of material fact, Plaintiffs would not have been induced to sell their shares in the Company for $11.2881 per share.

172.   Plaintiffs have been injured and have suffered economic losses because the fair market value of Plaintiffs' ownership interests in the Company greatly exceeded $11.2881 per share.

173.   Defendants' material false statements and omissions of material fact were the proximate cause of Plaintiffs' injuries and economic losses.

174.   Defendants' material false statements and omissions of material fact alleged herein constituted devices, schemes, and artifices to defraud Plaintiffs and acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with the purchase of securities in the Company from Plaintiffs, all in violation of Rule 10b-5.

175.   Defendants' material false statements and omissions of material fact alleged herein constituted manipulative and deceptive devices and contrivances in connection with the purchase of securities from Plaintiffs, in contravention of Rule 10b-5 and, thus, in violation of Exchange Act Section 10(b).

<u>**COUNT II**</u>
**FOR JOINT AND SEVERAL LIABILITY UNDER EXCHANGE ACT § 20(a) FOR MOTORSPORT'S VIOLATION OF EXCHANGE ACT § 10(b) AND RULE 10b-5 THEREUNDER (AGAINST ZOI, KOZKO, AND NEW)**

176.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

177.    Defendants Zoi, Kozko, and New, in their capacities as controlling executives of Defendant Motorsport (and, with it, the Company), and by the use of various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, intentionally made untrue statements of material facts to Plaintiffs relating to the financial condition and future prospects of the Company.

178.    In the course of using various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, Defendants Zoi, Kozko, and New also intentionally or recklessly omitted to state material facts relating to the financial condition and future prospects of the Company that were necessary in order to make Defendants' statements made concerning the Company, in the light of the circumstances under which they were made, not misleading.

179.    At each time Defendants Zoi, Kozko, and New made the material false statements and omissions of material fact alleged herein, they knew, or recklessly disregarded, that such statements were false and/or incomplete, and that Plaintiffs would rely on those statements.

180.    Plaintiffs justifiably relied upon the statements by Defendants Zoi, Kozko, and New in deciding to sell their ownership interests in the Company to Motorsport at a price of $11.2881 per share.

181.    But for Defendants Zoi, Kozko, and New's material false statements and omissions of material fact, Plaintiffs would not have been induced to sell their shares in the Company for $11.2881 per share.

182.    Plaintiffs have been injured and have suffered economic losses because the fair market value of Plaintiffs' ownership interests in the Company greatly exceeded $11.2881 per share.

183.    Defendants Zoi, Kozko, and New's material false statements and omissions of material fact on behalf of Motorsport were the proximate cause of Plaintiffs' injuries and economic losses.

184.    Defendants Zoi, Kozko, and New's material false statements and omissions of material fact on behalf of Motorsport alleged herein constituted devices, schemes, and artifices to defraud Plaintiffs and acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with the purchase of securities in the Company from Plaintiffs, all in violation of Rule 10b-5.

185.    Defendants Zoi, Kozko, and New's material false statements and omissions of material fact on behalf of Motorsport alleged herein constituted manipulative and deceptive devices and contrivances in connection with the purchase of securities from Plaintiffs, in contravention of Rule 10b-5 and, thus, in violation of Exchange Act Section 10(b).

186.    As Manager of Motorsport Network, the sole owner of Defendant Motorsport from its inception until the IPO on January 13, 2021 and the controlling stockholder of Defendant Motorsport at all times, Defendant Zoi has had the direct or indirect power to direct or cause the direction of the management and policies, and to control the general business affairs, of Motorsport since at least August 2018.

187.     In his capacity as the Manager of Motorsport Network, the sole owner of Defendant Motorsport from its inception until January 13, 2021, Zoi has had the requisite direct or indirect power to control the specific corporate actions resulting in the liability alleged herein—namely, Motorsport's actions as the controlling stockholder of the Company during the times in which Defendants' materially false statements and omissions alleged herein, including statements by Zoi, were made.

188.     Upon information and belief, Defendant Zoi did not act in good faith, but instead directly or indirectly induced Defendants' materially false statements and omissions alleged herein, which constitute this cause of action under the Exchange Act and Rule 10b-5 thereunder.

189.     Upon information and belief, and, in particular, in light of the substantial individual financial incentive provided by Defendant Zoi's ownership interest in Defendant Motorsport (via his ownership of Motorsport Network), Defendant Zoi was an active, culpable participant in Motorsport's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder alleged herein.

190.     Pursuant to Exchange Act Section 20(a), therefore, Defendant Zoi, as a "control person" of Motorsport, is liable jointly and severally with Motorsport and to the same extent as Motorsport is liable to Plaintiffs for Plaintiffs' claims under Exchange Act Section 10(b) and Rule 10b-5.

191.     As Chief Executive Officer and Executive Chairman of Motorsport, Defendant Kozko has had the direct or indirect power to direct or cause the direction of the management and policies, and to control the general business affairs, of Motorsport since at least January 2020.

192.     In his capacity as Chief Executive Officer of Motorsport since January 2020, Kozko has had the requisite direct or indirect power to control the specific corporate actions resulting in the liability alleged herein—namely, Motorsport's actions as the controlling stockholder of the

Company during the times at which Defendants' material false statements and omissions alleged herein, including statements by Kozko, were made.

193.     Upon information and belief, Defendant Kozko did not act in good faith, but instead directly or indirectly induced Defendants' material false statements and omissions alleged herein, which constitute this cause of action under the Exchange Act and Rule 10b-5.

194.     Upon information and belief, and, in particular, in light of the substantial individual financial incentive provided by the Kozko Employment Agreement, Defendant Kozko was an active, culpable participant in Motorsport's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder alleged herein.

195.     Pursuant to Exchange Act Section 20(a), therefore, Defendant Kozko, as a "control person" of Motorsport, is liable jointly and severally with Motorsport and to the same extent as Motorsport is liable to Plaintiffs for Plaintiffs' claims under Exchange Act Section 10(b) and Rule 10b-5.

196.     As Chief Financial Officer of Motorsport, Defendant New has had the direct or indirect power to direct or cause the direction of the management and policies, and to control the general business affairs, of Motorsport since at least January 2020.

197.     In his capacity as Chief Financial Officer of Motorsport since January 2020, New has had the requisite direct or indirect power to control the specific corporate actions resulting in the liability alleged herein—namely, Motorsport's actions as the controlling stockholder of the Company during the times at which Defendants' material false statements and omissions alleged herein, including statements by New, were made.

198.     Upon information and belief, Defendant New did not act in good faith, but instead directly or indirectly induced Defendants' material false statements and omissions alleged herein, which constitute this cause of action under the Exchange Act and Rule 10b-5.

199.     Upon information and belief, and, in particular, in light of the substantial individual financial incentive provided by the New Employment Agreement, Defendant New was an active, culpable participant in Motorsport's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder alleged herein.

200.     Pursuant to Exchange Act Section 20(a), therefore, Defendant New, as a "control person" of Motorsport, is liable jointly and severally with Motorsport and to the same extent as Motorsport is liable to Plaintiffs for Plaintiffs' claims under Exchange Act Section 10(b) and Rule 10b-5.

<u>**COUNT III**</u>
**FOR VIOLATION OF § 20A OF THE EXCHANGE ACT**
**(AGAINST MOTORSPORT)**

201.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

202.     This Claim is brought against Motorsport under §20A of the Exchange Act, 15 U.S.C. §78t-1.

203.     Motorsport possessed the true material undisclosed information, including information about the Company's true financial performance, the value of the Company (which Motorsport also knew would be the basis for the lucrative IPO of Motorsport), and liquidity needs, at all relevant times. In addition, the information was, in each case, considered confidential by 704Games as it was corporate information that was not publicly disclosed.

204.     Motorsport knew, or recklessly disregarded, that it owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to the Company and its shareholders to keep the information confidential.

205.     Nevertheless, while in possession of material, non-public, adverse information, Motorsport bought Plaintiffs' shares of the Company without first disclosing that information.

206.     Plaintiffs sold their shares to Motorsport without access to this material adverse information.

207.     Motorsport purchased Plaintiffs' shares contemporaneously with Plaintiffs' sales within the meaning of Section 20A of the Exchange Act.

208.     By virtue of possessing material non-public information, Motorsport had a duty to either disclose that information to Plaintiffs before purchasing their shares of the Company on the basis of that information or abstain from engaging in that transaction. By trading while in possession of such information, it violated this duty and infringed upon the relationship of trust and confidence that it had with Plaintiffs as investors in the Company.

209.     Accordingly, under Section 20A of the Exchange Act, Motorsport's purchase of the Company shares while knowingly in possession of material, positive, and non-public information makes it liable to Plaintiffs for all profits gained and losses avoided as a result of such stock sales.

210.     Motorsport is required to account for all such stock sales and disgorge its profits or ill-gotten gains.

## COUNT IV
### BREACH OF CONTRACT
### (AGAINST MOTORSPORT)

211.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

212.   The Stockholders' Agreement is a valid and enforceable contract to which Plaintiffs and Motorsport are parties.

213.   Motorsport knowingly and voluntarily entered into the Stockholders' Agreement.

214.   Section 7.1 of the Stockholders' Agreement obligated Motorsport to provide to Plaintiffs quarterly and annual financial statements prepared in accordance with GAAP.

215.   Motorsport breached Section 7.1 of the Stockholders' Agreement by providing financial statements that contained material misstatements and omitted material facts, thus rendering such statements inaccurate and not prepared in accordance with GAAP.

216.   Plaintiffs have been injured by Motorsport's breach of Section 7.1 of the Stockholders' Agreement because Plaintiffs did not have access to complete and accurate financial information about the Company, thus causing Plaintiffs to severely undervalue their ownership interests in the Company and sell their shares of the Company to Motorsport for a fraction of their fair market value.

217.   Had Defendants complied with their obligations under the Stockholders' Agreement, Plaintiffs would not have sold their ownership interests in the Company to Motorsport at the price of $11.2881 per share.

**COUNT V**
**FRAUD IN THE INDUCEMENT**
**(AGAINST ALL DEFENDANTS)**

218.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

219.   Defendant Motorsport knowingly and voluntarily entered into the SPA.

220.   Upon information and belief, in negotiating the SPA, Defendants misrepresented the financial condition and future prospects of the Company.

221.    Upon information and belief, in negotiating the SPA, Defendants misrepresented the profitability, cash reserves, future prospects, and likelihood of a capital call for the Company.

222.    Upon information and belief, Defendants knew or recklessly disregarded that the misrepresentations to Plaintiffs alleged herein were false and that Defendants intended to purchase Plaintiffs' ownership interests in the Company for a price far below the true fair market value of those shares.

223.    Upon information and belief, Defendants knew or recklessly disregarded that a fair market price for the shares of the Company was a material term of the SPA and that Plaintiffs would not have entered into the SPA at the price of $11.2881 per share had Plaintiffs been aware of the truth regarding the financial condition, future prospects, and likelihood of a capital call for the Company.

224.    Upon information and belief, Defendants intentionally or recklessly deceived Plaintiffs to induce Plaintiffs to enter into the SPA in order for Defendants to acquire Plaintiffs' ownership interests in the Company at a deep discount.

225.    Defendants' misrepresentations and omissions alleged herein were willful and intentional and reckless and involved a breach of trust or confidence.

226.    The misrepresentations and omissions alleged herein injured Plaintiffs because Plaintiffs reasonably relied upon those misrepresentations. Had Plaintiffs known those representations were false, Plaintiffs would not have entered into the SPA with Motorsport.

**COUNT VI**
**BREACH OF FIDUCIARY DUTIES**
**(AGAINST ALL DEFENDANTS)**

227.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

228.    Defendant Motorsport has been the controlling majority stockholder of the Company at all times relevant to Plaintiffs' allegations herein.

229.    Defendant Zoi has been the Manager of Motorsport Network, the sole owner of Defendant Motorsport from its inception until January 13, 2021, since at least August 2018.

230.    Defendant Kozko has been a member of the Board of Directors of the Company at all times relevant to Plaintiffs' allegations herein and the Chairman of the Company's Board since at least June 2020.

231.    Defendant New has acted as chief financial officer for the Company, upon information and belief since January 2020.

232.    By virtue of their respective roles as controlling majority stockholder, Manager and owner of the controlling majority stockholder's corporate parent, member and Chairman of the Company's Board, and acting chief financial officer for the Company, Defendants Motorsport, Zoi, Kozko, and New each owed fiduciary duties to the Company, Plaintiffs, and other minority stockholders, including the duties of care and loyalty.

233.    Defendants breached their fiduciary duties to Plaintiffs by the repeated acts of disloyalty, bad faith, and other misconduct alleged herein, including, without limitation, (a) Defendants' failure to provide accurate and complete financial statements of the Company to Plaintiffs, (b) Defendants' material misstatements and omissions of material fact regarding a cash shortfall and likely capital call for the Company, (c) Defendants' pursuit and consummation of the acquisition of Plaintiffs' shares in the Company for far less than a fair market price; (d) Defendants' theft of corporate opportunities in connection with the Alonso Agreement and Le Mans Agreements and delay of the IPO until after acquiring Plaintiffs' stock at a deeply discounted

price; and (e) Defendants' purchase of Plaintiffs' shares without disclosing material non-public information.

234.     Defendants' breaches of their fiduciary duties to Plaintiffs resulted in damages to Plaintiffs. Had Plaintiffs known the true financial condition and likelihood of a capital call for the Company, Plaintiffs would not have sold their ownership interests in the Company to Motorsport for $11.2881 per share.

235.     Defendants' material misstatements and omissions were willful and wanton and were made for the purpose of injuring Plaintiffs by acquiring Plaintiff's ownership interests in the Company for far less than their fair market value.

## COUNT VII
## UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST
## (AGAINST ALL DEFENDANTS)

236.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

237.     Defendants defrauded Plaintiffs and fraudulently induced Plaintiffs to enter into the SPA.

238.     Defendants also breached their contractual obligations and fiduciary duties of care, loyalty, disclosure, candor, and good faith.

239.     Defendants' wrongdoing injured and impoverished Plaintiffs by depriving Plaintiffs of the value of their shares of Company stock.

240.     Defendants' wrongdoing enriched Defendants by permitting them to obtain approximately 26.2 percent of the Company's stock for less than one percent of its true value, and by permitting Defendants to keep for themselves all distributions that would otherwise have been due to Plaintiffs if not for the SPA.

241.    Defendants' breaches of fiduciary duty, fraud, and self-enrichment at the expense of plaintiffs were unjustified.

242.    As a result of Defendants' wrongdoing, a constructive trust exists in favor of Plaintiffs with respect to 26.2 percent of the Company's value.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Awarding Plaintiffs their damages in the form of economic losses, including but not limited to adjusted fair market value of the shares of 704Gaming common stock as of August 18, 2020, disgorgement of all profits gained by Defendants as a result of their fraudulent purchase of Plaintiffs' shares of 704Gaming common stock, punitive damages, and/or such other measures of damages as are proven at trial, plus interest;

B.    Imposing a constructive trust in favor of Plaintiffs with respect to 26.2% of the value of the Company and of Motorsport;

C.    Awarding Plaintiffs their pre- and post-judgment interest; and

D.    Awarding Plaintiffs their costs and expenses, including reasonable attorneys' fees, as the prevailing parties in this action pursuant to the fee-shifting indemnification provision in the Stockholders' Agreement; and

E.    Granting such other and further relief as the Court may deem just, equitable, and proper.

Dated: February 8, 2021

**CHIPMAN BROWN CICERO & COLE, LLP**

OF COUNSEL:

 /s/ Joseph B. Cicero
Joseph B. Cicero (#4388)

Karl C. Huth
Gregory E. Stuhlman (#4765)
Matthew J. Reynolds
Aidan T. Hamilton (#6729)
Sara G. Wilcox
Hercules Plaza
**HUTH REYNOLDS LLP**
1313 North Market Street, Suite 5400
41 Cannon Court
Wilmington, Delaware 19801
Huntington, NY 11743
(302) 295-0191
(212) 731-9333
cicero@chipmanbrown.com
huth@huthreynolds.com
stuhlman@chipmanbrown.com
reynolds@huthreynolds.com
hamilton@chipmanbrown.com
swilcox@huthreynolds.com

*Attorneys for Plaintiff*
*HC2 Holdings 2, Inc.*

**LABATON SUCHAROW LLP**

OF COUNSEL:

 /s/ Ned Weinberger
Ned Weinberger (#5256)

David J. Schwartz
300 Delaware Avenue, Suite 1340
Ira A. Schochet
Wilmington, Delaware 19801
Carol C. Villegas
(302) 573-2540
Jake Bissell-Linsk
nweinberger@labaton.com
LABATON SUCHAROW LLP
140 Broadway
*Attorneys for Plaintiff Continental General*
New York, NY 10591
*Insurance Company*
(212) 907-0700
dschwartz@labaton.com
ischochet@labaton.com
cvillegas@labaton.com
jbisselllinsk@labaton.com