**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| |
|---|
| HC2 HOLDINGS 2, INC. ~~and~~, CONTINENTAL GENERAL INSURANCE COMPANY, and LEO CAPITAL HOLDINGS LLC, <br><br> Plaintiffs, <br><br> v. <br><br> MOTORSPORT GAMES INC. (f/k/a MOTORSPORT GAMING US LLC); MIKE ZOI; JONATHAN NEW; ~~and~~ DMITRY KOZKO; and ALEX ROTHBERT, <br><br> Defendants. |

Civil Action No. 21-00165-RGA

**AMENDED COMPLAINT**

Plaintiffs HC2 Holdings, Inc. ("HC2") ~~and~~, Continental General Insurance Company ("Continental"), and Leo Capital Holdings LLC ("Leo" and, collectively with HC2 and Continental, "Plaintiffs"), by their undersigned attorneys, as and for their complaint against defendants Motorsport Games Inc. ("Motorsport"), Mike Zoi ("Zoi"), Jonathan New ("New"), ~~and~~ Dmitry Kozko ("Kozko"), and Alex Rothbert ("Rothbert" and, collectively with Motorsport, Zoi ~~and~~, New, and Kozko, "Defendants"), allege as follows:

**NATURE OF THE ACTION**

1.      This is a classic case of a controlling stockholder abusing its fiduciary position to defraud minority investors and snap up their shares at a deep discount—only for the controlling stockholder to turn around and immediately realize an enormous profit on the deal.

2.      Defendant Motorsport, the controlling stockholder of 704Games Company, a Delaware corporation ("704Games" or the "Company"), told Plaintiffs, the Company's minority investors, a false tale of woe and unprofitability—when, in fact, the Company was in the midst

of a groundbreaking year of success and profitability, and ~~Motorsport~~Defendants fully expected to realize a bonanza profit when ~~it~~Motorsport conducted an initial public offering.

3.      Relying on Defendants' false assurances, Plaintiffs accepted a paltry $~~1.2~~1.36 million in return for their ~~26.2~~29.2% share of the Company.

4.      Mere months later, Defendants conducted a spectacularly successful IPO that valued ~~26.2~~29.2% of the Company, the percentage share of the Company Plaintiffs owned before the sale to Motorsport, at a whopping $~~206~~230 million—***more than 170 times*** the amount Motorsport paid Plaintiffs for their shares.

5.      This action arises under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, for violation of Securities and Exchange Commission ("SEC") Rule 10b-5, codified at 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), as well as for breach of contract, fraud in the inducement, breach of fiduciary duty, unjust enrichment, and constructive trust under Delaware law.

6.      The Company is a developer and publisher of video games for a variety of platforms, including the PlayStation 4 and Xbox One game consoles, Windows PCs, and mobile phones. It holds the exclusive license to be the official video game developer and publisher for the NASCAR® video game racing franchise. To date, the Company has sold well over a million copies of its NASCAR video games for game consoles and PCs, its NASCAR Heat Mobile application for iOS- and Android-based mobile devices has had approximately five million installs, and the Company is developing two additional NASCAR games for mobile devices with projected release dates in 2021.

7.      HC2's investment in NASCAR games dates back to 2015, when HC2's subsidiary, DMi, Inc., acquired certain exclusive rights to build a NASCAR games business. HC2 paid $6.0 million to acquire the DMi, Inc. business.

8.      Leo's investment in NASCAR games dates to 2016, when Leo joined with NASCAR industry insiders to invest in DMi, Inc. Leo paid $1.0 million to acquire stock in DMi, Inc.

9.      In 2017, the Company went through a rebranding effort, including changing its name from DMi, Inc. to 704Games.

10.     8.  Motorsport was formed in 2018 as a holding company and wholly owned subsidiary of Motorsport Network, LLC ("Motorsport Network").

11.     9.  In August 2018, HC2 and, Continental, and Leo, along with other investors in the Company, entered into a Stockholders' Agreement with Motorsport in connection with Motorsport's purchase of 217,352 shares of the Company's common stock (the "Stockholders' Agreement," a copy of which is attached hereto as Exhibit 1). Motorsport's acquisition made Motorsport the controlling stockholder of the Company, leaving HC2 with 54,807 shares of common stock and, Continental with 51,500 shares of common stock, and Leo with 10,301 shares of common stock.

12.     10.  After the 2018 transaction, Motorsport owned approximately 53.5% of the Company's common stock, while HC2 owned approximately 13.5% and, Continental owned approximately 12.7%, and Leo owned approximately 3.0%. As controlling stockholder, Motorsport and its agents, including Zoi, Kozko, and New, and Rothbert, exercised control over the flow of financial and operational information to Plaintiffs.

13.   11. Since acquiring control of the Company, Motorsport has derived nearly all of its total net revenues from its ownership interest in the Company.

14.   12. Motorsport, its controlling owner Zoi, its CEO Kozko, and its CFO New, and Rothbert, VP Finance & Global Controller of Motorsport's parent company, owed fiduciary duties to Plaintiffs by virtue of Motorsport's position as the controlling majority stockholder of the Company.

15.   13. During 2020, Defendants misrepresented and concealed the financial results and prospects of the Company, leading Plaintiffs and other minority stockholders to believe that the Company was historically unprofitable, continued to operate at a deficit in the near term, and would require significant additional investment by Plaintiffs in order to become profitable in the future.

16.   In addition, Defendants claimed that there had been a "substantial" revenue overstatement in 2018 and demanded either $1.1 million in additional cash or 15% of all other stockholders' equity shares in consideration for the alleged overstatement.

17.   14. In June 2020, Defendants approached PlaintiffsHC2 and Continental and offered to purchase Plaintiffs'their respective shares of the Company for a price far below what, upon information and beliefit is fair to infer, Defendants knew was the fair market value for those shares.

18.   In August 2020, Defendants approached Leo and offered to purchase Leo's shares of the Company at that same artificially low price, despite, based on the facts alleged, Defendants' knowledge that the Company was overperforming expectations and would soon be on solid financial footing.

19.   15. Defendants controlled the information flow to Plaintiffs concerning the Company's results and prospects. Plaintiffs relied on Defendants' statements, including Defendants' statements concerning the Company's near-term lack of profitability and the need for additional capital contributions to become profitable in the future, in deciding to sell Plaintiffs' stock to Motorsport.

20.   16. PlaintiffsHC2, Continental, and Motorsport thereafter entered into a Stock Purchase Agreement dated August 18, 2020 (the "SPA,", a copy of which is attached hereto as Exhibit 2), pursuant to which PlaintiffsHC2 and Continental sold their shares in the Company to Motorsport for $11.2881 per share, for a total sale price of $1.2 million.

17.   Contrary to Defendants' misrepresentations that the Company was in dire financial straits, the Company was making a profit. The financial information reported in the Motorsport Prospectus, which was based almost exclusively on the financials of 704Games, indicated positive EBITDA of $3,278,706 for the nine months ended September 30, 2020.

21.   Leo and Motorsport entered into a substantially identical Stock Purchase Agreement dated October 6, 2020 (the "Leo SPA", a copy of which is attached hereto as Exhibit 3), pursuant which Leo sold its shares in the Company to Motorsport for $11.2881 per share, for a total sale price of $116,279.

22.   18. On January 13, 2021, less than five months after acquiring PlaintiffsHC2 and Continental's shares at a steep discount, and approximately three months after acquiring Leo's shares at the same steep discount, Defendants and their affiliates held an initial public offering of stock in Motorsport on the NASDAQ stock exchange (the "IPO"). As reflected in the prospectus and other materials issued in connection with the IPO, the Company is the primary asset of Motorsport.  For example, in the prospectus filed with the SEC on January 13, 2021, (the

"Motorsport Prospectus", a copy of which is attached hereto as Exhibit 4), Motorsport disclosed that "revenues associated with the NASCAR Heat franchise accounted for approximately 99% of our total net revenue for the years ended December 31, 2019 and 2018 and the nine months ended September 30, 2020, and we expect this franchise to continue to account for the majority of our revenue for the year ended December 31, 2020."

23.    Contrary to Defendants' misrepresentations that the Company would be modestly profitable in 2020 but was still in dire financial straits and would need significant additional capital to meet development goals in 2021, the Company was making a significant profit. The financial information reported in the Motorsport Prospectus, which was based almost exclusively on the financials of 704Games, indicated positive EBITDA of $3,278,706 for the nine months ended September 30, 2020. By contrast, in June 2020 Motorsport and Kozko presented a financial summary to Plaintiffs that projected positive EBITDA of just $610,000 for all of 2020, and a cash shortfall of over one million dollars in 2021, even with modest profit in 2020.

24.    19. Defendants had, in fact, been planning the IPO well in advance of their purchase of Plaintiffs' shares. In January 2020, Motorsport entered into an employment agreement with Kozko that contemplated a lucrative IPO. In preparation for the IPO and prior to their acquisition of Plaintiffs' shares, Defendants signed a confidential Promotional Services Agreement with Fernando Alonso Diaz, a prominent Formula One racecar driver, and were negotiating to obtain exclusive licenses to develop multi-platform games for Automobile Club de l'Ouest, including games based on the FIA World Endurance Championship and the 24 Hours of Le Mans. The first confidential filing in support of the IPO was made mere weeks after Defendants purchased Plaintiffs' HC2's and Continental's shares in the Company, and *prior to* Defendants' purchase of Leo's shares.

25.     Despite their *pro forma* disclosure of the possibility of an unspecified liquidity event in the proposed language of the SPA and Leo SPA, Defendants never shared any of the substance, anticipated timing, or anticipated value of their IPO with Plaintiffs, despite being deeply engaged in the IPO planning process simultaneously with purchasing Plaintiffs' shares. In particular, Defendants should have disclosed that the Company's assets and operations would comprise the vast majority of the value proposition for the IPO of Motorsport. Plaintiffs only learned the true nature of Motorsport's IPO plans when the SEC filings were made public.

26.     20. The IPO was initially priced at $20.00 per share, but traded much higher, reaching $38.00 per share during initial trading on January 13, 2021. Based upon the peak trading price, the implied value of the Company is approximately $786 million. The 26.2 29.2% share of the Company that Motorsport acquired from Plaintiffs for $1.2 1.3 million is accordingly worth at least approximately $206 230 million.

27.     21. Defendants' actions violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 thereunder because Defendants misrepresented, misled, and failed to disclose material facts in connection with their purchase purchases of securities from Plaintiffs. Motorsport is also liable under Section 20A of the Exchange Act for insider trading, purchasing Plaintiffs' shares while in possession of material confidential information belonging to the Company without disclosing that information to Plaintiffs.

28.     22. Defendants' material misrepresentations and omissions, and their failure to provide timely and accurate financial information concerning the Company, also breached their obligations to Plaintiffs under the Stockholders' Agreement.

29.   23.  Defendants' material misrepresentations and omissions fraudulently induced Plaintiffs to enter into the SPA and the Leo SPA and sell Plaintiffs' shares of the Company to Motorsport for less than fair market value.

30.   24.  Defendants' actions also breached the fiduciary duties that Motorsport, as majority stockholder of the Company, owed to Plaintiffs, as minority stockholders, by materially misrepresenting and/or failing to disclose key financial and other information about the Company, and by diverting corporate opportunities for the benefit of Defendants.

## JURISDICTION AND VENUE

31.   25.  This Court has original subject-matter jurisdiction over this action pursuant to Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a), because it is an action at law and suit in equity brought to enforce liabilities and duties created by Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as well as under 28 U.S.C. Section 1331 because this is a civil action arising under the laws of the United States, specifically the Exchange Act and Rule 10b-5.

32.   26.  This Court has and may properly exercise supplemental jurisdiction over Plaintiffs' claims for breach of contract, fraud in the inducement, breach of fiduciary duty, unjust enrichment, and constructive trust under Delaware law pursuant to 28 U.S.C. § 1367 because all such claims are so related to Plaintiffs' claims under the Exchange Act and Rule 10b-5 thereunder that they form part of the same case or controversy under Article III of the U.S. Constitution.

33.   27.  This Court has personal jurisdiction over Defendant Motorsport because Motorsport (a) is a Delaware corporation and (b) expressly agreed in Section 17 of the SPA and Leo SPA that:

Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States or the courts of the State of Delaware in each case located in the State of Delaware, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding. Service of process, summons, notice or other document by mail to such party's address set forth herein shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or any proceeding in such courts and irrevocably waive and agree not to plead or claim in any such court that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

~~Ex~~Exs. 2 § 17 and 3 § 17.

34. ~~28.~~ This Court has personal jurisdiction over Defendant Kozko pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief, Kozko is a citizen and domiciliary of the United States and, as alleged herein, personally participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder. This Court also has personal jurisdiction over Defendant Kozko pursuant to Delaware's director and officer consent statute, 10 Del. Code § 3114, because Kozko is Chief Executive Officer and Executive Chairman of Defendant Motorsport and served as a Director of the Company, signed the SPA containing the Delaware forum selection clause quoted above on behalf of Defendant Motorsport, and, based on his conduct alleged herein, is a necessary and proper party to this action.

35. ~~29.~~ This Court has personal jurisdiction over Defendant New pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief, New is a citizen and domiciliary of the United States and, as alleged herein, personally participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder. This Court also has personal jurisdiction over Defendant New pursuant to Delaware's director and officer consent statute, 10 Del. Code § 3114, because New is

Chief Financial Officer of Defendant Motorsport, acted as chief financial officer for the Company, and, based on his conduct alleged herein, is a necessary and proper party to this action.

36. 30. This Court has personal jurisdiction over Defendant Zoi pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief, Zoi is a citizen and domiciliary of the United States and, as alleged herein, personally participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

37. This Court has personal jurisdiction over Defendant Rothbert pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief, Rothbert is a citizen and domiciliary of the United States and, as alleged herein, personally participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

38. 31. Venue for this action is proper in this Court with respect to Defendant Motorsport pursuant to the SPA's forum selection clause quoted above as well as Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because Motorsport, as a Delaware corporation, is deemed to be an inhabitant of Delaware, and, upon information and belief, transacts business in Delaware.

39. 32. Venue also is proper in this Court with respect to all Defendants pursuant to 28 U.S.C. § 1391(b)(3) because, although all Defendants are, upon information and belief, residents of Florida, the exclusive forum selection clause contained in Section 17 of the SPA, which Defendant Kozko signed on behalf of Defendant Motorsport, precludes bringing this action in the U.S. District Court for the Southern District of Florida. Since this Court has

personal jurisdiction over all Defendants with respect to this action and proceeding in this Court is consistent with the SPA's exclusive forum selection clause, this Court is the most appropriate venue for this action.

## THE PARTIES

40.   33. Plaintiff HC2 is a Delaware corporation with its principal place of business at 450 Park Avenue, 29th Floor, New York, New York 10022.

41.   34. Plaintiff Continental is a Texas insurance company with its principal place of business at 11001 Lakeline Boulevard, Suite 120, Austin, Texas 78717. During the relevant time frame, HC2's corporate parent, HC2 Holdings, Inc. ("HC2 Holdings"), also owned Continental. On March 29, 2021 HC2 Holdings announced that it has entered into a definitive agreement to sell Continental to Continental General Holdings LLC.

42.   Plaintiff Leo is an Illinois limited liability company with its principal place of business at 400 Skokie Boulevard, Suite 410, Northbrook, Illinois 60062.

43.   35. Defendant Motorsport is a Delaware corporation with its principal place of business at 5972 NE 4th Avenue, Miami, Florida 33137. Upon information and belief, prior to January 8, 2021, Motorsport was a Florida limited liability company known as Motorsport Gaming US LLC with its principal place of business at the same address. Upon information and belief, on January 8, 2021, Motorsport converted from a Florida limited liability company to a Delaware corporation pursuant to a statutory conversion and changed its name to Motorsport Games Inc.

44.   36. Upon information and belief, Defendant Zoi is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

45. 37. Defendant Zoi is the Manager of Motorsport Network. As the Manager, Zoi has sole voting and dispositive power with respect to the shares of Defendant Motorsport held by Motorsport Network. Motorsport Network was the sole shareholder of Motorsport until the IPO of Motorsport stock on January 13, 2021, and continues to own a controlling interest in Motorsport.

46. 38. Upon information and belief, Defendant Kozko is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

47. 39. Defendant Kozko is the principal executive officer of Motorsport, having served as its Chief Executive Officer since January 2020 and as its Executive Chairman since December 2020. Kozko previously served as Senior VP of Operations and COO of Motorsport's corporate parent, Motorsport Network, which he joined in January 2018.

48. 40. Upon information and belief, Defendant New is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

49. 41. Defendant New is the principal financial officer of Motorsport, having served as its Chief Financial Officer since January 2020. Upon information and belief, New also acted as chief financial officer for the Company since January 2020.

50. Upon information and belief, Defendant Rothbert is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

51. Defendant Rothbert is the VP Finance & Global Controller of Motorsport Network. Motorsport Network was the sole shareholder of Motorsport until the IPO of Motorsport stock on January 13, 2021 and continues to own a controlling interest in Motorsport.

## FACTUAL ALLEGATIONS

### THE PARTIES' INITIAL INVESTMENTS IN THE COMPANY

52.   42. HC2 made its initial investment in NASCAR games in 2014, when HC2 formed its subsidiary, DMi, Inc., which subsequently acquired certain exclusive rights to build a NASCAR games business. At the time of HC2's initial investment, Blake Davidson, NASCAR Vice President of Licensing and Consumer Products, publicly announced that "[w]e share a strategic vision with [HC2 subsidiary] DMi to broaden NASCAR Interactive Entertainment and deliver a first-class gaming experience to our fans, who are deeply passionate about NASCAR games". As noted in HC2's annual report for the fiscal year ended December 31, 2015, HC2 paid $6.0 million to acquire the DMi, Inc. business.

53.   On April 11, 2016, Leo acquired its minority position in DMi, Inc for an initial investment of $1.0M.

54.   PlayFast Games, LLC ("PlayFast"), an investment vehicle formed by a group of NASCAR insiders including Brooks, the former President of NASCAR Media Group and former Senior Vice President of NASCAR, NASCAR driver and 2015 Daytona 500 Champion Joey Logano, and 2012 NASCAR Sprint Cup Series Champion Brad Keselowski, acquired a minority position simultaneously with Leo. Leo and PlayFast were strategic partners in making the 2016 investment.

55.   43. Over time and a series of investments, HC2's initial investment developed into the Company today, 704Games. On April 11, 2016, PlayFast Games, LLC ("PlayFast") and Leo Capital Holdings, LLC ("Leo"), acquired minority positions in DMi, Inc. In 2017, the Company completed its transition from DMi, Inc. into 704Games when Paul Brooks ("Brooks"),

the lead investor from PlayFast, took over the CEO position from founding CEO Tom Dusenberry and the Company changed its name.

56.    44. The Company is a developer and publisher of video games for a large and growing variety of platforms, including the PlayStation 4 and Xbox One game consoles, Windows PCs, and mobile phones. It holds the exclusive license to be the official video game developer and publisher for the NASCAR video game racing franchise. To date, the Company has sold well over a million copies of its NASCAR video games for game consoles and PCs. The products offered by the Company also include NASCAR Heat Mobile for iOS and Android, which has had approximately five million installs to date, and the Company is developing two additional NASCAR games for mobile devices with projected release dates in 2021. In addition, the Company holds the exclusive right to create and organize e-sports leagues and events for NASCAR using the Company's NASCAR racing video games, subject to certain limited exceptions.

57.    45. At the time the Company completed its transition from DMi, Inc. to 704Games, the Company's board of directors approved a fair market valuation of the Company's shares of $88.76 per share, based on an analysis provided by an independent third-party valuation firm. In August 2017, HC2 and Leo extended a $1.4 million term loan to fund the Company's operations, based on the Company's promising results and bright prospects.

58.    46. As early as May 2018, Zoi and Motorsport Network met with then-CEO of 704Games, Paul Brooks, regarding potential collaboration with and investment in the Company. Zoi wanted Motorsport to have a controlling stake in the Company from the first meeting.

59.    47. In August 2018, Motorsport was formed as a holding company and purchased a controlling interest consisting of 217,352 shares of the Company's common stock at a price of

$50.61 per share. At the time of the Motorsport acquisition, the Company's board of directors determined that the fair market value of the Company was $50.61 per share.

60. 48. Motorsport's acquisition made Motorsport the controlling stockholder of the Company, leaving HC2 with 54,807 shares of common stock and, Continental with 51,500 shares of common stock, and Leo with 10,301 shares of common stock. After the 2018 transaction, Motorsport owned approximately 53.5% of the Company's common stock, while HC2 owned approximately 13.5% and, Continental owned approximately 12.7%, and Leo owned approximately 3.0%.

### DEFENDANTS' DUTIES TO PLAINTIFFS

61. 49. In connection with Motorsport's acquisition of approximately 53.5% of the Company's shares, on August 14, 2018, Motorsport and the minority stockholders of the Company (including HC2 and, Continental, and Leo) entered into the Stockholders' Agreement, which specified certain rights of the Stockholders vis-à-vis the Company and each other.

62. 50. Pursuant to Section 7.1 of the Stockholders' Agreement, the Company, as controlled by Defendants, was obligated to provide Plaintiffs and the other minority stockholders with quarterly unaudited and annual audited financial statements of the Company on a timely basis. All such financial statements were required to be prepared in accordance with generally accepted accounting practices (GAAP).

63. 51. At all times from August 2018 through the present, Plaintiffsdate of the SPA, HC2, Continental, and Defendants understood that Plaintiff Continental would communicate and receive information about the Company via Plaintiff HC2. Defendants did not communicate directly with Plaintiff Continental, but at all times understood that any representations that

Defendants made to HC2 were equally made to Continental. Further, all such representations were received and relied upon by Continental.

64.  52.  As controlling majority stockholder of the Company, Motorsport and its agents owed fiduciary duties to the Company and its minority stockholders, including duties of care, loyalty, and disclosure.

**DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS**

**Defendants Asserted Control and Improperly Excluded Minority Stockholders**

65.  53.  Defendants systematically removed representatives of the minority stockholders from positions of influence with the Company and failed to provide information and financial reporting to the minority stockholders as required by the Stockholders' Agreement.

66.  54.  On January 1, 2019, Motorsport requested that then-CEO Paul Brooks step down from his position as CEO of the Company. Motorsport made this request unilaterally and without consulting the Company's Board of Directors, which included Wayne Barr, Jr. ("Mr. Barr"), a director of HC2's corporate parent, HC2 Holdings, Inc. ("HC2 Holdings"), and current CEO of HC2 Holdings, as a legacy board member and representative of Plaintiff HC2. Leo, which held the right to observe the actions of the Board of Directors, learned of the request via a January 3, 2019 email from Brooks to members and observers of the Board of Directors.

67.  55.  From January 2019 forward, Defendants operated as if they owned 704Games in full, largely ignoring the rights of legacy board members to be apprised of decisions and approve changes to agreements.

68.  56.  Also beginning in January 2019, Kozko instructed 704Games employees that all major decisions should be approved by representatives of Defendants.

69.  57.  Throughout 2019 and the first half of 2020, Plaintiffs HC2 and Continental (via its representatives at HC2) repeatedly requested to be informed of board actions, provided

with financial reporting, and generally informed of the status of the Company per the terms of the Stockholders' Agreement.

70.   58.   Despite Plaintiffs HC2 and Continental making numerous requests to multiple representatives of the Company and Defendants over several months, Defendants never delivered audited financial results for 2019. Defendants also failed to deliver regular quarterly financial reports prepared in accordance with GAAP.

71.   59.   In response to Plaintiffs HC2 and Continental's requests, Defendants represented to Plaintiffs HC2 and Continental that financial results—audited or otherwise—were unavailable and that Defendants would provide results to Plaintiffs as and when they were completed.

72.   60.   Defendants delayed providing results between November 2019 and June 2020. On June 4, 2020, when Defendants did finally provide limited summary financial results for 2019 and the first quarter of 2020 to HC2 and Continental, those statements were not detailed financial statements prepared in accordance with US GAAP and did not satisfy Defendants' obligations to disclose financial information.

73.   Defendants never provided Leo with audited 2019 financial results or any financial information for 2020, other than summary slides in presentations to the Board of Directors.

**Defendants Set the Stage at the Company's November 2019 Board of Directors Meeting**

74.   61.   On November 12, 2019, the Company held a special meeting of its Board of Directors, of which HC2 Holdings director Wayne Mr. Barr, Jr. was a member, via Zoom telephone/video conference. Defendant Kozko chaired the meeting and HC2 employee AJ Stahl ("Mr. Stahl") attended the meeting on behalf of Plaintiff HC2 as a minority stockholder with observer rights under the Stockholders' Agreement.

75. 62. At that meeting, the financial review of the Company indicated a $5 million reduction in revenue from the prior forecast and a reduction in EBITDA (earnings before interest, taxes, depreciation and amortization, a common measure of cash flow) from a projected $1.3 million to *negative $1.6 million*—portraying the Company as a money-losing entity that was likely to require additional capital infusions from its investors with little hope of near-term profitability.

76. Leo was informed of the November 12, 2019 meeting as a minority stockholder with observer rights under the Stockholders' Agreement but was unable to attend. Leo received a copy of the presentation used at that meeting on November 11, 2019, which included the same information regarding the reduction in EBITDA and projected negative financial outlook.

77. 63. Defendants' dire predictions forassessment of the Company werewas a significant departure from prior expectations for a company whose shares Motorsport had acquired for $50.61 per share just two years earlier. Defendants' reports and projections portrayed the Company as a weak enterprise whose fair market value had suffered during Motorsport's tenure as controlling majority stockholder.

78. 64. In fact, upon information and belief,the facts alleged support an inference that Defendants believed that the Company's results were promising and would yield an attractive valuation in an IPO. This belief culminated in the execution of a January 1, 2020 employment agreement between Motorsport and Kozko (the "Kozko Employment Agreement"), a copy of which is attached hereto as Exhibit 35, targeting a Company valuation of at least $100 million, ranging all the way up to beyond $1 billion.

**Defendants' 2020 Company Budget Falsely Indicated Millions in 2020 EBITDA Losses**

79. 65. On December 26, 2019, Defendant Kozko emailed a spreadsheet purporting to be the 2020 Consolidated Budget for 704Games to Mr. Stahl. A copy of that document (the "2020 Consolidated Budget") is attached hereto as Exhibit 4, as representative of HC2 and Continental.

80. 66. In the 2020 Consolidated Budget, Defendants estimated that in 2020 the Company would generate an EBITDA loss of over $3,094,400 for the year.

81. 67. After providing the 2020 Consolidated Budget to Mr. Stahl, Defendant Kozko then initiated a Zoom conference with Mr. Stahl in which they discussed the 2020 Consolidated Budget, including the projected losses, the reasons for lower sales and high expenses, and the potential necessity for additional investment in the Company.

82. 68. Upon information and belief, Based on the facts alleged, Plaintiffs believe that the 2020 Consolidated Budget prepared and provided by Defendants was not accurate and included material misstatements and omissions, including, in particular, Defendants' estimate that the Company would generate an EBITDA loss in 2020.

83. 69. In fact, in connection with the Company IPO, Motorsport reported positive EBITDA in the millions for 2020 in connection with the IPO the first 9 months of 2020. As Motorsport's financials are based almost entirely on the Company's revenues, it follows that the Company also saw a record increase in EBITDA.

84. 70. Upon information and belief, It is fair to infer that the 2020 Consolidated Budget was not merely a poor prediction but was a material misstatement of Defendants' true knowledge and expectations concerning the Company's performance in 2020—which significantly altered the total mix of information made available to Plaintiffs in deciding to sell

their shares. Plaintiffs have formed this belief because, immediately after providing the misleading 2020 Consolidated Budget to ~~Plaintiffs~~HC2 and Continental, Motorsport entered into the Kozko Employment Agreement—the effective date of which was contemporaneous with the Defendants' representations to minority investors that the Company was *losing* over $3 million per year. The Kozko Employment Agreement provided for incentive compensation to Kozko in the event of an IPO that valued Motorsport at "at least One Hundred Million ($100,000,000)" and contained additional equity awards for Kozko starting at a market capitalization of $150 million, ranging all the way up to a valuation of $1 billion—metrics that are irreconcilable with Defendants' inaccurate portrayal of the Company at the Company's November 2019 Board of Directors meeting and in the 2020 Consolidated Budget. Ex. 4̶5 § 5.3(a)–(b). ~~Upon information and belief,~~Based on the facts alleged, Plaintiffs believe that Motorsport and Kozko based the metrics in the Kozko Employment Agreement upon their true knowledge of the value of Motorsport—which derived nearly all of its value from the Company. On January 12, 2021, Motorsport awarded Kozko (i) 20,333 shares of the Company's Class A common stock and (ii) stock options to purchase 203,333 restricted shares of Motorsport's Class A common stock at an exercise price of $20.00 per share pursuant to the Kozko Employment Agreement. On March 26, 2021, the board of directors of Motorsport approved a $300,000 annual bonus to Kozko, for his performance in 2020.

**Defendants Fail to Disclose Their Expectation That an IPO Would Yield a Company Valuation of Over $100 Million**

85. ~~71.~~ On January 1, 2020, immediately after the November 12, 2019 Board meeting and the December 26, 2019 Consolidated Budget, Motorsport and Kozko agreed to the lucrative new Kozko Employment Agreement, which targeted a ~~Company~~ value for Motorsport of at least

$100 million in an IPO or other valuation event, and rewarded Kozko with additional compensation at value increments all the way up to $1 billion.

86.     As of January 1, 2020 and through the IPO, Motorsport's only material asset was its majority ownership of the Company. In the Motorsport Prospectus filed in connection with the IPO, Motorsport disclosed that "revenues associated with the NASCAR Heat franchise accounted for approximately 99% of our total net revenue for the years ended December 31, 2019 and 2018 and the nine months ended September 30, 2020, and we expect this franchise to continue to account for the majority of our revenue for the year ended December 31, 2020. In the future, we expect this trend to continue with a relatively limited number of franchises producing a disproportionately high percentage of our revenues and profits."

87.     72.  Given that the Company accounted for 99% of Motorsport's revenues, Defendants' valuation targets for Motorsport were based on their valuation of 704Games. Defendants failed to disclose the existence of the new Kozko Employment Agreement, or its valuation targets, to Plaintiffs—a critical omission of important information that further altered the total mix of information made available to Plaintiffs in deciding to sell their shares. Plaintiffs first learned of the valuation terms of the Kozko Employment Agreement *after* selling their shares, when Motorsport attached the text of the Kozko Employment Agreement to public SEC filings.

88.     Defendants had a duty to disclose the terms of the Kozko Employment Agreement, including its valuation targets, to Plaintiffs prior to acquiring Plaintiffs' respective stakes in the Company because the value of Motorsport was based virtually entirely on Defendants' valuation of the Company.

89.   ~~73.~~ Other contemporaneous evidence also shows that Defendants intended, throughout 2020, to engage in a highly lucrative IPO. One of the exhibits to the Motorsport~~'s prospectus~~ Prospectus is a curiously backdated employment agreement between Motorsport and Defendant New as CFO, which states that it is "dated October 19, 2020, but effective as of January 3, 2020", and claims that the letter "is confirming the offer extended to you prior to [January 3, 2020]" (the "New Employment Agreement"). The New Employment Agreement provides that New would be rewarded with a $150,000 bonus if Motorsport "consummates and closes the initial public offering of its securities". The New Employment Agreement, along with New's prior experience in taking former employer UniCapital through the IPO process, suggests that New was hired specifically to implement a lucrative IPO.

90.   ~~74.~~ Defendants did not disclose the terms of the New Employment Agreement, including the IPO bonus provisions, to Plaintiffs prior to acquiring Plaintiffs' stake in the Company.

91.   Defendants had a duty to disclose to Plaintiffs the terms of the New Employment Agreement, including its IPO bonus provisions, to Plaintiffs prior to acquiring Plaintiffs' respective stakes in the Company because the value of Motorsport was based virtually entirely on Defendants' valuation of the Company.

**In Spring 2020, Defendants Secure a $10 Million Line of Credit from Motorsport's Parent Company to Fund Acquisitions**

92.   ~~75. Despite~~ While portraying the Company as a money-losing entity to Plaintiffs, in early 2020 Defendants secretly lined up financing to fund additional acquisition activity.

93.   ~~76.~~ On April 1, 2020, Motorsport entered into a promissory note with Motorsport's parent, Motorsport Network, providing for a $10 million line of credit, payable on

demand, to fund "working capital, operations, acquisitions, investments or any other purposes of [Motorsport]" (the "April 2020 Note").

94.   ~~77. Upon information and belief, the~~The April 2020 Note was made available, and intended, to fund the acquisition of minority investors' holdings in the Company. According to the Motorsport Prospectus, "The principal amount under the Promissory Note was primarily funded through one or more advances from Motorsport Network, including an advance in August 2020 *for purposes of acquiring an additional ownership interest in 704Games*" (emphasis added).

95.   The April 2020 Note also provided Motorsport Network with a way to immediately profit off Motorsport's IPO by calling in the April 2020 Note, which would be immediately due and payable on demand, and deeming pre-IPO investments to be "Advances" under the note.

96.   ~~78. Upon information and belief,~~It is fair to infer that the $10 million face value of the April 2020 Note —which was explicitly given for the purpose of acquiring additional ownership interest in the Company—reflects Defendants' expectation that it would cost substantially more per share to acquire Company stock from its minority investors than the $1.2 million Motorsport ultimately paid for Plaintiffs' shares.

97.   ~~79.~~Defendants did not disclose the April 2020 Note, or the fact that they had secured a $10 million line of credit to fund investments and acquisitions, to Plaintiffs—yet another omission of important information altering the total mix of information made available to Plaintiffs in deciding to sell their shares. Plaintiffs learned of the April 2020 Note through public SEC filings in connection with the Motorsport IPO.

**Defendants' 2019 Quarterly Financials for the Company Showed Massive Increases in EBITDA Losses**

98. ~~80.~~ On June 4, 2020, after numerous requests for updated financial information from Plaintiffs, Michelle Baker Dillon of 704Games finally provided a spreadsheet purporting to show the 2019 Quarterly Financials for 704Games to Mr. Stahl. ~~A copy of that spreadsheet (the "2019 Quarterly Financials") is attached hereto as Exhibit 5~~, as representative of HC2 and Continental.

99. ~~81.~~ The 2019 Quarterly Financials show quarterly results for the Company in 2018 and 2019 and the variance year over year. These figures indicated that EBITDA losses increased by 684% in 2019 as compared to such losses in 2018 (from $512,500 in 2018 to $3,233,800 in 2019).

100. ~~82.~~ The 2019 Quarterly Financials do not conform to GAAP and did not satisfy Defendants' disclosure obligations because they are simply overview EBITDA calculations, which are non-GAAP accounting measures, and do not include reconciliations showing net earnings according to GAAP.

101. ~~83.~~ Mr. Stahl and Ms. Baker Dillon thereafter discussed the contents of the 2019 Quarterly Financials. Mr. Stahl reiterated Plaintiffs' rights to audited financial results prepared in accordance with the requirements of GAAP and asked when those would be provided. Ms. Baker Dillon could not provide an answer as to when audited GAAP financials for 2019 would be available.

**Defendants' Presentation at the Company's 2020 Board of Directors Meeting Falsely Indicated a Multimillion-Dollar Cash Shortfall Even If the Company Achieved All Goals**

102. ~~84.~~ Also on June 4, 2020, Amanda LeCheminant, VP and Deputy General Counsel of Motorsport Network, sent an email to the directors and stockholders of 704Games, including Plaintiffs, attaching a Meeting Agenda and Presentation for the Company board

meeting set to take place on June 5, 2020. A copy of the presentation (the "June 2020 BOD Presentation") is attached hereto as Exhibit 6. Ms. LeCheminant also attached the minutes of the November 12, 2019 meeting of the 704Games Board of Directors for approval.

103.   85. The June 2020 BOD Presentation included a slide entitled "CEO Remarks" from Kozko on page 3, including the estimation claiming that there was "bad community sentiment" about the Company's imminently forthcoming video game, NASCAR Heat 5, that the game's "pre-sales are struggling", and estimating that the Company would "***run out of money next year*** around launch [of a new product], ***even if we hit our current projections***" (emphasis added).

104.   The discussion of "NASCAR HEAT 5 Pre Orders" on page 6 of the June 2020 BOD Presentation noted that, as of the preceding week, such pre orders were "-27% behind [the game's predecessor, NASCAR Heat 4] with 6 weeks to launch" and included a graph showing NASCAR Heat 5's pre orders trailing pre orders of NASCAR Heat 4 and NASCAR Heat 2 for the entire period from eleven weeks before their respective release dates through six weeks before those dates.

105.   86. The 2019 Financials reflected on page 13 of the June 2020 BOD Presentation indicated that the Company ran a deficit of EBITDA of $3,234,000 in 2019, dramatically worse than in 2018, and noted that "Expenses [are] almost flat, EBITDA drop is primarily due to Console Revenue."

106.   87. The Q1-20 Financials reflected on page 14 of the June 2020 BOD Presentation indicated that EBITDA was positive for that quarter, due in part to the "quarantine impact in March", but noted a decrease in mobile revenue with the explanation "Mobile game content needs a refresh" and that a number of expenses had been cut in the first quarter of 2020,

including dramatic decreases in the categories of "Development Costs,", "Sales & Marketing,", and "T&E".

107.  88. The 2021 Monthly Forecast on page 16 of the June 2020 BOD Presentation indicated that, even assuming all product launches and sales targets were accomplished, the Company would hit a major cash shortfall in July 2021.

108.  89. The Cash Shortfall Projections on pagePage 17 of the June 2020 BOD Presentation, titled "CASH SHORTFALL PROJECTIONS", indicated that, even with no delays, there would be a cash shortfall of $1,190,000. In a high impact scenarioscenarios, including risks such as "[m]iss[ing] sales targets" because "states will have exited stay at home orders" or "GameStop hesitant to place orders while stores are still closed/limited", the cash shortfall estimate was $4,705,000.

109.  90. At the meeting of the Board of Directors on June 5, 2020, which Mr. Barr and Mr. Stahl attended on behalf of HC2 and Continental, Defendants reiterated that there would likely be a capital call in the near future because of the predicted cash shortfall. Defendants continued to project a pessimistic view of the prospects of the Company.

110.  Leo was informed of the June 5, 2020 meeting as a minority stockholder with observer rights under the Stockholders' Agreement but was unable to attend. Leo received a copy of the June 2020 BOD Presentation used at that meeting, including the content described in Paragraphs 103 through 108 above.

111.  91. Upon information and belief,Based on the facts alleged, Plaintiffs believe that the June 2020 BOD Presentation was not accurate and included material misstatements and omissions of material facts regarding the financial condition of the Company and the prospects for the finances of the Company going forward, including, in particular, the repeated indications

of a cash shortfall even if the Company achieved all of the goals set forth in the June 2020 BOD Presentation. This misrepresentation, like Defendants' other misrepresentations and omissions alleged herein, concerned important information and altered the total mix of information made available to Plaintiffs in deciding to sell their shares.

112. 92. Plaintiffs have formed this belief about the June 2020 BOD Presentation based on the Company's actual reported 2020 performance, the success of the IPO, and the Kozko Employment Agreement, all of which are inconsistent and irreconcilable with Defendants' dire portrayal of the Company in the June 2020 BOD Presentation.

**Defendants Placed Pressure on Plaintiffs to Agree to a Sale by Demanding Cash or Equity to Cure an Alleged Financial Misstatement**

113. 93. On June 11, 2020, Defendant New, the CFO and principal financial and accounting officer of Motorsport, sent an email to the stockholders of 704Games, including Plaintiffs, identifying an alleged revenue overstatement for 2018 of $1.1 million and requesting that the other stockholders either (1) consent to Motorsport Network (Motorsport's parent company) withdrawing $1.1 million from the Company's accounts or (2) contribute 15% additional equity to Motorsport pursuant to the August 2018 Stock Purchase Agreement by which Motorsport had acquired its interest in the Company. New provided only five days for Plaintiffs to respond.

114. 94. On June 15, 2020, AJMr. Stahl replied, disputing that any money or equity was owed to Motorsport or its parent company.

115. 95. On June 18, 2020, Mr. New replied to Mr. Stahl's email and requested a phone call.

116. 96. Defendants also failed to disclose that, via the April 2020 Note, Motorsport Network had recently agreed to extend **additional** credit to Motorsport, rather than require the cash payment suggested by New.

117. 97. Defendants' sudden assertion in June 2020 that revenue had been overstated was self-serving and highly aggressive, especially in light of the fact that ***Defendants themselves*** controlled the accounting for the Company and had never raised any problem with the 2018 financials prior to summer 2020.

118. 98. Defendants' extortionate demand highlighted Defendants' failure to disclose material information to Plaintiffs. In response to New's demand, Mr. Stahl specifically requested "backup and cites to GAAP supporting a restatement of financials" and noted that "in Section 7.1 of the Investor Rights Agreement, the company is currently in breach in that it has failed to provide [audited financial statements] for 2019. As such, we request an update to the timing of AFS for 2019." Defendants never provided sufficient information supporting their demand, in violation of (a) Defendants' fiduciary obligation to disclose all material facts to minority stockholders, and (b) the Company's contractual obligation, under Defendants' management, to provide audited financial statements.

119. 99. Upon information and belief, New's representation that a revenue overstatement necessitated consent from Plaintiffs to Motorsport Network withdrawing $1.1 million from the Company's accounts or Plaintiffs to contribute additional equity to Motorsport constituted material misstatements and entailed omissions of material facts regarding the financial conditions of the Company, as no such consent or contribution was required.

120. 100. Upon information and belief, It is fair to infer that Defendants' demand for additional cash or equity was designed to—and did—place pressure on Plaintiffs to sell their

shares to Motorsport. The pressure was intensified by the fact that, as the controlling majority stockholder of the Company, Motorsport had control over the information provided to Plaintiffs and had the power to hold Plaintiffs' investment hostage if Plaintiffs did not agree to Defendants' demands.

121. ~~101.~~ Plaintiffs have formed these beliefs about Defendants' demand for additional cash or equity based on the Company's actual reported 2020 performance, the success of the IPO, and the Kozko Employment Agreement, all of which are utterly inconsistent and irreconcilable with Defendants' inaccurate portrayal of the Company in the June 2020 BOD Presentation.

122. ~~102.~~ Moreover, as shown by the New Employment Agreement, New had been hired specifically in anticipation of preparing the Company for a profitable IPO and stood to gain a windfall upon the consummation of such an IPO (~~and~~plus an additional bonus at Kozko's discretion), giving New a financial motive to acquire Plaintiffs' shares to maximize Defendants' ownership of the Company and prospect of IPO profits based on the Company, as Motorsport's only significant asset.

**Defendants Falsely Claimed that the Company Would Soon Require a Capital Call**

123. ~~103.~~ As early as December 26, 2019, Kozko ~~indicated~~informed Mr. Stahl, as representative of HC2 and Continental, that the Company would likely require additional investment in order to succeed.

124. ~~104.~~ At the June 5, 2020 Board of Directors meeting, Defendants, including at least Kozko for himself and on behalf of Motorsport, indicated to ~~Plaintiffs~~HC2 and Continental that the Company was facing a cash shortfall and that a capital call was likely. The same

information was reflected on page 16 of the written materials circulated to all Plaintiffs on June 4, 2020.

125. 105. On June 23, 2020, AJMr. Stahl had another call with Zoi and New. On that call, Zoi and New indicated to Mr. Stahl that there would be a capital call in the near future, and that PlaintiffsHC2 and Continental, as the largest of the Company's minority stockholders, should be aware of this. They also suggested to Mr. Stahl that if PlaintiffsHC2 and Continental were not going to participate in a capital call, perhaps Motorsport should acquire Plaintiffs'their interest in the Company.

126. 106. On June 23, 2020, after their phone call, Zoi sought to capitalize on the pressure on PlaintiffsHC2 and Continental by sending a formal offer letter to AJMr. Stahl. The offer letter again indicated that a capital call would occur in the near-term and suggested that PlaintiffsHC2 and Continental should sell their interests in the Company to Motorsport in lieu of making a capital contribution. A copy of that letter is attached hereto as Exhibit 76.

127. 107. Upon information and belief,Based on the facts alleged, Plaintiffs believe that Defendants' representations about the need for additional investment by Plaintiffs, including, in particular, New's representation that there would be a capital call for the Company in the near future, were not accurate and were material misstatements regarding the financial conditions of the Company and the prospects for the finances of the Company going forward, and no such capital call was required or occurred. The New Employment Agreement's financial incentives upon the consummation of an IPO shows that, contrary to anticipating a cash shortfall and capital call, New had every reason to expect an imminent IPO, and no need for a capital call.

128. 108. Plaintiffs have formed this belief about these representations, and in particular this representation by New, based on the absence of such a capital call, the

~~Company~~Motorsport's ~~actual~~ reported 2020 performance of $19 million in revenue, which New publicly stated was "primarily due to the release of NASCAR Heat 5 in July of 2020 which saw sales surpassing the release of NASCAR Heat 4 in 2019", the success of the IPO, the Kozko Employment Agreement, the New Employment Agreement, and the April 2020 Note extending in which Motorsport Network extended additional credit to Motorsport, all of which are utterly inconsistent and irreconcilable with the Company requiring a capital call after June 23, 2020.

129.   ~~109.~~Moreover, the timing of Motorsport's proposal to acquire ~~Plaintiffs'~~HC2 and Continental's respective shares, when coupled with Defendants' misleading portrayal of the Company as a financial disaster, and with Motorsport's sudden extortionate demands for additional cash or equity, strongly suggest that Defendants' pressure campaign was designed to induce ~~Plaintiffs~~HC2 and Continental to sell their Company stock at a low valuation.

**Defendants Continue to Conceal Material Information and Opportunities from Plaintiffs**

130.   ~~110.~~In the midst of negotiations to acquire Plaintiffs' stock at a bargain basement valuation, all Defendants continued to conceal the true prospects of the Company, prepare for a lucrative IPO, and ~~diverted~~divert corporate opportunities to their own benefit.

131.   On July 7, 2020, a full six weeks before Motorsport acquired HC2 and Continental's respective shares, and four months before Motorsport acquired Leo's shares, the Company released NASCAR Heat 5 Gold Edition, followed shortly by the standard edition release of NASCAR Heat 5 on July 10, 2020.

132.   Demand and sales of NASCAR Heat 5 significantly exceeded sales of the Company's prior NASCAR Heat games. Despite knowing that the Company therefore would be in a much better financial position than the June 2020 BOD Presentation had indicated (with its portrayal of NASCAR Heat 5 as "struggling" with pre orders and having "bad community

sentiment"), Defendants did not share this good news with Plaintiffs, who at that time still owned nearly 30% of the Company and to whom Motorsport owed fiduciary duties as the controlling majority stockholder.  Instead, Defendants did not disclose any updated information about the pre-orders or sales of NASCAR Heat 5—which information materially altered the financial condition and fair market value of the Company, and which they had a duty to disclose—to Plaintiffs prior to acquiring Plaintiffs' stock in the Company.

133.  111.  On July 20, 2020, less than one month before Motorsport acquired Plaintiffs' HC2 and Continental's respective shares, and before Motorsport even offered to acquire Leo's shares, Motorsport entered into a confidential Promotional Services Agreement with Fernando Alonso Diaz, a prominent Formula One racecar driver (the "Alonso Agreement").

134.  The Alonso Agreement provided that Alonso would "promote the Company and its affiliated entities", which included 704Games—Motorsport's only material subsidiary affiliate.

135.  112.  The Alonso Agreement provided that Alonso would not provide services until Motorsport had consummated an IPO, and that Alonso's compensation would take the form of a grant of "3% of the Company's issued and outstanding Class A Stock as of the effective date of the IPO".

136.  113.  By entering into the Alonso Agreement, Defendants both (a) commandeered a business opportunity belonging to the Company for their own benefit, and (b) ensured that Plaintiffs would not realize any benefit from the Alonso relationship prior to, or as a part of, their stock sale to Motorsport.

137.  114.  Defendants did not disclose the Alonso Agreement to Plaintiffs prior to acquiring Plaintiffs' stock. In fact, the Alonso Agreement contained a strict confidentiality

provision providing for legal remedies against Alonso if he were to disclose the existence of the Alonso Agreement to any person without Motorsport's written consent.

138.    Section 4.1 of the Stockholders' Agreement bound Motorsport to a covenant not to compete.  Although that covenant is subject to certain definitions and limitations, nothing in it allowed Motorsport to pursue the Alonso Agreement to the detriment of the Company, and nothing in the Stockholders' Agreement excuses Motorsport from the obligation to disclose a self-interested transaction.

139.    115. The existence of the Alonso Agreement—a high-profile promotional agreement with a world-famous racecar driver to promote Motorsport and the Company—was squarely contrary to the image of a struggling Company that Defendants were portraying to Plaintiffs, and knowledge of the Alonso Agreement would have been material to Plaintiffs' decision whether to sell their stock at the price paid by Motorsport.

140.    116. Upon information and beliefIt is fair to infer that, concurrent with Motorsport's negotiations to acquire Plaintiffs' stock in the Company, Motorsport was also in the process of obtaining the exclusive licenses to develop multi-platform games for Automobile Club de l'Ouest, including games based on the FIA World Endurance Championship and the 24 Hours of Le Mans.

141.    117. On January 25, 2021, Motorsport did, in fact, enter into an Amendment of its existing Le Mans Esports Series Ltd. Joint Venture Agreement with Automobile Club de l'Ouest and a series of related license agreements, which together enable Motorsport to develop games related to, themed as, or containing the FIA World Endurance Championship and the 24 Hours of Le Mans (together, the "Le Mans Agreements").

142.   118. Upon information and belief, theThe original Le Mans Esports Series Ltd. Joint Venture Agreement with Automobile Club de l'Ouest included only an agreement to facilitate the Le Mans Esports Series and not the rights to develop video games related to Le Mans.

143.   119. The Le Mans Agreements are for development of racing video games. Based on publicly available information, Plaintiffs believe that, as of the date of the Le Mans Agreements, Motorsport hashad no assets or relationships that relaterelated to video game development other than its ownership of 704Games.

144.   120.   By entering into the Le Mans Agreements, Defendants both (a) commandeered a business opportunity belonging to the Company for their own benefit, and (b) ensured that Plaintiffs would not realize any benefit from the Automobile Club de l'Ouest relationship prior to, or as a part of, their stock sale to Motorsport.

145.   121. Defendants did not disclose to Plaintiffs that Defendants were pursuing the Le Mans Agreements prior to acquiring Plaintiffs' stock.

146.   Nothing in Motorsport's covenant not to compete in Section 4.1 of the Stockholders' Agreement allowed Motorsport to pursue the Le Mans Agreement to the detriment of the Company, and nothing in the Stockholders' Agreement excuses Motorsport from the obligation to disclose a self-interested transaction.

147.   122. Defendants' pursuit of the Le Mans Agreements—an agreement to develop games related to two world-famous race events that would open up significant new revenue opportunities and new markets for Motorsport and the Company—was squarely contrary to the image of a struggling Company that Defendants were portraying to Plaintiffs, and knowledge of

negotiations for the Le Mans Agreements would have been material to Plaintiffs' decision whether to sell their stock at the price paid by Motorsport.

### DEFENDANTS MADE THEIR MATERIAL MISREPRESENTATIONS AND OMISSIONS ABOUT THE COMPANY WITH SCIENTER

148. ~~123.~~ Contemporaneous documents and subsequent events indicate that Defendants made the material misstatements and omissions alleged above with the intent to deceive, manipulate, and defraud Plaintiffs, and are inconsistent with any plausible innocent explanation for Defendants' actions.

149. ~~124. Upon information and belief,~~ It is fair to infer that Defendants knowingly and intentionally (or at the very least recklessly) made the material misrepresentations and omissions alleged above in connection with the Company's November 2019 Board of Directors Meeting, the Company's 2020 Consolidated Budget, the Company's 2019 Quarterly Financials, and Defendants' June 2020 BOD Presentation, and, through Defendants Zoi, Kozko, and New, made the statements alleged above concerning the need for additional investment by Plaintiffs, a revenue overstatement, and a looming capital call for the Company, to induce Plaintiffs to sell their ownership interests in the Company to Motorsport for what Defendants knew to be a fraction of their fair market value.

150. ~~125.~~ Contrary to Defendants' repeated misrepresentations that the Company would only be modestly profitable in 2020 and was in dire financial straits, ~~in fact~~ that would require significant additional capital in the near-term, the timeline of the Motorsport IPO indicates that Defendants were, ~~upon information and belief,~~ already planning a public offering or other liquidity event for Motorsport, based on the value of the Company as its only significant asset, at a much higher valuation.

151.    Defendants filed their first draft prospectus with the SEC on September 8, 2020, only 3 weeks after they purchased HC2 and Continental's stock in the Company, and prior to acquiring Leo's stock in the Company. It is fair to infer that Defendants had been preparing the draft prospectus and making other preparations for the IPO for weeks, if not months, prior to their initial SEC filing.

152.    126. Defendants selectively disclosed to PlaintiffsHC2 and Continental that they wanted to pursue a liquidity event or initial public offering of the parent company. Plaintiffs understood this to mean thatBased on Defendants' representations that the Company was Motorsport's only significant asset and Defendants' representations regarding the poor financial condition of the Company, HC2 and Continental believed that such a liquidity event could not be successful unless Defendants planned a liquidity event for Motorsport Network, the parent company of Motorsport, or for Motorsport after contribution of significant additional assets by Motorsport Network.

153.    In making their self-serving and selective disclosure, Defendants concealed that the transaction would be based almost exclusively on the value of 704Games, and that the Company had significantly better prospects than indicated to Plaintiffs. They similarly failed to disclose any facts regarding the timeline for such a liquidity event or the anticipated value of that event.

154.    Despite having already filed a confidential proposed prospectus with the SEC on September 8, 2020, Defendants included only a *pro forma* reference to a planned liquidity event in the Leo SPA, omitting material details about the nature and timing of the IPO. In particular, Defendants failed to disclose that the planned IPO was already in process and that the valuation of Motorsport would be based almost entirely on the value of the Company, Motorsport's only

material asset. Leo only learned the specifics of the IPO after the closing of the Leo SPA, when the related SEC filings were made public.

155. 127. As alleged above, the Kozko Employment Agreement was contemporaneous with Defendants' provision of their misleading 2020 Consolidated Budget to PlaintiffsHC2 and Continental, preceded Defendants' other material misstatements and omissions alleged above, and may even have been negotiated prior to or contemporaneously with Defendants' misleading financial review of the Company at the Company's November 2019 Board of Directors meeting.

156. 128. The Kozko Employment Agreement's contemplation of an IPO valuing Motorsport at "at least One Hundred Million ($100,000,000)", and potentially over $1 billion, Ex. 45 § 5.3(a)–(b), cannot be reconciled with Defendants' portrayal of the Company in 2020 as losing millions of dollars and being in imminent danger of running out of money.

157. 129. Similarly, the New Employment Agreement states that its terms, and the specific financial incentives for a successful IPO, were discussed with New prior to his January 3, 2020 employment start date. New's pressure campaign, his contentions that the Company required a capital call, and his demands for immediate agreements to transfer cash or equity to Motorsport Network, all occurred at the same time that New **knew for a certainty** that he would be rewarded for a successful IPO.

158. 130. Defendants' actions in the weeks and months following their fraudulently induced purchase of Plaintiffs' ownership interests in the Company are equally impossible to reconcile with their dire portrayal of the Company's financial status to Plaintiffs. On September 48, 2020—mere weeks after acquiring Plaintiffs'HC2's and Continental's shares in the Company and while negotiating the acquisition of Leo's shares—Motorsport had already filed a confidential draft prospectus with the SEC for the IPO.

159. 131. Upon information and beliefBased on Motorsport's public disclosures, on January 8, 2021, Motorsport converted from a Florida limited liability company to a Delaware corporation pursuant to a statutory conversion in preparation for the IPO. As a result of the corporate conversion, Motorsport Network became the sole holder of the Class A common stock and Class B common stock of Motorsport Games Inc.

160. 132. On January 13, 2021, Motorsport filed an updated prospectusthe Motorsport Prospectus with the SEC pursuant to Rule 424(b)(4) under the Securities Act of 1933 (the "Securities Act"), codified at 17 C.F.R. § 230.424(b)(4) (the "Motorsport Prospectus," a copy of which is attached hereto as Exhibit 8).

161. 133. Contrary to Defendants' misrepresentations to Plaintiffs about the Company, the Motorsport Prospectus reported positive EBITDA of $3,279,706 for the nine months ended September 30, 2020. *See* Ex. 9 at 13, 64.

162. 134. The wildly successful results of Motorsport's January 13, 2021 IPO speak for themselves and belie Defendants' prior representations about the Company to Plaintiffs in inducing Plaintiffs to sell their Company stock.

163. 135. The Motorsport Prospectus indicates that essentially all of the assets of Motorsport are derived from its interest in the Company, and that the value of Motorsport is approximately equivalent to its 82.2% interest in the Company.

164. 136. Per the Motorsport Prospectus, following the IPO there would be approximately 10 million shares of Class A common stock and 7 million shares of Class B common stock outstanding, of which Motorsport Network owns approximately 96.3% of the combined voting power.

165. 137. On January 13, 2021, Defendants successfully launched the IPO, which was priced at $20.00 per share.

166. 138. The IPO raised more than $60 million in proceeds for 3 million shares of Motorsport. The price immediately skyrocketed, reaching $38 per share on the first day of trading.

167. 139. At the $20 per share IPO price, multiplied by the 17 million authorized shares, the implied value of Motorsport would be approximately $340 million. At the $38.00 peak trading price on January 13, 2021, the implied value of Motorsport is approximately $646 million.

168. 140. The implied value of the Company, based on the fact that Motorsport's profitability is was based upon its 82.2% ownership of the Company, is approximately $414 million based on the IPO price, or $786 million based on the peak trading price on January 13, 2021.

**DEFENDANTS ARE NOT ENTITLED TO A SAFE HARBOR FOR THEIR FALSE AND MISLEADING STATEMENTS**

169. 141. The statutory safe harbor provided by the Private Securities Litigation Reform Act ("PSLRA") for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

170. 142. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

171. ~~143.~~ The PSLRA safe harbor also does not apply because the claims alleged herein are covered by statutory exceptions to the safe harbor, including 15 U.S.C. § 77z–2(b)(2) because the statements were made in connection with an initial public offering, insofar as Defendants' misstatements and omissions were made in anticipation of the ~~undisclosed~~ planned IPO.

172. ~~144.~~ To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking statements, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

173. ~~145.~~ In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by individuals who knew that the statement was false when made.

## PLAINTIFFS RELIED ON DEFENDANTS' MATERIAL MISREPRESENTATIONS AND OMISSIONS IN SELLING THEIR COMPANY SHARES TO DEFENDANTS

174. ~~146.~~ Plaintiffs did not wish to contribute to a capital call for the Company, which they believed, based on the material misrepresentations and omissions by Defendants alleged above, to be unprofitable and to have limited prospects for future profitability.

175. ~~147.~~ Plaintiffs, as non-controlling minority stockholders, were not positioned to ascertain independently the truth, falsity, or completeness of Defendants' representations concerning the Company's results and prospects.

176. 148. Plaintiffs relied on the material misrepresentations and omissions by Defendants alleged above, including, in particular, New's statement about an upcoming capital call, and the projection of a cash shortfall in the June 5, 2020 Board Presentation in determining that it would be best to sell Plaintiffs' ownership interests in the Company.

177. 149. On July 14, 2020, Plaintiffs HC2 reached out to Defendant Kozko to resume discussions regarding a potential sale of Plaintiffs' interest HC2's and Continental's interests in the Company. Plaintiffs HC2 also spoke with Defendant Zoi on July 15, 2020 to reach agreement on the price for the purchase of Plaintiffs' HC2 and Continental's respective shares. Plaintiffs HC2 and Continental asked to delay closing until October 2020, in order to determine whether Motorsport would acquire other minority interests at a higher price. Defendants refused to wait.

178. 150. Upon information and belief, It is plausible that Defendants resisted a delay in closing because, at the time they initiated the purchase of Plaintiffs HC2's and Continental's shares, Defendants already knew that a lucrative IPO was imminent and were well under way in preparing for the IPO. Indeed, Defendants filed their initial draft registration statement with the SEC on September 8, 2020, less than only three weeks after executing the SPA to acquire Plaintiffs' HC2's and Continental's shares.

179. 151. On July 24, 2020, counsel for Defendants at Snell & Wilmer L.L.P. provided a draft Stock Purchase Agreement to Plaintiffs HC2 and Continental.

180. 152. Defendant Zoi was intimately involved in structuring the deal, engaging via email and phone calls with Plaintiffs HC2 and Continental and the parties' respective counsel.

181. ~~153. Plaintiffs~~HC2, Continental, and Motorsport thereafter entered into the SPA effective as of August 18, 2020, pursuant to which ~~Plaintiffs~~HC2 and Continental sold all of their shares in the Company to Motorsport at a price of just $11.2881 per share.

182. ~~154.~~ Section 4(h) of the SPA included a representation by ~~Plaintiffs~~HC2 and Continental (defined therein as "Seller" or "Sellers") regarding ~~Plaintiffs'~~HC2's and Continental's access to information about Motorsport and the Company:

> The Seller (i) has sufficient knowledge and experience with and information about Buyer (including Buyer's business objective and current efforts to consummate a liquidity event or an initial public offering of Buyer as soon as practicable) and the Company in order to be fully familiar with Buyer, the Company and its current business, operations, assets, finances, financial results, financial condition and prospects and so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement, (ii) has full access to all books and records of the Company and all of its contracts, agreements and documents and (iii) has had an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company and its current business, operations, assets, financing, operating results, financial condition and prospects in order to make an informed decision to sell the Shares.

Ex. 2 § 4(h).

183. ~~155.~~ As of the date of that representation in the SPA, ~~Plaintiffs~~HC2 and Continental mistakenly believed, in reliance on, and due to, Defendants' false and misleading statements and material omissions, that the contemplated "liquidity event or an initial public offering of Buyer" would be an offering of Motorsport's parent company and/or would include substantial assets other than those of the Company.

184. ~~156.~~ As of the date of that representation in the SPA, ~~Plaintiffs~~HC2 and Continental mistakenly believed, in reliance on, and due to, Defendants' false and misleading statements and material omissions regarding the unavailability of audited financials, and the information that Defendants did provide, that ~~Plaintiffs~~HC2 and Continental did, in fact, have access to the same information known to Defendants, and therefore access to all the information

necessary to make a decision to sell ~~Plaintiffs'~~ HC2 and Continental's respective shares in the Company.

~~157.   On October 6, 2020, Motorsport entered an agreement to purchase additional shares of the Company from minority stockholder Leo Capital Holdings, LLC at an identical price per share as they had paid Plaintiffs~~

185.   On August 19, 2020, just one day after signing the SPA with HC2 and Continental, Defendant Alex Rothbert, the Vice President of Finance for Motorsport Network, sent an email to Randy Rissman, principal of Leo ("Mr. Rissman"), attaching an offer to purchase Leo's shares in the Company (the "Leo Offer Letter"). The letter represented that "Motorsport recently entered into a transaction with HC2 and CGI to purchase all shares held by HC2 and CGI at a price of $11.2881 per share" and offered to purchase Leo's shares at the same price per share. The Leo Offer Letter also stated that "[t]his offer is open only until 5:00 p.m. (EST) time on August 26, 2020 (the 'Acceptance Deadline')."

186.   It is fair to infer that Defendants included the Acceptance Deadline in the Leo Offer Letter to put additional pressure on Leo to decide to sell quickly and without further investigation.

187.   On August 20, 2020, Mr. Rissman reached out to Brooks to inquire as to whether PlayFast had received a similar offer and seek Brooks' opinion on the offer. Brooks offered to look into the matter further and relay information about the offer to Mr. Rissman.

188.   Based on communications from Brooks to Mr. Rissman, it is fair to infer that on August 21, 2020, Brooks had a call with Kozko, during which Brooks requested information about the status of the Company and the offers to purchase shares from certain minority stockholders of the Company. According to Brooks' account of the interaction, Kozko

represented to Brooks that Motorsport purchased HC2's shares because HC2 was in need of cash. This statement, if made, was false. According to Brooks, Kozko further represented that there were no 2019 audited financials for the Company and that there would likely be a capital call or other additional investment needed for the Company to succeed.

189.    Shortly after his call with Kozko, Brooks replied to Mr. Rissman and relayed the substance of that call, including Kozko's representations regarding the financial condition of the Company and the likelihood of a capital call.

190.    Also on August 21, 2020, Brooks forwarded to Mr. Rissman two spreadsheets that Brooks had received from Defendant Rothbert, representing historical financials for the Company (the "Historical Financials") and a forecast as of August 20, 2020 (the "August 2020 Forecast").

191.    The Historical Financials include profit and loss calculations for 2019 and the first 6 months of 2020. The Historical Financials are not audited financial statements, nor are they in the format required by the Stockholders' Agreement. They show that the Company finished 2019 with a loss of $4,332,906. For the first seven months of 2020, the Company had positive net income of $3,286,652, but this was in large part based on a $5 million increase in revenue in July 2020, when two of the Company's products, NASCAR HEAT 5 and HEAT5 Gold Edition, were launched.

192.    The August 2020 Forecast indicated a net income of approximately $2,841,000. This projection, coupled with the results through July 2020 in the Historical Financials, indicated that the July 2020 results were an anomaly and that the Company was anticipated to lose money for the remainder of 2020.

193.    It is fair to infer that the August 2020 Forecast was false and misleading because they projected poor performance of NASCAR Heat 5, which by August 2020 all Defendants knew was a great success.

194.    On August 24, 2020, Mr. Rissman emailed Rothbert and indicated that Leo would be willing to sell Leo's shares of the Company to Motorsport.

195.    Leo and Motorsport thereafter entered into the Leo SPA effective as of October 6, 2020, pursuant to which Leo sold all of its shares in the Company to Motorsport at a price of just $11.2881 per share.

196.    Section 4(h) of the Leo SPA included a representation by Leo (defined therein as "Seller") regarding Leo's access to information about Motorsport and the Company:

> The Seller (i) has sufficient knowledge and experience with and information about Buyer (including Buyer's business objective and current efforts to consummate a liquidity event or an initial public offering of Buyer as soon as practicable) and the Company in order to be fully familiar with Buyer, the Company and its current business, operations, assets, finances, financial results, financial condition and prospects and so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement, (ii) has full access to all books and records of the Company and all of its contracts, agreements and documents and (iii) has had an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company and its current business, operations, assets, financing, operating results, financial condition and prospects in order to make an informed decision to sell the Shares.

Ex. 3 § 4(h).

197.    As of the date of that representation in the Leo SPA, Leo mistakenly believed, in reliance on, and due to, Defendants' false and misleading statements and material omissions regarding the unavailability of audited financials, and the information that Defendants did provide, that Leo did, in fact, have access to the same information known to Defendants, and therefore access to all the information necessary to make a decision to sell Leo's shares in the Company.

**PLAINTIFFS' ECONOMIC LOSSES AND LOSS CAUSATION**

198. 158. Defendants fraudulently induced Plaintiffs to accept just $1.21.3 million for their 26.229.2% stake in the Company. At the peak trading price on Motorsport's first day of trading, that stake is actually worth at least approximately $206230 million.

199. 159. Plaintiffs would not have entered into the SPA and the Leo SPA had they been aware that the financial condition of the Company indicated a much higher fair market value than the price per share that Defendants offered and paid for Plaintiffs' shares in the Company, or that Defendants intended to offer shares in Motorsport (the only substantial asset of which is the Company) in the impending IPO.

200. 160. Plaintiffs would have retained their ownership interests in the Company if Defendants had not represented to Plaintiffs, mere months before the IPO, that the Company was in dire financial condition and that a capital call was forthcoming.

201. 161. Defendants' material misstatements and omissions damaged Plaintiffs by causing Plaintiffs to sell their ownership interests in the Company for far less than fair market value, depriving Plaintiffs of the true value of those ownership interests.

**The One of the Company's Remaining Minority Stockholders Have Filed Suit Against Motorsport Arising from Motorsport's Theft of Corporate Opportunities**

202. 162. Upon information and belief, onOn or about December 23, 2020, representatives of Ascend FS, Inc. ("Ascend") and PlayFast, both minority stockholders of the Company, sent a letter to Defendants alleging that the SPA and the October 6, 2020 transactionLeo SPA were made in breach of the Stockholders' Agreement. That letter also demanded certain documents relating to Motorsport.

203. 163. On December 29, 2020, Jennifer Hadley Catero of Snell & Wilmer L.L.P., counsel for Motorsport, replied via letter to Ascend and PlayfastPlayFast, denying that the SPA

or ~~the October 6, 2020 transaction~~Leo SPA breached the Stockholders' Agreement and refusing to provide information about Motorsport.

204.   ~~164.~~ On January 11, 2021, Ascend filed a derivative suit on behalf of the Company against Motorsport and Kozko in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Local Case Number 2021-000705-CA-01, alleging breaches of fiduciary and contractual duties and theft of corporate opportunities from the Company in excess of $94 million, based on Motorsport's acquisition of stock in the Company from Plaintiffs and Leo via the SPA and ~~the October 6, 2020~~Leo SPA transaction, respectively. Ascend's complaint ~~alleges~~alleged, among other things, that Motorsport purchased Plaintiffs' stock "at a 98.6% discount" and at a price "far below its value", which Motorsport anticipated would lead to "***a return of approximately 72 times*** the price it paid" (emphasis in original). Ascend's complaint further ~~alleges~~alleged that Defendants "concealed . . . their inside information about the IPO from . . . minority shareholders until they were a *fait accompli*."

**The Company's Remaining Minority Stockholders Settled Their Dispute by Selling Shares to Motorsport at More than Thirty Times the Price Motorsport Paid Plaintiffs**

205.   On March 11, 2021, Motorsport and PlayFast entered into a share exchange agreement (the "PlayFast Exchange Agreement"), pursuant to which Motorsport agreed to acquire PlayFast's 30,903 shares of common stock in the Company in exchange for stock in Motorsport and cash, for a total transaction value of approximately $10.75 million.

206.   The PlayFast Exchange Agreement transaction value indicated a per-share value of the Company at $347.862 per share. This share value is ***more than 30 times*** the amount that Motorsport paid to Plaintiffs in August and October 2020, only months earlier.

207.   On March 14, 2021, Motorsport and Ascend entered into a share exchange agreement (the "Ascend Exchange Agreement"), pursuant to which Motorsport agreed to acquire

Ascend's 41,204 shares of common stock in the Company in exchange for stock in Motorsport and cash, for a total transaction value of approximately $14.6 million.

208.    The Ascend Exchange Agreement transaction value indicated a per-share value of the Company at $354.335 per share. This share value is ***more than 31 times*** the amount that Motorsport paid to Plaintiffs in August and October 2020, only months earlier.

209.    On April 1, 2021, Motorsport and PlayFast entered into an amendment of the PlayFast Exchange Agreement, and Motorsport and Ascend entered into an amendment of the Ascend Exchange Agreement (together, the "Amended Exchange Agreements"). In these Amended Exchange Agreements, Motorsport agreed with PlayFast and Ascend to delay the closing of the PlayFast Exchange Agreement and the Ascend Exchange Agreement, respectively, and create a new entity, "Newco" that would merge with the Company.

210.    On April 20, 2021, Motorsport announced that it had closed the transactions contemplated by the PlayFast Exchange Agreement and the Ascend Exchange Agreement, each as amended by the Amended Exchange Agreements. As contemplated by the Amended Exchange Agreements, the Company merged with and into a newly formed Delaware limited liability company called 704Games LLC.

211.    According to the public disclosure, the merger consideration issued to (i) PlayFast in connection with the Merger with respect to the shares of common stock of 704Games it surrendered in such merger consisted of 366,542 newly issued shares of Class A common stock of Motorsport and $1,542,519 in cash and (ii) Ascend in connection with the Merger with respect to the shares of common stock of 704Games it surrendered in such merger consisted of 488,722 newly issued shares of Motorsport and $2,056,692 in cash.

212.    The per-share consideration paid to each of PlayFast and Ascend under the Amended Exchange Agreements remains the same as under the PlayFast Exchange Agreement and the Ascend Exchange Agreement—giving PlayFast and Ascend more than 30 times the value that Plaintiffs received for their shares in the same Company only months earlier.

213.    Under the PlayFast Exchange Agreement, as amended, and the Ascend Exchange Agreement, as amended, Motorsport and its affiliates, without admitting any liability by any party, were released from all claims that Ascend or PlayFast could allege or assert against Motorsport as minority stockholders of 704Games. Pursuant to the Ascend Exchange Agreement, as amended, the parties agreed that the derivative legal action commenced by Ascend against Motorsport and certain of its affiliates will be dismissed with prejudice.

214.    The difference in value between the amount paid for Plaintiffs' stock in August 2020 and October 2020 and the amount paid to PlayFast and Ascend in April 2020 shocks the conscience and puts the lie to any claim that Motorsport paid fair market value for Plaintiffs' stock.

**Motorsport Reported Record Sales for the Company in 2020**

215.    On March 24, 2021, Motorsport announced its financial results for 2020.

216.    Based on the facts alleged, it is fair to infer that the financial results that Motorsport reported on March 24, 2021 are based almost entirely on the financials of the Company, as the controlling stake in the Company was the only material asset of Motorsport as of December 31, 2020.

217.    Defendant New identified "considerable revenue growth driven by NASCAR Heat sales" as a major factor in Motorsport's improved financial condition between 2019 and 2020.

218.   Revenues increased 60% in 2020 compared to 2019. Motorsport's press release stated that "The increase was primarily due to the release of NASCAR Heat 5 in July of 2020 which saw sales surpassing the release of NASCAR Heat 4 in 2019."

**Motorsport Is Building a Racing Game Empire at Plaintiffs' Expense**

219.   Motorsport, NASCAR, and analysts alike have treated Motorsport as if it owned all of 704Games—and made it clear that Motorsport owned nothing else of note. The value of Motorsport is based primarily on the value of its ownership of 704Games.

220.   As early as May 2020 NASCAR's press release about the upcoming release of NASCAR Heat 5 said that "NASCAR Heat 5 will be published by Motorsport Games."

221.   Similarly, analysts treat the companies as interchangeable. For example, a February 8, 2021 report from Canaccord Genuity Capital Markets noted that "Motorsport Games historically has been driven by a single console game franchise, NASCAR Heat." A report from The Benchmark Company of the same date noted that "MSGM currently develops and publishes games based only from their NASCAR license"—a license that actually belongs to 704Games—and includes a graphic for NASCAR Heat 5 with the label "Figure 1: MSGM – 704Games".

222.   After the successful IPO based on the value of Motorsport's ownership in the Company, Defendants used the capital raised to enter into a series of acquisitions.

223.   On February 19, 2021, Motorsport entered into a binding term sheet with Black Delta Holdings PTY and its affiliates to purchase all assets related to the KartKraft Game for $1 million. This binding term sheet resulted in an asset sale and purchase agreement dated as of March 18, 2021, which closed on March 22, 2021. KartKraft is a leading kart racing simulator for PC, with a development team based in Australia.

224.   The acquisition brought Motorsport not only a new video game title but also development capabilities, which Motorsport previously did not have except through its

ownership of the Company. According to Motorsport's February 19, 2021 press release, "the new Motorsport Games Australia team will bring additional knowledge and expertise to Motorsport Games, specifically in Epic Games' trademark game Unreal Engine, as well as vehicle physics and driving simulation. ***They will play an integral role in the development of our future products***" (emphasis added).

225.    On February 25, 2021, Motorsport entered into a binding term sheet with Luminis International BV to acquire its subsidiary Studio397 BV for $16 million. This binding term sheet resulted in a share purchase agreement dated as of April 1, 2021.

226.    The acquisition of Studio397, which publishes the rFactor 2 racing simulation platform, also uses the proceeds from the IPO to expand Motorsport's previously nonexistent development capabilities. According to Motorsport's March 3, 2021 press release, "[t]he acquisition will see Studio397 continue its work on rFactor 2 while also developing the physics and handling models for Motorsport Games' forthcoming projects."

227.    On March 24, 2021, Motorsport entered into a binding term sheet to acquire Digital Tales USA LLC. Digital Tales USA LLC is the developer of mobile games for the FIM Superbike World Championship. This third acquisition once again adds to Motorsport's development capabilities, which previously were limited to the resources of the Company.

228.    Motorsport acquired nearly one-third of the Company from Plaintiffs at an artificially low value, based on inaccurate statements and material omissions about the condition of the Company. Defendants have now leveraged the value of the Company to build a multi-million dollar racing game licensing and development portfolio at Plaintiffs' expense.

**COUNT I**
**FOR VIOLATION OF EXCHANGE ACT § 10(b)**
**AND RULE 10b-5 THEREUNDER**
*(AGAINST MOTORSPORT)*

229. ~~165.~~ Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

230. ~~166.~~ Defendant Motorsport, in its capacity as the majority stockholder of the Company, and by the use of various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, intentionally made untrue statements of material facts to Plaintiffs relating to the financial condition and future prospects of the Company.

231. ~~167.~~ In the course of using various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, Defendant also intentionally or recklessly omitted to state material facts relating to the financial condition and future prospects of the Company that were necessary in order to make Defendants' statements made concerning the Company, in the light of the circumstances under which they were made, not misleading.

232. ~~168.~~ At each time Defendants made the false statements and omissions of material fact alleged herein, Defendants knew, or recklessly disregarded, that such statements were false and/or incomplete, and that Plaintiffs would rely on those statements.

233. ~~169.~~ Plaintiffs justifiably relied upon the statements by Defendants in deciding to sell their ownership interests in the Company to Motorsport at a price of $11.2881 per share.

234. ~~170.~~ Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact. At least with respect to

several of the allegations, the claims primarily allege omissions ~~and~~ where there was an affirmative duty to disclose information.

235. ~~171.~~ But for Defendants' material false statements and omissions of material fact, Plaintiffs would not have been induced to sell their shares in the Company for $11.2881 per share.

236. ~~172.~~ Plaintiffs have been injured and have suffered economic losses because the fair market value of Plaintiffs' ownership interests in the Company greatly exceeded $11.2881 per share.

237. ~~173.~~ Defendants' material false statements and omissions of material fact were the proximate cause of Plaintiffs' injuries and economic losses.

238. ~~174.~~ Defendants' material false statements and omissions of material fact alleged herein constituted devices, schemes, and artifices to defraud Plaintiffs and acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with the purchase of securities in the Company from Plaintiffs, all in violation of Rule 10b-5.

239. ~~175.~~ Defendants' material false statements and omissions of material fact alleged herein constituted manipulative and deceptive devices and contrivances in connection with the purchase of securities from Plaintiffs, in contravention of Rule 10b-5 and, thus, in violation of Exchange Act Section 10(b).

**COUNT II**
**FOR VIOLATION OF § 10(b) OF THE EXCHANGE ACT**
**AND RULE 10b-5(a) AND (c) THEREUNDER**
**(AGAINST ALL DEFENDANTS)**

240. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

241.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiffs need not allege in this Count nor prove in this case that each of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

242.    Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did deceive Plaintiffs into selling their shares for artificially low prices, lower than the fair value of those shares, by misleading, creating the perception that 704 was failing, required capital, and was expecting poor performance, by creating urgency through the supposed need for a capital call and capital contribution, and by timing the transaction to close prior to the public disclosure of Motorsport's IPO and prior to the disclosure of the Company's strong performance due to NASCAR Heat 5's successful launch.  This course of conduct, in whole and in part, was a fraudulent scheme in that it intentionally created and exploited information asymmetries in order to induce sales at an unfairly low price.

243.    As alleged herein, Defendants also engaged in a fraudulent scheme to the extent they deceptively participated in a course of conduct to convey misleading information or withhold truthful information, regardless of whether they personally made statements to Plaintiffs.

244.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

245.    Plaintiffs were unaware of the Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiffs known of Defendants' unlawful scheme and unlawful course of conduct, they would not have sold their securities, or if they had, would not have done so at the artificially low prices paid for such securities.

246.    As a direct and proximate result of the Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs suffered damages in connection with their sale of their shares.

247.    By reason of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder and are liable to Plaintiffs for damages suffered in connection with their sale of their shares.

## COUNT III
**FOR JOINT AND SEVERAL LIABILITY UNDER EXCHANGE ACT § 20(a) FOR MOTORSPORT'S VIOLATION OF EXCHANGE ACT § 10(b) AND RULE 10b-5 THEREUNDER (AGAINST ZOI, KOZKO, AND NEW)**

248.    176. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

249.    177. Defendants Zoi, Kozko, and New, in their capacities as controlling executives of Defendant Motorsport (and, with it, the Company), and by the use of various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, intentionally made untrue statements of material facts to Plaintiffs relating to the financial condition and future prospects of the Company.

250.    178. In the course of using various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, Defendants Zoi, Kozko, and New also intentionally or recklessly omitted to state material facts relating to the financial condition and future prospects of the Company that were necessary in

order to make Defendants' statements made concerning the Company, in the light of the circumstances under which they were made, not misleading.

251. ~~179.~~ At each time Defendants Zoi, Kozko, and New made the material false statements and omissions of material fact alleged herein, they knew, or recklessly disregarded, that such statements were false and/or incomplete, and that Plaintiffs would rely on those statements.

252. ~~180.~~ Plaintiffs justifiably relied upon the statements by Defendants Zoi, Kozko, and New in deciding to sell their ownership interests in the Company to Motorsport at a price of $11.2881 per share.

253. ~~181.~~ But for Defendants Zoi, Kozko, and New's material false statements and omissions of material fact, Plaintiffs would not have been induced to sell their shares in the Company for $11.2881 per share.

254. ~~182.~~ Plaintiffs have been injured and have suffered economic losses because the fair market value of Plaintiffs' ownership interests in the Company greatly exceeded $11.2881 per share.

255. ~~183.~~ Defendants Zoi, Kozko, and New's material false statements and omissions of material fact on behalf of Motorsport were the proximate cause of Plaintiffs' injuries and economic losses.

256. ~~184.~~ Defendants Zoi, Kozko, and New's material false statements and omissions of material fact on behalf of Motorsport alleged herein constituted devices, schemes, and artifices to defraud Plaintiffs and acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with the purchase of securities in the Company from Plaintiffs, all in violation of Rule 10b-5.

257. 185. Defendants Zoi, Kozko, and New's material false statements and omissions of material fact on behalf of Motorsport alleged herein constituted manipulative and deceptive devices and contrivances in connection with the purchase of securities from Plaintiffs, in contravention of Rule 10b-5 and, thus, in violation of Exchange Act Section 10(b).

258. 186. As Manager of Motorsport Network, the sole owner of Defendant Motorsport from its inception until the IPO on January 13, 2021 and the controlling stockholder of Defendant Motorsport at all times, Defendant Zoi has had the direct or indirect power to direct or cause the direction of the management and policies, and to control the general business affairs, of Motorsport since at least August 2018.

259. 187. In his capacity as the Manager of Motorsport Network, the sole owner of Defendant Motorsport from its inception until January 13, 2021, Zoi has had the requisite direct or indirect power to control the specific corporate actions resulting in the liability alleged herein—namely, Motorsport's actions as the controlling stockholder of the Company during the times in which Defendants' materially false statements and omissions alleged herein, including statements by Zoi, were made.

260. 188. Upon information and belief Based on the facts alleged, Defendant Zoi did not act in good faith, but instead directly or indirectly induced Defendants' materially false statements and omissions alleged herein, which constitute this cause of action under the Exchange Act and Rule 10b-5 thereunder.

261. 189. Upon information and belief Based on the facts alleged, and, in particular, in light of the substantial individual financial incentive provided by Defendant Zoi's ownership interest in Defendant Motorsport (via his ownership of Motorsport Network), Plaintiffs believe

that Defendant Zoi was an active, culpable participant in Motorsport's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder alleged herein.

262.   190. Pursuant to Exchange Act Section 20(a), therefore, Defendant Zoi, as a "control person" of Motorsport, is liable jointly and severally with Motorsport and to the same extent as Motorsport is liable to Plaintiffs for Plaintiffs' claims under Exchange Act Section 10(b) and Rule 10b-5.

263.   191. As Chief Executive Officer and Executive Chairman of Motorsport, Defendant Kozko has had the direct or indirect power to direct or cause the direction of the management and policies, and to control the general business affairs, of Motorsport since at least January 2020.

264.   192. In his capacity as Chief Executive Officer of Motorsport since January 2020, Kozko has had the requisite direct or indirect power to control the specific corporate actions resulting in the liability alleged herein—namely, Motorsport's actions as the controlling stockholder of the Company during the times at which Defendants' material false statements and omissions alleged herein, including statements by Kozko, were made.

265.   193. Upon information and belief Based on the facts alleged, Defendant Kozko did not act in good faith, but instead directly or indirectly induced Defendants' material false statements and omissions alleged herein, which constitute this cause of action under the Exchange Act and Rule 10b-5.

266.   194. Upon information and belief Based on the facts alleged, and, in particular, in light of the substantial individual financial incentive provided by the Kozko Employment Agreement, Plaintiffs believe that Defendant Kozko was an active, culpable participant in Motorsport's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder alleged herein.

267. 195. Pursuant to Exchange Act Section 20(a), therefore, Defendant Kozko, as a "control person" of Motorsport, is liable jointly and severally with Motorsport and to the same extent as Motorsport is liable to Plaintiffs for Plaintiffs' claims under Exchange Act Section 10(b) and Rule 10b-5.

268. 196. As Chief Financial Officer of Motorsport, Defendant New has had the direct or indirect power to direct or cause the direction of the management and policies, and to control the general business affairs, of Motorsport since at least January 2020.

269. 197. In his capacity as Chief Financial Officer of Motorsport since January 2020, New has had the requisite direct or indirect power to control the specific corporate actions resulting in the liability alleged herein—namely, Motorsport's actions as the controlling stockholder of the Company during the times at which Defendants' material false statements and omissions alleged herein, including statements by New, were made.

270. 198. Upon information and beliefBased on the facts alleged, Defendant New did not act in good faith, but instead directly or indirectly induced Defendants' material false statements and omissions alleged herein, which constitute this cause of action under the Exchange Act and Rule 10b-5.

271. 199. Upon information and beliefBased on the facts alleged, and, in particular, in light of the substantial individual financial incentive provided by the New Employment Agreement, Plaintiffs believe that Defendant New was an active, culpable participant in Motorsport's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder alleged herein.

272. 200. Pursuant to Exchange Act Section 20(a), therefore, Defendant New, as a "control person" of Motorsport, is liable jointly and severally with Motorsport and to the same

extent as Motorsport is liable to Plaintiffs for Plaintiffs' claims under Exchange Act Section 10(b) and Rule 10b-5.

## COUNT ~~III~~IV
### FOR VIOLATION OF § 20A OF THE EXCHANGE ACT
### (AGAINST MOTORSPORT)

273.   ~~201.~~ Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

274.   ~~202.~~ This Claim is brought against Motorsport under §20A of the Exchange Act, 15 U.S.C. §78t-1.

275.   ~~203.~~ Motorsport possessed the true material undisclosed information, including information about the Company's true financial performance, the value of the Company (which Motorsport also knew would be the basis for the lucrative IPO of Motorsport), ~~and~~ liquidity needs, the undisclosed employment contracts, licensing negotiations, and the planned IPO of Motorsport, at all relevant times. In addition, the information was, in each case, considered confidential by 704Games as it was corporate information that was not publicly disclosed.

276.   ~~204.~~ Motorsport knew, or recklessly disregarded, that it owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to the Company and its ~~shareholders~~stockholders to keep the information confidential.

277.   ~~205.~~ Nevertheless, while in possession of material, non-public, adverse information, Motorsport bought Plaintiffs' shares of the Company without first disclosing that information, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

278.   ~~206.~~ Plaintiffs sold their shares to Motorsport without access to this material adverse information.

279. 207. Motorsport purchased Plaintiffs' shares contemporaneously with Plaintiffs' sales within the meaning of Section 20A of the Exchange Act.

280. 208. By virtue of possessing material non-public information, Motorsport had a duty to either disclose that information to Plaintiffs before purchasing their shares of the Company on the basis of that information or abstain from engaging in that transaction. By trading while in possession of such information, it violated this duty and infringed upon the relationship of trust and confidence that it had with Plaintiffs as investors in the Company.

281. 209. Accordingly, under Section 20A of the Exchange Act, Motorsport's purchase of the Company shares while knowingly in possession of material, positive, and non-public information makes it liable to Plaintiffs for all profits gained and losses avoided as a result of such stock sales.

282. 210. Motorsport is required to account for all such stock sales and disgorge its profits or ill-gotten gains.

## COUNT IV V
## BREACH OF CONTRACT
## (AGAINST MOTORSPORT)

283. 211. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

284. 212. The Stockholders' Agreement is a valid and enforceable contract to which Plaintiffs and Motorsport are parties.

285. 213. Motorsport knowingly and voluntarily entered into the Stockholders' Agreement.

286. 214. Section 7.1 of the Stockholders' Agreement obligated Motorsport to provide to Plaintiffs quarterly and annual financial statements prepared in accordance with GAAP.

287. 215. Motorsport breached Section 7.1 of the Stockholders' Agreement by providing financial statements that contained material misstatements and omitted material facts, thus rendering such statements inaccurate and not prepared in accordance with GAAP.

288. 216. Plaintiffs have been injured by Motorsport's breach of Section 7.1 of the Stockholders' Agreement because Plaintiffs did not have access to complete and accurate financial information about the Company, thus causing Plaintiffs to severely undervalue their ownership interests in the Company and sell their shares of the Company to Motorsport for a fraction of their fair market value.

289. 217. Had Defendants complied with their obligations under the Stockholders' Agreement, Plaintiffs would not have sold their ownership interests in the Company to Motorsport at the price of $11.2881 per share.

## COUNT ~~V~~ VI
## FRAUD IN THE INDUCEMENT
### (AGAINST ALL DEFENDANTS)

290. 218. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

291. 219. Defendant Motorsport knowingly and voluntarily entered into the SPA and the Leo SPA.

292. 220. Upon information and belief Based on the facts alleged, in negotiating the SPA and the Leo SPA, Defendants misrepresented the financial condition and future prospects of the Company.

293. 221. Upon information and belief Based on the facts alleged, in negotiating the SPA and the Leo SPA, Defendants misrepresented the profitability, cash reserves, future prospects, and likelihood of a capital call for the Company.

294. ~~222. Upon information and belief,~~It is fair to infer that Defendants knew or recklessly disregarded that the misrepresentations to Plaintiffs alleged herein were false and that Defendants intended to purchase Plaintiffs' ownership interests in the Company for a price far below the true fair market value of those shares.

295. ~~223. Upon information and belief,~~It is fair to infer that Defendants knew or recklessly disregarded that a fair market price for the shares of the Company was a material term of both the SPA and the Leo SPA, and that Plaintiffs would not have entered into the SPA or the Leo SPA at the price of $11.2881 per share had Plaintiffs been aware of the truth regarding the financial condition, future prospects, and likelihood of a capital call for the Company.

296. ~~224. Upon information and belief,~~Based on the facts alleged, it is fair to infer that Defendants intentionally or recklessly deceived Plaintiffs to induce Plaintiffs to enter into the SPA and the Leo SPA in order for Defendants to acquire Plaintiffs' ownership interests in the Company at a deep discount.

297. Based on the facts alleged, it is fair to infer that Defendants intentionally or recklessly deceived Plaintiffs as to the completeness of their disclosures to Plaintiffs to induce Plaintiffs to mistakenly make the representations in Section 4(h) of each of the SPA and the Leo SPA.

298. Based on the facts alleged, it is fair to infer that Defendants intentionally or recklessly deceived Plaintiffs to induce Plaintiffs to agree to the releases in Section 9 of each of the SPA and the Leo SPA.

299. Based on the facts alleged, it is fair to infer that Defendants intentionally or recklessly deceived Plaintiffs to induce Plaintiffs to agree to the provisions in Section 12 of each of the SPA and the Leo SPA.

300. 225. Defendants' misrepresentations and omissions alleged herein were willful and intentional and reckless and involved a breach of trust or confidence.

301. 226. The misrepresentations and omissions alleged herein injured Plaintiffs because Plaintiffs reasonably relied upon those misrepresentations. Had Plaintiffs known those representations were false, Plaintiffs would not have entered into the SPA or the Leo SPA with Motorsport.

**COUNT ~~VI~~VII**
**BREACH OF FIDUCIARY DUTIES**
**(AGAINST ALL DEFENDANTS)**

302. 227. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

303. 228. Defendant Motorsport has been the controlling majority stockholder of the Company at all times relevant to Plaintiffs' allegations herein.

304. 229. Defendant Zoi has been the Manager of Motorsport Network, the sole owner of Defendant Motorsport from its inception until January 13, 2021, since at least August 2018.

305. 230. Defendant Kozko has been a member of the Board of Directors of the Company at all times relevant to Plaintiffs' allegations herein and the Chairman of the Company's Board since at least June 2020.

306. 231. Defendant New has acted as chief financial officer for the Company, upon information and belief since January 2020.

307. Defendant Rothbert has acted as controller for Motorsport Network, the sole owner of Motorsport from its inception until January 13, 2021, since at least July 2014.

308. 232. By virtue of their respective roles as controlling majority stockholder, Manager and owner of the controlling majority stockholder's corporate parent, member and

Chairman of the Company's Board, ~~and~~ acting chief financial officer for the Company, and controller of the controlling majority stockholder's corporate parent, Defendants Motorsport, Zoi, Kozko, ~~and~~ New, and Rothbert each owed fiduciary duties to the Company, Plaintiffs, and other minority stockholders, including the duties of care and loyalty.

309. ~~233.~~ Defendants breached their fiduciary duties to Plaintiffs by the repeated acts of disloyalty, bad faith, and other misconduct alleged herein, including, without limitation, (a) Defendants' failure to provide accurate and complete financial statements of the Company to Plaintiffs, (b) Defendants' material misstatements and omissions of material fact regarding a cash shortfall and likely capital call for the Company, (c) Defendants' pursuit and consummation of the acquisition of Plaintiffs' shares in the Company for far less than a fair market price; (d) Defendants' theft of corporate opportunities in connection with the Alonso Agreement and Le Mans Agreements and delay of the IPO until after acquiring Plaintiffs' stock at a deeply discounted price; and (e) Defendants' purchase of Plaintiffs' shares without disclosing material non-public information.

310. ~~234.~~ Defendants' breaches of their fiduciary duties to Plaintiffs resulted in damages to Plaintiffs. Had Plaintiffs known the true financial condition and likelihood of a capital call for the Company, Plaintiffs would not have sold their ownership interests in the Company to Motorsport for $11.2881 per share.

311. ~~235.~~ Defendants' material misstatements and omissions were willful and wanton and were made for the purpose of injuring Plaintiffs by acquiring ~~Plaintiff~~Plaintiffs's ownership interests in the Company for far less than their fair market value.

**COUNT ~~VII~~VIII**
**UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST**
**(AGAINST ALL DEFENDANTS)**

312. ~~236.~~Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

313. ~~237.~~Defendants defrauded Plaintiffs and fraudulently induced Plaintiffs to enter into the SPA and the Leo SPA.

314. ~~238.~~Defendants also breached their contractual obligations and fiduciary duties of care, loyalty, disclosure, candor, and good faith.

315. ~~239.~~Defendants' wrongdoing injured and impoverished Plaintiffs by depriving Plaintiffs of the value of their shares of Company stock.

316. ~~240.~~Defendants' wrongdoing enriched Defendants by permitting them to obtain approximately ~~26.2~~29.2 percent of the Company's stock for less than one percent of its true value, and by permitting Defendants to keep for themselves all distributions that would otherwise have been due to Plaintiffs if not for the SPA and the Leo SPA.

317. ~~241.~~Defendants' breaches of fiduciary duty, fraud, and self-enrichment at the expense of plaintiffs were unjustified.

318. ~~242.~~As a result of Defendants' wrongdoing, a constructive trust exists in favor of Plaintiffs with respect to ~~26.2~~29.2 percent of the Company's value.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.   Awarding Plaintiffs their damages in the form of economic losses, including but not limited to adjusted fair market value of the shares of 704Gaming common stock as of August 18, 2020 for HC2 and Continental, and as of October 6, 2020

for Leo, disgorgement of all profits gained by Defendants as a result of their fraudulent purchase of Plaintiffs' shares of 704Gaming common stock, punitive damages, and/or such other measures of damages as are proven at trial, plus interest;

B.   Imposing a constructive trust in favor of Plaintiffs with respect to 26.229.2% of the value of the Company and of Motorsport;

C.   Awarding Plaintiffs their pre- and post-judgment interest; and

D.   Awarding Plaintiffs their costs and expenses, including reasonable attorneys' fees, as the prevailing parties in this action pursuant to the fee-shifting indemnification provision in the Stockholders' Agreement; and

E.   Granting such other and further relief as the Court may deem just, equitable, and proper.

Dated: ~~February 8~~April 26, 2021                     **CHIPMAN BROWN CICERO & COLE, LLP**

                                                         */s/ Joseph B. Cicero*
OF COUNSEL:                                              Joseph B. Cicero (#4388)
                                                         Gregory E. Stuhlman (#4765)
Karl C. Huth                                             Aidan T. Hamilton (#6729)
Matthew J. Reynolds                                      Hercules Plaza
Sara G. Wilcox                                           1313 North Market Street, Suite 5400
**HUTH REYNOLDS LLP**                                   Wilmington, Delaware  19801
41 Cannon Court                                          (302) 295-0191
Huntington, NY 11743                                     cicero@chipmanbrown.com
(212) 731-9333                                           stuhlman@chipmanbrown.com
huth@huthreynolds.com                                    hamilton@chipmanbrown.com
reynolds@huthreynolds.com
swilcox@huthreynolds.com                                *Attorneys for* ~~*Plaintiff*~~
                                                        *Plaintiffs HC2 Holdings 2, Inc. and Leo Capital*
                                                        *Holdings LLC*


                                                        **LABATON SUCHAROW LLP**

                                                         */s/ Ned Weinberger*
OF COUNSEL:                                              Ned Weinberger (#5256)
                                                         300 Delaware Avenue, Suite 1340
David J. Schwartz                                        Wilmington, Delaware 19801
Ira A. Schochet                                          (302) 573-2540
Carol C. Villegas                                        nweinberger@labaton.com
Jake Bissell-Linsk
**LABATON SUCHAROW LLP**                                *Attorneys for Plaintiff Continental General*
140 Broadway                                            *Insurance Company*
New York, NY 10591
(212) 907-0700
dschwartz@labaton.com
ischochet@labaton.com
cvillegas@labaton.com
jbisselllinsk@labaton.com

Document comparison by Workshare 10.0 on Monday, April 26, 2021 4:35:38 PM

| Input: | |
|---|---|
| Document 1 ID | file://\\ccb-vdc1\dms\WDOCS\Clients\11024\001\00009745.DOCX |
| Description | 00009745 |
| Document 2 ID | file://\\ccb-vdc1\dms\WDOCS\Clients\11024\001\00009741.DOCX |
| Description | 00009741 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 650 |
| Deletions | 416 |
| Moved from | 5 |
| Moved to | 5 |
| Style changes | 0 |
| Format changes | 0 |
| Total changes | 1076 |