IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INNOVATE 2 CORP. (f/k/a HC2 HOLD-
INGS 2, INC.), CONTINENTAL
GENERAL INSURANCE CO., and LEO
CAPITAL HOLDINGS LLC

       *Plaintiffs*,

       v.                          No. 1:21-cv-165-SB

MOTORSPORT GAMES INC., MIKE
ZOI, JONATHAN NEW, DMITRY
KOZKO, and ALEX ROTHBERT

       *Defendants*.

---

Joseph Benedict Cicero, Aidan T. Hamilton, Gregory Erich Stuhlman, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Matthew J. Reynolds, Sara G. Wilcox, HUTH REYNOLDS LLP, New York, New York and Denver, Colorado; Ned C. Weinberger, LABATON SUCHAROW LLP, Wilmington, Delaware.

       *Counsel for Plaintiffs.*

Daniel A. O'Brien, Brian L. Schwalb, VENABLE LLP, Wilmington, Delaware.

       *Counsel for Defendants.*

---

**MEMORANDUM OPINION**

March 28, 2022

---

BIBAS, *Circuit Judge*, sitting by designation.

A shareholder with a controlling stake in a company has great power. With great power comes great responsibility. Because the controlling shareholder has access to company information that minority shareholders do not, it must keep them in the loop. And it may not exploit its insider position to buy out the minority shareholders at a discount.

Yet here, minority shareholders in 704Games say the controlling shareholder, Motorsport, did just that. It led them to believe the company was in dire straits, then failed to correct that impression when new information suggested otherwise. If true, that counts as securities fraud. So I will not dismiss their claim.

The shareholders tack on other securities claims against Motorsport and its executives too, plus breach of fiduciary duty and unjust enrichment. Those allegations arise from the same facts and are also plausible, so I will not dismiss them either.

## I. BACKGROUND

704Games is a videogame developer, best known for making the NASCAR Heat series of racing games. D.I. 14 ¶6. But this case is about boardroom competition, not virtual car races.

In mid-2020, 704Games' controlling shareholder, Motorsport Games Inc., offered to buy out minority shareholders HC2 Holdings 2, Inc., Continental General Insurance Company, and Leo Capital Holdings. *Id.* ¶¶17–18. Its bid succeeded. In August, HC2 and Continental signed a Stock Purchase Agreement with Motorsport, selling

their stakes in 704Games for $11.29 per share. *Id.* ¶ 20. Leo followed suit in October, signing a nearly identical agreement. *Id.* ¶ 21.

But the minority shareholders soon came to regret that sale. In January 2021, Motorsport, which now wholly owned 704Games, went public. *Id.* ¶ 22. Its initial public offering was a roaring success. During the first day's trading, shares in Motorsport hit $38. *Id.* ¶ 26.

That success, the shareholders allege, reflected the true value of 704Games. They point out that Motorsport was essentially a holding company for 704Games. *Id.* ¶¶ 10, 13, 59. Indeed, the NASCAR Heat series, 704Games's key product, "accounted for … 99% of [Motorsport's] total net revenue" the year before the company went public. *Id.* ¶ 22. Plus, Motorsport's IPO documents advertised that the "franchise [would] continue to account for the majority of [Motorsport's] revenue." *Id.*

Because 704Games drove the value of Motorsport's IPO, the shareholders say, they should have been able to share in that success. But Motorsport denied them that chance. They claim that it leveraged its position as 704Games's controlling shareholder to dupe them into selling their shares at a knockdown price. *Id.* ¶¶ 3, 15. To support that theory, they point to what Motorsport told them and what it hid from them.

The shareholders say that Motorsport spent a year presenting a gloomy forecast for 704Games. In board meetings and budgets, it "portray[ed] [704Games] as a money-losing entity that was likely to require additional capital infusions from its investors with little hope of near-term profitability." *Id.* ¶¶ 75, 80.

3

Plus, in June 2020, Motorsport's CEO told the shareholders that there was "bad … sentiment" about 704Games's forthcoming game, NASCAR Heat 5. *Id.* ¶ 103. He went on to say that "pre-sales [of the game] [were] struggling" and claimed that 704Games would "run out of money … even if [it] hit [its] current projections." *Id.* (emphasis omitted). Confirming that impression, Motorsport projected a cash shortfall of almost $1.2 million. *Id.* ¶ 108. As a result, Motorsport said that to stay afloat, 704Games would likely need additional investment soon. *Id.* ¶ 125.

Yet this grim forecast was not borne out. In July 2020, NASCAR Heat 5 was released with strong sales: in fact, demand for that game "significantly exceeded sales of [740Games's] prior NASCAR Heat games." *Id.* ¶ 132. But even though the strong sales boosted the company's finances, Motorsport did not "share th[at] good news with [the minority shareholders]." *Id.*

The shareholders also claim that Motorsport hid the truth about its IPO from them. Though Motorsport told them it planned to go public in the future, it failed to disclose that its IPO was "already in process and that the valuation of Motorsport would be based almost entirely on the value of [704Games]." *Id.* ¶ 154.

Last, the shareholders say that Motorsport usurped corporate opportunities that rightfully belonged to 704Games. Motorsport entered into a promotion agreement with a celebrity driver: two-time Formula One World Champion Fernando Alonso. *Id.* ¶ 133. And it began negotiations to get exclusive permission to make games based on other high-profile races like the FIA World Endurance Championship and the 24 Hours of Le Mans. *Id.* ¶ 140.

4

Outraged by Motorsport's maneuvers, the minority shareholders sued Motorsport and four of its executives: Mike Zoi, Jonathan New, Dmitry Kozko, and Alex Rothbert. They sue under the Securities Exchange Act of 1934, and also claim for breach of contract, breach of fiduciary duty, fraud, and unjust enrichment.

Now the defendants move to dismiss. D.I. 17. To survive, the shareholders' complaint must contain enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## II. THE SHAREHOLDERS' § 10(b) SECURITIES CLAIMS MAY PROCEED

To state a claim for securities fraud under § 10(b) of the Securities Exchange Act of 1934, the shareholders must plead that:

- Motorsport made a "material misrepresentation or omission";

- intentionally or recklessly;

- in connection with the sale of 704Games stock;

- and that in reliance, the shareholders suffered economic loss.

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008); 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. Plus, securities-fraud claims have a heightened pleading standard. So the shareholders must "specify each allegedly misleading statement [and explain] why the statement was misleading." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009); 15 U.S.C. § 78u-4(b)(1). And they must give facts raising "a strong inference that [Motorsport] acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).

Motorsport does not contest that the alleged misrepresentations concerned the sale of 704Games stock. Instead, it asserts that the shareholders failed to check the other three boxes. But those arguments fail. The shareholders state a claim.

## A. Material misrepresentations or omissions

Unpacking the shareholders' securities-fraud claim shows that it rests on two different alleged deceptions:

- Motorsport's failure to tell the shareholders that it had immediate plans to go public after its acquisition of 704Games. D.I. 14 ¶¶ 74−147

- Motorsport's presenting a gloomy forecast about 704Games future and then failing to tell shareholders that NASCAR Heat 5 was a success. *Id.*

Take each theory in turn. The first alleged deception is undercut by facts in the shareholders' complaint. They cannot complain that Motorsport failed to disclose its plans to go public because it *did* tell them. When they sold their stock, the shareholders signed an agreement acknowledging that they "ha[d] sufficient knowledge … about [Motorsport's] … current efforts to consummate a liquidity event or an initial public offering … as soon as practicable." *Id.* ¶¶ 182, 196. But now, they sing a different tune: they say the IPO disclosures were not specific enough because Motorsport did not expressly say that it was *already* planning to go public. D.I. 20, at 9−10. This new argument is plainly inconsistent with (and undercut by) the earlier acknowledgment. D.I. 14 ¶¶ 182, 196.

Yet all is not lost; the shareholders' second theory is viable. True, many of Motorsport's statements were predictions about 704Games' future performance. And such

forward-looking statements are actionable only if Motorsport knew that they were false when it made them. 15 U.S.C. §78u-5(c)(1)(B)(ii), (i)(1)(A). But where later developments make such predictive statements "misleading if left unrevised," a majority shareholder has a "duty … to correct [them]." *In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1245 (3d Cir. 1989); *see also Steiner v. MedQuist Inc.*, 2006 WL 2827740, at *15 (D.N.J. Sept. 29, 2006) ("[C]orporate officers … are required to make … additional disclosures … necessary to avoid rendering [prior] statements … misleading.").

That is what happened here. The shareholders allege that after Motorsport made grim predictions about the company's future, it learned that NASCAR Heat 5, the company's major new product, had "exceeded sales of the company's prior NASCAR Heat games." D.I. 14 ¶ 132. That placed 704Games in a "much better financial position than … [Motorsport] had indicated." *Id.* Indeed, Motorsport later attributed its strong 2020 performance to "the release of [the game]." *Id.* ¶ 128. Yet it never told the minority shareholders. If true, that counts as a material omission.

## B. Intentionally or recklessly

To check this box, the shareholders must allege facts that make it as likely as not that Motorsport acted intentionally or recklessly. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007). Though they do not need "smoking-gun" evidence, the inference must be "cogent and compelling." *Id.* at 324. Here, Motorsport's motive to defraud the shareholders into selling their shares below market value is compelling evidence of the required mental state. *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 245 (3d Cir. 2013) ("[P]lead[ing] motive … can be persuasive.").

As the shareholders note, "[t]he launch of Heat 5 was by far the most important operational event for 704Games." D.I. 20, at 18. So Motorsports' key executives would have known about its strong sales. *See, e.g.*, *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *36 (D.N.J. Dec. 31, 2018) (finding issues that "str[ike] at the heart of [a company's] core business and operations" probative of knowledge). And the executives' knowledge may be attributed to Motorsport. *See, e.g.*, *SEC v. Graulich*, 2013 WL 3146862, at *6 (D.N.J. June 19, 2013) (allowing senior executives' knowledge to be attributed to company).

The executives also had a motive to mislead the shareholders about Heat 5's success. They could buy 704Games at a discount, have more cash on hand at the IPO, and thus look more attractive to investors. *In re Shanda Games Ltd. Sec. Litig.*, 2019 WL 11027710, at *7 (S.D.N.Y. Sept. 30, 2019) (finding "motive and opportunity to secure a low transaction price" enough to show intent or recklessness). Plus, they stood to benefit personally: the more successful the IPO, the bigger the payday. *See* D.I. 14 ¶¶ 84–85 (noting that one executive's compensation was linked to the success of the IPO); *Rahman*, 736 F.3d at 245–46 (recognizing "concrete … benefit to the individual defendants" as motive evidence (quoting *Avaya*, 564 F.3d at 278)). Thus, the shareholders adequately plead that Motorsport and its executives intentionally or recklessly misled them.

### C. Reliance and loss

*1. Reliance.* When a securities-fraud plaintiff is misled by an omission, "reliance will be presumed from the materiality of the information not disclosed." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 192 (3d Cir. 2001) (citing *Affiliated Ute Citizens*

*v. United States*, 406 U.S. 128, 153–54 (1972)). Here, the shareholders' claim is based on an omission: they say Motorsport should have, but did not, tell them about Heat 5's success. That was an omission of a material fact, so I will presume reliance here. *Id.*

*2. Loss.* The shareholders also plead that they suffered a loss. They say the market value of 704Games' stock was higher than the amount they got. D.I. 14 ¶ 198. To support that, they point to the success of Motorsport's IPO. True, Motorsport may ultimately undermine that causation theory by explaining why Motorsport's valuation does not reflect 704Games's value. But I may not resolve that factual dispute on this motion to dismiss.

### III. THE SHAREHOLDERS' INSIDER-TRADING AND CONTROL-PERSON CLAIMS MAY PROCEED

In addition to their securities-fraud claims, the shareholders bring claims under the Securities Act of 1934: an insider-trading claim against Motorsport and control-person claims against Zoi, Kozko, and New.

The defendants make just one argument for dismissing those claims. They point out that both claims require a predicate violation of the Exchange Act, yet here, they say, the shareholders have not pleaded that violation. D.I. 18, at 19; *see also In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 378–79 (D.N.J. 1999) (listing requirements for both § 20A and § 20(a) claims). Not so. As I have explained, the shareholders have plausible securities-fraud claims against the defendants. And that counts as a predicate violation. *Id.* at 378 (noting that § 10(b) claims count as predicate violations).

Because the defendants do not contest the other elements of the shareholders' insider-trading and control-person claims, those claims may go on.

## IV. THE SHAREHOLDERS' COMMON-LAW CLAIMS MAY PROCEED

The shareholders also bring common-law claims against the defendants. They allege that the Motorsport breached its 704Games Stockholders' Agreement by failing to make proper financial disclosures. Plus, they say, all the defendants violated their fiduciary duties to the shareholders. Last, they contend that the defendants were unjustly enriched by their fraudulent scheme.

Parrying those allegations, the defendants argue that the common-law claims are barred by the general release that the shareholders signed when they sold their stock. And even if that release does not bar the shareholders' claims, the defendants say, each claim fails on its merits. Both responses miss the mark.

### A. The release does not bar the shareholders claims

Start with the text of the release:

> [The shareholders release] any and all claims, debts, obligations, and liabilities, whether known or unknown, contingent or noncontingent, at law or in equity, in each case directly or indirectly arising from or in connection with, or relating to, [704Games], [its] business, the Shares or any agreements or obligations of [704Games] and/or [Motorsport's] ownership [of it].

D.I. 14-1, Ex. 2 §9 (HC2 and Continental release); D.I. 14-1, Ex. 3 §9 (same release in Leo contract).

On its face, that provision is broad enough to bar all the shareholders' common-law claims. But here's the rub: the shareholders say the release, which is part of the

contract selling their stock to Motorsport, was fraudulently induced. D.I. 14 ¶¶ 290–301.

That argument is persuasive. The shareholders say they would not have sold their stock had Motorsport and its executives not misled them. *Id.* ¶ 301. And when a general release is *itself* fraudulently induced, the "party alleging fraud … may elect rescission," setting aside that release. *E.I. Dupont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 465 (Del. 1999).

True, parties may execute general releases that "extinguish claims for … fraud in the inducement." *Seven Invs. LLC v. AD Cap., LLC*, 32 A.3d 391, 399 (Del. Ch. 2011). But they did not do that here.

For one, they did not expressly mention fraudulent inducement in the text of the release. Indeed, the alleged fraudulent inducement is "'different sequentially and conceptually' from the … subject of the [release]." *Id.* at 400 (quoting *Seven Invs.*, 32 A.3d at 462). The contract released claims "relating to [704Games], [its] business" and "[Motorsport's] ownership [of it]." D.I. 14-1, Ex. 2 §9; D.I. 14-1, Ex. 3 §9. Put differently, it relieved Motorsport from liability flowing from its management of the company. Yet the shareholders' fraudulent-inducement claim goes to the sale of stock, not management of the company. Besides, unlike other cases in which courts are willing to read releases to preclude fraudulent-inducement claims, here there is no hint that the shareholders were "on notice of potential fraud." *Seven Inves.*, 32 A.3d at 399.

Because the shareholders plausibly plead that the release was fraudulently induced, I may look past it and consider the merits of their common-law claims.

**B. The shareholders' claims survive on the merits**

*1. Breach of contract.* Motorsport does not contest the shareholders' claim that it breached the 704Games Stockholders' Agreement by failing to make proper financial disclosures. Instead, it points out that the Stockholders' Agreement has a forum-selection clause directing disputes to federal district court in Florida. D.I. 14, Ex. 1 § 13.8.

Pushing back, the shareholders point to a competing forum-selection clause in the parties' Stock Purchase Agreement. That one sends disputes to this Court. *See* D.I. 14-1, Ex. 2 § 17; D.I. 14-1, Ex. 3 § 17. But the shareholders may not have their cake and eat it too. They cannot say that the Stock Purchase Agreement was fraudulently induced and avoidable, but also claim that agreement validly overrides their earlier forum-selection clause. D.I. 20, at 24 n.13.

Still, I may overlook a forum-selection clause where judicial economy requires it. I may do so if "the strong public interest in upholding the contracting parties' settled expectations is 'overwhelmingly' outweighed by the countervailing interests." *In re Howmedica Ostenoics Corp.,* 867 F.3d 390, 405 (3d Cir. 2017) (quoting *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.,* 571 U.S. 49, 67 (2013)). This is that rare case.

Here, the parties' settled expectation in enforcing their forum-selection clause is less compelling because they later elected to send related disputes to this Court. D.I. 14-1, Ex. 2 § 17; D.I. 14-1, Ex. 3 § 17. And the countervailing interests greatly outweigh that diminished expectation. If I were to send the shareholders' contract claim to Florida, that court would have to do duplicative factfinding: the shareholders'

breach-of-contract and securities-fraud claims involve the same conduct by the defendants. Plus, that court would have to consider the same fraudulent-inducement argument that I have before me here, raising the possibility of contradictory rulings.

I thus look past the Florida forum-selection clause and let the contract claim proceed here. *See In re Howmedica*, 867 F.3d at 405.

*2. Breach of fiduciary duty*. A controlling shareholder owes fiduciary duties to minority shareholders. *See, e.g.*, *Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 364 (D. Del. 1975). It may not "mislead [a minority] stockholder by use of corporate information to which the latter is not privy." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). Nor may it steal corporate opportunities that rightfully belong to the company. *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154–55 (Del. 1996).

Yet Motorsport allegedly did both. It left the shareholders with the impression that 704Games was in rough shape, then failed to correct that impression once it learned that Heat 5 was a success. D.I. 14 ¶ 132. And it took 704Games's opportunities by signing an endorsement deal with Fernando Alonso and negotiating to develop a new series of racing games. *Id.* ¶ 133. If true, those facts suggest that Motorsport breached its fiduciary duty. So this claim survives too.

*3. Unjust enrichment*. To raise a claim that the defendants were unjustly enriched, the shareholders must plead that they "ret[ained] … a benefit to the loss of [the shareholders]," without justification. *Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315 (D. Del. 2008).

Again, Motorsport does not contest that the shareholders state a claim on the merits. Rather, it says that claim is barred because it "arises from a relationship governed by contract"—here the parties' Stock Purchase Agreement. D.I. 18, at 24 (quoting *Air Prods. & Chem., Inc. v. Wiesemann*, 237 F. Supp. 3d, 192, 216 (D. Del. 2017)). True enough. But here, the shareholders plausibly plead that the Stock Purchase Agreement was fraudulently induced. And where "there is doubt surrounding the enforceability … of a contract," unjust-enrichment claims may proceed. *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005).

\* \* \* \* \*

A controlling shareholder may not use its insider knowledge to mislead minority shareholders, particularly when it enters a self-interested transaction to buy their stock. Yet Motorsport allegedly did just that. So I will let the minority shareholders' securities-fraud claim proceed. Plus, the shareholders allege plausible insider-trading, control-person, breach-of-contract, breach-of-fiduciary-duty, and unjust-enrichment claims. So I decline Motorsport's invitation to dismiss them.

14