## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INNOVATE 2, CORP.; CONTINENTAL GENERAL INSURANCE COMPANY; and LEO CAPITAL HOLDINGS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MOTORSPORT GAMES INC. (f/k/a MOTORSPORT GAMING US LLC); MIKE ZOI; JONATHAN NEW; DMITRY KOZKO; and ALEX ROTHBERT,<br><br>Defendants. | Civil Action No. 21-00165-RGA |

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

## ANSWER

Defendants Motorsport Games Inc. ("Motorsport"), Mike Zoi, Jonathan New, Dmitry Kozko, and Alex Rothbert, by counsel, submit this Answer to the allegations in Plaintiffs' Amended Complaint.

## PRELIMINARY STATEMENT

The following are incorporated by reference into Defendants' responses to each paragraph of the Complaint:

The headings and sub-headings in Plaintiffs' Amended Complaint require no response. However, to the extent a response is required, Defendants deny all allegations in the headings and sub-headings in Plaintiffs' Amended Complaint. Any allegation not expressly admitted below is denied.

## NATURE OF THE ACTION

1.      This is a classic case of a controlling stockholder abusing its fiduciary position to defraud minority investors and snap up their shares at a deep discount—only for the controlling stockholder to turn around and immediately realize an enormous profit on the deal.

ANSWER:   Defendants deny the allegations in Paragraph 1.

2.      Defendant Motorsport, the controlling stockholder of 704Games Company, a Delaware corporation ("704Games" or the "Company"), told Plaintiffs, the Company's minority investors, a false tale of woe and unprofitability—when, in fact, the Company was in the midst of a groundbreaking year of success and profitability, and Defendants fully expected to realize a bonanza profit when Motorsport conducted an initial public offering.

ANSWER:   Defendants admit that Motorsport is a Delaware corporation with a controlling interest in 704Games.  Defendants deny the remaining allegations in Paragraph 2.

3.      Relying on Defendants' false assurances, Plaintiffs accepted a paltry $1.36 million in return for their 29.2% share of the Company.

ANSWER:   Defendants deny the allegations in Paragraph 3, except to admit that Plaintiffs sold their combined 29.2% share of 704Games for $1.36 million.

4.      Mere months later, Defendants conducted a spectacularly successful IPO that valued 29.2% of the Company, the percentage share of the Company Plaintiffs owned before the sale to Motorsport, at a whopping $230 million—***more than 170 times*** the amount Motorsport paid Plaintiffs for their shares.

ANSWER:   Defendants admit that Motorsports' shares were sold via an initial public offering ("IPO").  All remaining allegations in Paragraph 4 are denied.

5.      This action arises under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, for violation of Securities and Exchange Commission ("SEC") Rule 10b-5, codified at 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), as well as for breach of contract, fraud in the inducement, breach of fiduciary duty, unjust enrichment, and constructive trust under Delaware law.

ANSWER:   Paragraph 5 states conclusions of law for which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 5.

6.      The Company is a developer and publisher of video games for a variety of platforms, including the PlayStation 4 and Xbox One game consoles, Windows PCs, and mobile phones. It holds the exclusive license to be the official video game developer and publisher for the NASCAR® video game racing franchise. To date, the Company has sold well over a million copies

of its NASCAR video games for game consoles and PCs, its NASCAR Heat Mobile application for iOS- and Android-based mobile devices has had approximately five million installs, and the Company is developing two additional NASCAR games for mobile devices with projected release dates in 2021.

ANSWER:   Defendants deny the allegations in Paragraph 6.

7.     HC2's investment in NASCAR games dates back to 2015, when HC2's subsidiary, DMi, Inc., acquired certain exclusive rights to build a NASCAR games business. HC2 paid $6.0 million to acquire the DMi, Inc. business.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 7, and therefore deny them.

8.     Leo's investment in NASCAR games dates to 2016, when Leo joined with NASCAR industry insiders to invest in DMi, Inc. Leo paid $1.0 million to acquire stock in DMi, Inc.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 8, and therefore deny them.

9.     In 2017, the Company went through a rebranding effort, including changing its name from DMi, Inc. to 704Games.

ANSWER:   Defendants admit that in 2017 704Games changed its name from DMi, Inc. to

704Games.   Defendants lack sufficient information to either admit or deny the remaining

allegations in Paragraph 9, and therefore deny them.

10.     Motorsport was formed in 2018 as a holding company and wholly owned subsidiary of Motorsport Network, LLC ("Motorsport Network").

ANSWER:   Defendants admit the allegations in Paragraph 10.

11.     In August 2018, HC2, Continental, and Leo, along with other investors in the Company, entered into a Stockholders' Agreement with Motorsport in connection with Motorsport's purchase of 217,352 shares of the Company's common stock (the "Stockholders' Agreement," a copy of which is attached hereto as Exhibit 1). Motorsport's acquisition made Motorsport the controlling stockholder of the Company, leaving HC2 with 54,807 shares of common stock, Continental with 51,500 shares of common stock, and Leo with 10,301 shares of common stock.

ANSWER:   Defendants admit the allegations in Paragraph 11.

12.     After the 2018 transaction, Motorsport owned approximately 53.5% of the

3

Company's common stock, while HC2 owned approximately 13.5%, Continental owned approximately 12.7%, and Leo owned approximately 3.0%. As controlling stockholder, Motorsport and its agents, including Zoi, Kozko, New, and Rothbert, exercised control over the flow of financial and operational information to Plaintiffs.

ANSWER: Defendants admit that after the 2018 transaction, Motorsport owned approximately 53.5% of 704Games' common stock, while HC2 owned approximately 13.5%, Continental owned approximately 12.7%, and Leo owned approximately 3.0%. All remaining allegations in Paragraph 12 are denied.

13.    Since acquiring control of the Company, Motorsport has derived nearly all of its total net revenues from its ownership interest in the Company.

ANSWER:  Defendants admit that the majority of Motorsport's net revenues were derived from Motorsport's ownership interest in 704Games.

14.    Motorsport, its controlling owner Zoi, its CEO Kozko, its CFO New, and Rothbert, VP Finance & Global Controller of Motorsport's parent company, owed fiduciary duties to Plaintiffs by virtue of Motorsport's position as the controlling majority stockholder of the Company.

ANSWER:  Paragraph 14 states conclusions of law to which no response is required. To the extent a response is required, Defendants admit that Motorsport, as majority shareholder in 704Games, owed fiduciary duties to minority shareholders in 704Games.

15.    During 2020, Defendants misrepresented and concealed the financial results and prospects of the Company, leading Plaintiffs and other minority stockholders to believe that the Company was historically unprofitable, continued to operate at a deficit in the near term, and would require significant additional investment by Plaintiffs in order to become profitable in the future.

ANSWER:  Defendants deny the allegations in Paragraph 15.

16.    In addition, Defendants claimed that there had been a "substantial" revenue overstatement in 2018 and demanded either $1.1 million in additional cash or 15% of all other stockholders' equity shares in consideration for the alleged overstatement.

ANSWER:  Defendants admit the allegations in Paragraph 16.

17.    In June 2020, Defendants approached HC2 and Continental and offered to purchase their respective shares of the Company for a price far below what, it is fair to infer, Defendants knew was the fair market value for those shares.

4

ANSWER:   Defendants deny the allegations in Paragraph 17, except to admit that in June 2020 Defendants approached HC2 and Continental and offered to purchase their respective shares of 704Games.

18.   In August 2020, Defendants approached Leo and offered to purchase Leo's shares of the Company at that same artificially low price, despite, based on the facts alleged, Defendants' knowledge that the Company was overperforming expectations and would soon be on solid financial footing.

ANSWER:   Defendants deny the allegations in Paragraph 18, except to admit that in August 2020, Defendants approached Leo and offered to purchase Leo's shares of 704Games.

19.   Defendants controlled the information flow to Plaintiffs concerning the Company's results and prospects. Plaintiffs relied on Defendants' statements, including Defendants' statements concerning the Company's near-term lack of profitability and the need for additional capital contributions to become profitable in the future, in deciding to sell Plaintiffs' stock to Motorsport.

ANSWER:   Defendants deny the allegations in Paragraph 19.

20.   HC2, Continental, and Motorsport thereafter entered into a Stock Purchase Agreement dated August 18, 2020 (the "SPA", a copy of which is attached hereto as Exhibit 2), pursuant to which HC2 and Continental sold their shares in the Company to Motorsport for $11.2881 per share, for a total sale price of $1.2 million.

ANSWER:   Defendants admit the allegations in Paragraph 20.

21.   Leo and Motorsport entered into a substantially identical Stock Purchase Agreement dated October 6, 2020 (the "Leo SPA", a copy of which is attached hereto as Exhibit 3), pursuant which Leo sold its shares in the Company to Motorsport for $11.2881 per share, for a total sale price of $116,279.

ANSWER:   Defendants admit the allegations in Paragraph 21.

22.   On January 13, 2021, less than five months after acquiring HC2 and Continental's shares at a steep discount, and approximately three months after acquiring Leo's shares at the same steep discount, Defendants and their affiliates held an initial public offering of stock in Motorsport on the NASDAQ stock exchange (the "IPO"). As reflected in the prospectus and other materials issued in connection with the IPO, the Company is the primary asset of Motorsport. For example, in the prospectus filed with the SEC on January 13, 2021, (the "Motorsport Prospectus", a copy of which is attached hereto as Exhibit 4), Motorsport disclosed that "revenues associated with the NASCAR Heat franchise accounted for approximately 99% of our total net revenue for the years ended December 31, 2019 and 2018 and the nine months ended September 30, 2020, and we expect this franchise to continue to account for the majority of our revenue for the year ended December 31, 2020."

ANSWER:   Defendants admit that Motorsport conducted an IPO of Motorsport stock on the NASADAQ on January 13, 2021.   Defendants also admit that the allegations in Paragraph 22 purport to quote, in part, the Motorsport Prospectus; Defendants deny those allegations to the extent they inaccurately or incompletely quote the relevant terms of the Motorsport Prospectus and refer the Court to such document for a complete and accurate statements of its contents. Defendants deny the remaining allegations in Paragraph 22.

23.     Contrary to Defendants' misrepresentations that the Company would be modestly profitable in 2020 but was still in dire financial straits and would need significant additional capital to meet development goals in 2021, the Company was making a significant profit. The financial information reported in the Motorsport Prospectus, which was based almost exclusively on the financials of 704Games, indicated positive EBITDA of $3,278,706 for the nine months ended September 30, 2020. By contrast, in June 2020 Motorsport and Kozko presented a financial summary to Plaintiffs that projected positive EBITDA of just $610,000 for all of 2020, and a cash shortfall of over one million dollars in 2021, even with modest profit in 2020.

ANSWER:   Defendants admit that it was forecasted and disclosed to Plaintiffs that the Company would be profitable in 2020 and would need a capital infusion in 2021.   Defendants also admit that the allegations of Paragraph 23 purport to quote, in part, the Motorsport Prospectus and a June 2020 financial presentation; Defendants deny those allegations to the extent they inaccurately or incompletely quote those documents and refer the Court to such documents for a complete and accurate statement of their contents.   Defendants deny the remaining allegations in Paragraph 23.

24.     Defendants had, in fact, been planning the IPO well in advance of their purchase of Plaintiffs' shares. In January 2020, Motorsport entered into an employment agreement with Kozko that contemplated a lucrative IPO. In preparation for the IPO and prior to their acquisition of Plaintiffs' shares, Defendants signed a confidential Promotional Services Agreement with Fernando Alonso Diaz, a prominent Formula One racecar driver, and were negotiating to obtain exclusive licenses to develop multi-platform games for Automobile Club de l'Ouest, including games based on the FIA World Endurance Championship and the 24 Hours of Le Mans. The first confidential filing in support of the IPO was made mere weeks after Defendants purchased HC2's and Continental's shares in the Company, and *prior to* Defendants' purchase of Leo's shares.

ANSWER:   Defendants admit only that an IPO of Motorsport was contemplated prior to the

purchase of Plaintiffs' shares, which each Plaintiff acknowledged being aware of in the respective SPA and

Leo SPA; Motorsport entered into an employment agreement with Kozko, that had an effective date

of January 1, 2020 but was entered into after the SPA and Leo SPA; Defendants signed a

confidential Promotional Services Agreement with Fernando Alonso Diaz and were negotiating to

obtain exclusive licenses to develop multi-platform games for Automobile Club de l'Ouest; and

the first confidential filing in support of the IPO was made weeks after Defendants purchased

HC2's and Continental's shares in 704Games and prior to Defendants' purchase of Leo's shares.

All remaining allegations in Paragraph 24 are denied.

25.     Despite their *pro forma* disclosure of the possibility of an unspecified liquidity
event in the proposed language of the SPA and Leo SPA, Defendants never shared any of the
substance, anticipated timing, or anticipated value of their IPO with Plaintiffs, despite being deeply
engaged in the IPO planning process simultaneously with purchasing Plaintiffs' shares. In
particular, Defendants should have disclosed that the Company's assets and operations would
comprise the vast majority of the value proposition for the IPO of Motorsport. Plaintiffs only
learned the true nature of Motorsport's IPO plans when the SEC filings were made public.

ANSWER:   Defendants admit that they disclosed to Plaintiffs the possibility of a liquidity

event, including a potential IPO, and Defendants deny the remaining allegations in Paragraph 25.

Additionally, Defendants state that Plaintiffs' allegations—that they only learned of the purported

true nature of Motorsport's IPO plans when the SEC filings were made public—are irreconcilable

with Plaintiffs' representations and warranties in Paragraph 4(h) of the respective Stock Purchase

Agreement that Plaintiffs "[have] sufficient knowledge and experience with and information about

Buyer (including Buyer's business objective and current efforts to consummate a liquidity event

or an initial public offering of Buyer as soon as practicable) . . . ."

26.     The IPO was initially priced at $20.00 per share, but traded much higher, reaching
$38.00 per share during initial trading on January 13, 2021. Based upon the peak trading price,
the implied value of the Company is approximately $786 million. The 29.2% share of the
Company that Motorsport acquired from Plaintiffs for $1.3 million is accordingly worth at least
approximately $230 million.

ANSWER:   Defendants admit only that the IPO was initially priced at $20.00 per share and

at some point, traded at $38.00 per share during initial trading on January 12, 2021.  All remaining

allegations in Paragraph 26 are denied.

27.      Defendants' actions violated Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 thereunder because Defendants misrepresented, misled, and failed to disclose material facts in connection with their purchases of securities from Plaintiffs. Motorsport is also liable under Section 20A of the Exchange Act for insider trading, purchasing Plaintiffs' shares while in possession of material confidential information belonging to the Company without disclosing that information to Plaintiffs.

ANSWER:    Paragraph 27 states conclusions of law for which no response is required.  To

the extent a response is required, Defendants deny the allegations in Paragraph 27.

28.      Defendants' material misrepresentations and omissions, and their failure to provide timely and accurate financial information concerning the Company, also breached their obligations to Plaintiffs under the Stockholders' Agreement.

ANSWER:    Paragraph 28 states conclusions of law for which no response is required.  To

the extent a response is required, Defendants deny the allegations in Paragraph 28.

29.      Defendants' material misrepresentations and omissions fraudulently induced Plaintiffs to enter into the SPA and the Leo SPA and sell Plaintiffs' shares of the Company to Motorsport for less than fair market value.

ANSWER:    Paragraph 29 states conclusions of law for which no response is required.  To

the extent a response is required, Defendants deny the allegations in Paragraph 29.

30.      Defendants' actions also breached the fiduciary duties that Motorsport, as majority stockholder of the Company, owed to Plaintiffs, as minority stockholders, by materially misrepresenting and/or failing to disclose key financial and other information about the Company, and by diverting corporate opportunities for the benefit of Defendants.

ANSWER:    Paragraph 30 states conclusions of law for which no response is required.  To

the extent a response is required, Defendants deny the allegations in Paragraph 30.

## JURISDICTION AND VENUE

31.      This Court has original subject-matter jurisdiction over this action pursuant to Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a), because it is an action at law and suit in equity brought to enforce liabilities and duties created by Sections 10(b), 20(a), and 20A of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as well as under 28 U.S.C. Section 1331 because this is a civil action arising

under the laws of the United States, specifically the Exchange Act and Rule 10b-5.

ANSWER:   Paragraph 31 states conclusions of law for which no response is required.  To

the extent a response is required, Defendants deny the allegations in Paragraph 31.

32.   This Court has and may properly exercise supplemental jurisdiction over Plaintiffs'
claims for breach of contract, fraud in the inducement, breach of fiduciary duty, unjust enrichment,
and constructive trust under Delaware law pursuant to 28 U.S.C. § 1367 because all such claims
are so related to Plaintiffs' claims under the Exchange Act and Rule 10b-5 thereunder that they
form part of the same case or controversy under Article III of the U.S. Constitution.

ANSWER:   Paragraph 32 states conclusions of law for which no response is required.  To

the extent a response is required, Defendants deny the allegations in Paragraph 32.

33.   This Court has personal jurisdiction over Defendant Motorsport because
Motorsport (a) is a Delaware corporation and (b) expressly agreed in Section 17 of the SPA and
Leo SPA that:

> Any legal suit, action or proceeding arising out of or based upon this Agreement
> or the transactions contemplated hereby may be instituted in the federal courts
> of the United States or the courts of the State of Delaware in each case located in the
> State of Delaware, and each party irrevocably submits to the exclusive
> jurisdiction of such courts in any such suit, action or proceeding. Service of
> process, summons, notice or other document by mail to such party's address set
> forth herein shall be effective service of process for any suit, action or other
> proceeding brought in any such court. The parties irrevocably and
> unconditionally waive any objection to the laying of venue of any suit, action or
> any proceeding in such courts and irrevocably waive and agree not to plead or
> claim in any such court that any such suit, action or proceeding brought in any
> such court has been brought in an inconvenient forum.

Exs. 2 § 17 and 3 § 17.

ANSWER:   Paragraph 33 states conclusions of law for which no response is required.  To

the extent a response is required, Defendants deny the allegations in Paragraph 33, except to admit

that the quoted language from Section 17 of the SPA and Leo SPA is accurately quoted.

34.   This Court has personal jurisdiction over Defendant Kozko pursuant to Exchange
Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief,
Kozko is a citizen and domiciliary of the United States and, as alleged herein, personally
participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule
10b-5 thereunder. This Court also has personal jurisdiction over Defendant Kozko pursuant to
Delaware's director and officer consent statute, 10 Del. Code § 3114, because Kozko is Chief
Executive Officer and Executive Chairman of Defendant Motorsport and served as a Director of

the Company, signed the SPA containing the Delaware forum selection clause quoted above on behalf of Defendant Motorsport, and, based on his conduct alleged herein, is a necessary and proper party to this action.

ANSWER:   Paragraph 34 states conclusions of law for which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 34, except to admit that Defendant Kozko is a citizen and domiciliary of the United States, is Chief Executive Officer and Executive Chairman of Defendant Motorsport and served as a Director of 704Games, and signed the SPA referenced and quoted in Paragraph 33.

35.   This Court has personal jurisdiction over Defendant New pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief, New is a citizen and domiciliary of the United States and, as alleged herein, personally participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder. This Court also has personal jurisdiction over Defendant New pursuant to Delaware's director and officer consent statute, 10 Del. Code § 3114, because New is Chief Financial Officer of Defendant Motorsport, acted as chief financial officer for the Company, and, based on his conduct alleged herein, is a necessary and proper party to this action.

ANSWER:   Paragraph 35 states conclusions of law for which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 35, except to admit that Defendant New is a citizen and domiciliary of the United States and is the Chief Financial Officer of Defendant Motorsport.

36.   This Court has personal jurisdiction over Defendant Zoi pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief, Zoi is a citizen and domiciliary of the United States and, as alleged herein, personally participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

ANSWER:   Paragraph 36 states conclusions of law for which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 36, except to admit that Defendant Zoi is a citizen and domiciliary of the United States.

37.   This Court has personal jurisdiction over Defendant Rothbert pursuant to Exchange Act Section 27(a), 15 U.S.C. § 78aa(a), because, as alleged below upon information and belief, Rothbert is a citizen and domiciliary of the United States and, as alleged herein, personally participated in Defendant Motorsport's alleged violations of Exchange Act Section 10(b) and Rule 10b-5 thereunder.

ANSWER:   Paragraph 37 states conclusions of law for which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 37, except to admit that Defendant Rothbert is a citizen and domiciliary of the United States.

38.     Venue for this action is proper in this Court with respect to Defendant Motorsport pursuant to the SPA's forum selection clause quoted above as well as Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because Motorsport, as a Delaware corporation, is deemed to be an inhabitant of Delaware, and, upon information and belief, transacts business in Delaware.

ANSWER:   Paragraph 38 states conclusions of law for which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 38, except to admit that Motorsport is a Delaware corporation and transacts business in Delaware.

39.     Venue also is proper in this Court with respect to all Defendants pursuant to 28 U.S.C. § 1391(b)(3) because, although all Defendants are, upon information and belief, residents of Florida, the exclusive forum selection clause contained in Section 17 of the SPA, which Defendant Kozko signed on behalf of Defendant Motorsport, precludes bringing this action in the U.S. District Court for the Southern District of Florida. Since this Court has personal jurisdiction over all Defendants with respect to this action and proceeding in this Court is consistent with the SPA's exclusive forum selection clause, this Court is the most appropriate venue for this action.

ANSWER:   Paragraph 39 states conclusions of law for which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 39.

## THE PARTIES

40.     Plaintiff HC2 is a Delaware corporation with its principal place of business at 450 Park Avenue, 29th Floor, New York, New York 10022.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 40, and therefore deny them.

41.     Plaintiff Continental is a Texas insurance company with its principal place of business at 11001 Lakeline Boulevard, Suite 120, Austin, Texas 78717. During the relevant time frame, HC2's corporate parent, HC2 Holdings, Inc. ("HC2 Holdings"), also owned Continental. On March 29, 2021 HC2 Holdings announced that it has entered into a definitive agreement to sell Continental to Continental General Holdings LLC.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 41, and therefore deny them.

11

42.     Plaintiff Leo is an Illinois limited liability company with its principal place of business at 400 Skokie Boulevard, Suite 410, Northbrook, Illinois 60062

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 41, and therefore deny them.

43.     Defendant Motorsport is a Delaware corporation with its principal place of business at 5972 NE 4th Avenue, Miami, Florida 33137. Upon information and belief, prior to January 8, 2021, Motorsport was a Florida limited liability company known as Motorsport Gaming US LLC with its principal place of business at the same address. Upon information and belief, on January 8, 2021, Motorsport converted from a Florida limited liability company to a Delaware corporation pursuant to a statutory conversion and changed its name to Motorsport Games Inc.

ANSWER:   Defendants admit the allegations in Paragraph 43.

44.     Upon information and belief, Defendant Zoi is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

ANSWER:   Defendants admit the allegations in Paragraph 44.

45.     Defendant Zoi is the Manager of Motorsport Network. As the Manager, Zoi has sole voting and dispositive power with respect to the shares of Defendant Motorsport held by Motorsport Network. Motorsport Network was the sole shareholder of Motorsport until the IPO of Motorsport stock on January 13, 2021 and continues to own a controlling interest in Motorsport.

ANSWER:   Defendants admit the allegations in Paragraph 45.

46.     Upon information and belief, Defendant Kozko is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

ANSWER:   Defendants admit the allegations in Paragraph 46.

47.     Defendant Kozko is the principal executive officer of Motorsport, having served as its Chief Executive Officer since January 2020 and as its Executive Chairman since December 2020. Kozko previously served as Senior VP of Operations and COO of Motorsport's corporate parent, Motorsport Network, which he joined in January 2018.

ANSWER:   Defendants admit the allegations in Paragraph 47.

48.     Upon information and belief, Defendant New is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

ANSWER:   Defendants admit the allegations in Paragraph 48.

49.     Defendant New is the principal financial officer of Motorsport, having served as its Chief Financial Officer since January 2020. Upon information and belief, New also acted as chief financial officer for the Company since January 2020.

ANSWER:  Defendants admit the allegations in Paragraph 49.

50.     Upon information and belief, Defendant Rothbert is a citizen and domiciliary of the State of Florida with a business address of 5972 NE 4th Avenue, Miami, Florida 33137.

ANSWER:  Defendants admit the allegations in Paragraph 50.

51.     Defendant Rothbert is the VP Finance & Global Controller of Motorsport Network. Motorsport Network was the sole shareholder of Motorsport until the IPO of Motorsport stock on January 13, 2021 and continues to own a controlling interest in Motorsport.

ANSWER:  Defendants admit the allegations in Paragraph 51.

## FACTUAL ALLEGATIONS

52.     HC2 made its initial investment in NASCAR games in 2014, when HC2 formed its subsidiary, DMi, Inc., which subsequently acquired certain exclusive rights to build a NASCAR games business. At the time of HC2's initial investment, Blake Davidson, NASCAR Vice President of Licensing and Consumer Products, publicly announced that "[w]e share a strategic vision with [HC2 subsidiary] DMi to broaden NASCAR Interactive Entertainment and deliver a first-class gaming experience to our fans, who are deeply passionate about NASCAR games". As noted in HC2's annual report for the fiscal year ended December 31, 2015, HC2 paid $6.0 million to acquire the DMi, Inc. business.

ANSWER:  Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 52, and therefore deny them.

53.     On April 11, 2016, Leo acquired its minority position in DMi, Inc for an initial investment of $1.0M.

ANSWER:  Defendants lack sufficient information to either admit or deny the allegations

in Paragraph 53, and therefore deny them.

54.     PlayFast Games, LLC ("PlayFast"), an investment vehicle formed by a group of NASCAR insiders including Brooks, the former President of NASCAR Media Group and former Senior Vice President of NASCAR, NASCAR driver and 2015 Daytona 500 Champion Joey Logano, and 2012 NASCAR Sprint Cup Series Champion Brad Keselowski, acquired a minority position simultaneously with Leo. Leo and PlayFast were strategic partners in making the 2016 investment.

ANSWER:  Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 54, and therefore deny them.

13

55.    In 2017, the Company completed its transition from DMi, Inc. into 704Games when Paul Brooks ("Brooks"), the lead investor from PlayFast, took over the CEO position from founding CEO Tom Dusenberry and the Company changed its name.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 55, and therefore deny them.

56.    The Company is a developer and publisher of video games for a large and growing variety of platforms, including the PlayStation 4 and Xbox One game consoles, Windows PCs, and mobile phones. It holds the exclusive license to be the official video game developer and publisher for the NASCAR video game racing franchise. To date, the Company has sold well over a million copies of its NASCAR video games for game consoles and PCs. The products offered by the Company also include NASCAR Heat Mobile for iOS and Android, which has had approximately five million installs to date, and the Company is developing two additional NASCAR games for mobile devices with projected release dates in 2021. In addition, the Company holds the exclusive right to create and organize e-sports leagues and events for NASCAR using the Company's NASCAR racing video games, subject to certain limited exceptions.

ANSWER:   Defendants admit the allegations in Paragraph 56.

57.    At the time the Company completed its transition from DMi, Inc. to 704Games, the Company's board of directors approved a fair market valuation of the Company's shares of $88.76 per share, based on an analysis provided by an independent third-party valuation firm. In August 2017, HC2 and Leo extended a $1.4 million term loan to fund the Company's operations.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

the Paragraph 57, and therefore deny them.

58.    As early as May 2018, Zoi and Motorsport Network met with then-CEO of 704Games, Brooks, regarding potential collaboration with and investment in the Company. Zoi wanted Motorsport to have a controlling stake in the Company from the first meeting.

ANSWER:    Defendants admit the allegations in the first sentence of Paragraph 58.

Defendants deny the allegations in the second sentence of Paragraph 58.

59.    In August 2018, Motorsport was formed as a holding company and purchased a controlling interest consisting of 217,352 shares of the Company's common stock at a price of $50.61 per share. At the time of the Motorsport acquisition, the Company's board of directors determined that the fair market value of the Company was $50.61 per share.

ANSWER:   Defendants admit the allegations in Paragraph 59.

60.    Motorsport's acquisition made Motorsport the controlling stockholder of the Company, leaving HC2 with 54,807 shares of common stock, Continental with 51,500 shares of

14

common stock, and Leo with 10,301 shares of common stock. After the 2018 transaction, Motorsport owned approximately 53.5% of the Company's common stock, while HC2 owned approximately 13.5%, Continental owned approximately 12.7%, and Leo owned approximately 3.0%.

ANSWER:   Defendants admit the allegations in Paragraph 60.

61.   In connection with Motorsport's acquisition of approximately 53.5% of the Company's shares, on August 14, 2018, Motorsport and the minority stockholders of the Company (including HC2, Continental, and Leo) entered into the Stockholders' Agreement, which specified certain rights of the Stockholders vis-à-vis the Company and each other.

ANSWER:   Defendants admit the allegations in Paragraph 61.

62.   Pursuant to Section 7.1 of the Stockholders' Agreement, the Company, as controlled by Defendants, was obligated to provide Plaintiffs and the other minority stockholders with quarterly unaudited and annual audited financial statements of the Company on a timely basis. All such financial statements were required to be prepared in accordance with generally accepted accounting practices (GAAP).

ANSWER:   Defendants admit that the allegations of Paragraph 62 purport to paraphrase

Section 7.1 of the Stockholders' Agreement; Defendants deny those allegations to the extent they

inaccurately or incompletely describe the relevant terms of the Stockholders' Agreement and refer

the Court to such agreement for its full and complete terms.

63.   At all times from August 2018 through the date of the SPA, HC2, Continental, and Defendants understood that Plaintiff Continental would communicate and receive information about the Company via Plaintiff HC2. Defendants did not communicate directly with Plaintiff Continental, but at all times understood that any representations that Defendants made to HC2 were equally made to Continental. Further, all such representations were received and relied upon by Continental.

ANSWER:   Defendants admit only that they did not communicate directly with Continental

and deny any allegations specifically made as to Defendants' knowledge.   Defendants lack

sufficient information to either admit or deny the remaining allegations in Paragraph 63, and

therefore deny them.

64.   As controlling majority stockholder of the Company, Motorsport and its agents owed fiduciary duties to the Company and its minority stockholders, including duties of care, loyalty, and disclosure.

15

ANSWER:   Paragraph 64 states conclusions of law for which no response is required.  To the extent a response is required, Defendants admit that Motorsport as majority shareholder of the Company, owed fiduciary duties to the Company's minority shareholders.

65.     Defendants systematically removed representatives of the minority stockholders from positions of influence with the Company and failed to provide information and financial reporting to the minority stockholders as required by the Stockholders' Agreement.

ANSWER:   Defendants deny the allegations in Paragraph 65.

66.     On January 1, 2019, Motorsport requested that then-CEO Brooks step down from his position as CEO of the Company. Motorsport made this request unilaterally and without consulting the Company's Board of Directors, which included Wayne Barr, Jr. ("Mr. Barr"), a director of HC2 Holdings, and current CEO of HC2 Holdings, as a legacy board member and representative of Plaintiff HC2. Leo, which held the right to observe the actions of the Board of Directors, learned of the request via a January 3, 2019 email from Brooks to members and observers of the Board of Directors.

ANSWER:   Defendants admit the allegations in the first sentence of Paragraph 66.  Defendants deny the allegations in the second sentence of Paragraph 66.  Defendants lack sufficient information to either admit or deny the allegations in the third sentence of Paragraph 66, and therefore deny them.

67.     From January 2019 forward, Defendants operated as if they owned 704Games in full, largely ignoring the rights of legacy board members to be apprised of decisions and approve changes to agreements.

ANSWER:   Defendants deny the allegations in Paragraph 67.

68.     Also beginning in January 2019, Kozko instructed 704Games employees that all major decisions should be approved by representatives of Defendants.

ANSWER:   Defendants deny the allegations in Paragraph 68.

69.     Throughout 2019 and the first half of 2020, HC2 and Continental (via its representatives at HC2) repeatedly requested to be informed of board actions, provided with financial reporting, and generally informed of the status of the Company per the terms of the Stockholders' Agreement.

ANSWER:   Defendants deny the allegations in Paragraph 69.

70.     Despite HC2 and Continental making numerous requests to multiple representatives of the Company and Defendants over several months, Defendants never delivered

audited financial results for 2019. Defendants also failed to deliver regular quarterly financial reports prepared in accordance with GAAP.

ANSWER:   Defendants admit only that audited financials for 2019 were not prepared and thus not delivered to any shareholders.  All remaining allegations in Paragraph 70 are denied.

71.     In response to HC2 and Continental's requests, Defendants represented to HC2 and Continental that financial results—audited or otherwise—were unavailable and that Defendants would provide results to Plaintiffs as and when they were completed.

ANSWER:   Defendants  deny the allegations in Paragraph 71.

72.     Defendants delayed providing results between November 2019 and June 2020. On June 4, 2020, when Defendants did finally provide limited summary financial results for 2019 and the first quarter of 2020 to HC2 and Continental, those statements were not detailed financial statements prepared in accordance with US GAAP and did not satisfy Defendants' obligations to disclose financial information.

ANSWER:   Defendants admit only that 704Games provided summary financial results for 2019 and the first quarter of 2020 and that those results were delayed.  Defendants deny the remaining allegations in Paragraph 72.

73.     Defendants never provided Leo with audited 2019 financial results or any financial information for 2020, other than summary slides in presentations to the Board of Directors.

ANSWER:  Defendants admit that audited financials for 2019 were not prepared and thus not delivered to any shareholders.  Defendants further admit that summary slides were presented to the Board of Directors.  Defendants deny the remaining allegations in Paragraph 73.

74.     On November 12, 2019, the Company held a special meeting of its Board of Directors, of which HC2 Holdings director Mr. Barr was a member, via Zoom telephone/video conference. Defendant Kozko chaired the meeting and HC2 employee AJ Stahl ("Mr. Stahl") attended the meeting on behalf of Plaintiff HC2 as a minority stockholder with observer rights under the Stockholders' Agreement.

ANSWER:  Defendants admit the allegations in Paragraph 74.

75.     At that meeting, the financial review of the Company indicated a $5 million reduction in revenue from the prior forecast and a reduction in EBITDA (earnings before interest, taxes, depreciation and amortization, a common measure of cash flow) from a projected $1.3 million to **negative $1.6 million**—portraying the Company as a money-losing entity that was likely to require additional capital infusions from its investors with little hope of near-term profitability.

ANSWER:   Defendants admit the allegations in Paragraph 75, except that they deny the

allegation that the Company was portrayed as a "money-losing entity."

76.    Leo was informed of the November 12, 2019 meeting as a minority stockholder
with observer rights under the Stockholders' Agreement but was unable to attend. Leo received a
copy of the presentation used at that meeting on November 11, 2019, which included the same
information regarding the reduction in EBITDA and projected negative financial outlook.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegation that

Leo was "unable" to attend, and therefore denies it.  All remaining allegations in Paragraph 76 are

admitted, including that Leo did not attend the November 12, 2019 Board Meeting.

77.    Defendants' dire assessment of the Company was a significant departure from prior
expectations for a company whose shares Motorsport had acquired for $50.61 per share just two
years earlier. Defendants' reports portrayed the Company as a weak enterprise whose fair market
value had suffered during Motorsport's tenure as controlling majority stockholder.

ANSWER:   Defendants deny the allegations in Paragraph 77.

78.    In fact, the facts alleged support an inference that Defendants believed that the
Company's results were promising and would yield an attractive valuation in an IPO. This belief
culminated in the execution of a January 1, 2020 employment agreement between Motorsport and
Kozko (the "Kozko Employment Agreement"), a copy of which is attached hereto as Exhibit 5,
targeting a Company valuation of at least $100 million, ranging all the way up to beyond $1 billion.

ANSWER:   Defendants deny the allegations in Paragraph 78, except to admit that the

allegations in Paragraph 78 purport to paraphrase the Kozko Employment Agreement; Defendants

deny those allegations to the extent they inaccurately or incompletely describe the relevant terms

of the Kozko Employment Agreement and refer the Court to such agreement for its full and

complete terms.

79.    On December 26, 2019, Defendant Kozko emailed a spreadsheet purporting to be
the 2020 Consolidated Budget for 704Games to Mr. Stahl, as representative of HC2 and
Continental.

ANSWER:   Defendants admit the allegations in Paragraph 79, except to the extent it refers

to the spreadsheet emailed to Mr. Stahl as a "purported" budget.

80.    In the 2020 Consolidated Budget, Defendants estimated that in 2020 the Company
would generate an EBITDA loss of over $3,094,400 for the year.

ANSWER:   Defendants admit the allegations in Paragraph 80.

81.    After providing the 2020 Consolidated Budget to Mr. Stahl, Defendant Kozko then initiated a Zoom conference with Mr. Stahl in which they discussed the 2020 Consolidated Budget, including the projected losses, the reasons for lower sales and high expenses, and the potential necessity for additional investment in the Company.

ANSWER:   Defendants admit the allegations in Paragraph 81.

82.    Based on the facts alleged, Plaintiffs believe that the 2020 Consolidated Budget prepared and provided by Defendants was not accurate and included material misstatements and omissions, including, in particular, Defendants' estimate that the Company would generate an EBITDA loss in 2020.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 82 as to Plaintiffs' belief, and therefore deny them. All remaining allegations in

Paragraph 82 are denied.

83.    In fact, in connection with the IPO, Motorsport reported positive EBITDA in the millions for the first 9 months of 2020. As Motorsport's financials are based almost entirely on the Company's revenues, it follows that the Company also saw a record increase in EBITDA.

ANSWER:   Defendants admit only that Motorsport reported positive EBITDA for the first 9

months of 2020.  All remaining allegations in Paragraph 83 are denied.

84.    It is fair to infer that the 2020 Consolidated Budget was not merely a poor prediction but was a material misstatement of Defendants' true knowledge and expectations concerning the Company's performance in 2020—which significantly altered the total mix of information made available to Plaintiffs in deciding to sell their shares. Plaintiffs have formed this belief because, immediately after providing the misleading 2020 Consolidated Budget to HC2 and Continental, Motorsport entered into the Kozko Employment Agreement—the effective date of which was contemporaneous with the Defendants' representations to minority investors that the Company was *losing* over $3 million per year. The Kozko Employment Agreement provided for incentive compensation to Kozko in the event of an IPO that valued Motorsport at "at least One Hundred Million ($100,000,000)" and contained additional equity awards for Kozko starting at a market capitalization of $150 million, ranging all the way up to a valuation of $1 billion—metrics that are irreconcilable with Defendants' inaccurate portrayal of the Company at the Company's November 2019 Board of Directors meeting and in the 2020 Consolidated Budget. Ex. 5 § 5.3(a)–(b). Based on the facts alleged, Plaintiffs believe that Motorsport and Kozko based the metrics in the Kozko Employment Agreement upon their true knowledge of the value of Motorsport—which derived nearly all of its value from the Company. On January 12, 2021, Motorsport awarded Kozko (i) 20,333 shares of the Company's Class A common stock and (ii) stock options to purchase 203,333 restricted shares of Motorsport's Class A common stock at an exercise price of $20.00 per share pursuant to the Kozko Employment Agreement. On March 26, 2021, the board of directors of Motorsport approved a $300,000 annual bonus to Kozko, for his performance in 2020.

ANSWER:  Defendants deny the allegations in the first sentence of Paragraph 84.  Defendants

lack sufficient information to either admit or deny the allegations in Paragraph 84 to the extent

such allegations address Plaintiffs' beliefs, and therefore deny them.  Defendants admit that Kozko

received the incentive compensation and a bonus as provided in his employment agreement in

2021.  Defendants admit that the allegations in Paragraph 84 also purport to paraphrase Kozko's

Employment Agreement, and Defendants deny those allegations to the extent they inaccurately or

incompletely describe the relevant terms of the Kozko Employment Agreement and refer the Court

to such agreement for its full and complete terms.  All remaining allegations in Paragraph 84 are

denied.

85.     On January 1, 2020, immediately after the November 12, 2019 Board meeting and
the December 26, 2019 Consolidated Budget, Motorsport and Kozko agreed to the lucrative new
Kozko Employment Agreement, which targeted a value for Motorsport of at least $100 million in
an IPO or other valuation event, and rewarded Kozko with additional compensation at value
increments all the way up to $1 billion.

ANSWER:  Defendants deny the allegations in Paragraph 85.

86.     As of January 1, 2020, and through the IPO, Motorsport's only material asset was
its majority ownership of the Company. In the Motorsport Prospectus filed in connection with the
IPO, Motorsport disclosed that "revenues associated with the NASCAR Heat franchise accounted
for approximately 99% of our total net revenue for the years ended December 31, 2019 and 2018
and the nine months ended September 30, 2020, and we expect this franchise to continue to account
for the majority of our revenue for the year ended December 31, 2020. In the future, we expect
this trend to continue with a relatively limited number of franchises producing a disproportionately
high percentage of our revenues and profits."

ANSWER:    Defendants deny the allegations in Paragraph 86, except to admit that the

allegations of Paragraph 86 purport to quote, in part, the Motorsport Prospectus; Defendants deny

those allegations to the extent they inaccurately or incompletely quote the relevant terms of the

Motorsport Prospectus and refer the Court to such document for a complete and accurate

statements of its contents.

87.     Given that the Company accounted for 99% of Motorsport's revenues, Defendants'
valuation targets for Motorsport were based on their valuation of 704Games. Defendants failed to

disclose the existence of the new Kozko Employment Agreement, or its valuation targets, to Plaintiffs—a critical omission of important information that further altered the total mix of information made available to Plaintiffs in deciding to sell their shares. Plaintiffs first learned of the valuation terms of the Kozko Employment Agreement *after* selling their shares, when Motorsport attached the text of the Kozko Employment Agreement to public SEC filings.

ANSWER:   Defendants admit only that at the relevant time period the Company's revenues accounted for 99% of Motorsport's revenue.  Defendants lack sufficient information to either admit or deny the allegations in the last sentence of Paragraph 87, and therefore deny them.  All remaining allegations in Paragraph 87 are denied.

88.     Defendants had a duty to disclose the terms of the Kozko Employment Agreement, including its valuation targets, to Plaintiffs prior to acquiring Plaintiffs' respective stakes in the Company because the value of Motorsport was based virtually entirely on Defendants' valuation of the Company.

ANSWER:   Defendants deny the allegations in Paragraph 88.

89.     Other contemporaneous evidence also shows that Defendants intended, throughout 2020, to engage in a highly lucrative IPO. One of the exhibits to the Motorsport Prospectus is a curiously backdated employment agreement between Motorsport and Defendant New as CFO, which states that it is "dated October 19, 2020, but effective as of January 3, 2020", and claims that the letter "is confirming the offer extended to you prior to [January 3, 2020]" (the "New Employment Agreement"). The New Employment Agreement provides that New would be rewarded with a $150,000 bonus if Motorsport "consummates and closes the initial public offering of its securities". The New Employment Agreement, along with New's prior experience in taking former employer UniCapital through the IPO process, suggests that New was hired specifically to implement a lucrative IPO.

ANSWER:   Defendants admit that Motorsport's business objective was to consummate a liquidity event or an IPO, a fact that Plaintiffs acknowledged that they had "sufficient knowledge and experience with and information about Buyer" in Paragraph 4(h) of the respective SPA and Leo SPA.  Defendants deny the remaining allegations in Paragraph 89, except to admit that the allegations in Paragraph 89 purport to quote, in part, New's October 19, 2020 Employment Agreement; Defendants deny those allegations to the extent they inaccurately or incompletely quote the relevant terms of New's Employment Agreement and refer the Court to such agreement for its full and complete terms.

21

90.     Defendants did not disclose the terms of the New Employment Agreement, including the IPO bonus provisions, to Plaintiffs prior to acquiring Plaintiffs' stake in the Company.

ANSWER:   Defendants admit the allegations in Paragraph 90, but to clarify state that

Defendant New's original Employment Agreement, dated December 3, 2019 and effective January

3, 2020, did not include IPO bonus provisions.  It was not until New's Employment agreement was

amended on October 19, 2020—after Plaintiffs sold their shares—that any such provisions were

included.

91.     Defendants had a duty to disclose to Plaintiffs the terms of the New Employment Agreement, including its IPO bonus provisions, to Plaintiffs prior to acquiring Plaintiffs' respective stakes in the Company because the value of Motorsport was based virtually entirely on Defendants' valuation of the Company.

ANSWER:   Defendants deny the allegations in Paragraph 91.

92.     While portraying the Company as a money-losing entity to Plaintiffs, in early 2020 Defendants secretly lined up financing to fund additional acquisition activity.

ANSWER:   Defendants deny the allegations in Paragraph 92.

93.     On April 1, 2020, Motorsport entered into a promissory note with Motorsport's parent, Motorsport Network, providing for a $10 million line of credit, payable on demand, to fund "working capital, operations, acquisitions, investments or any other purposes of [Motorsport]" (the "April 2020 Note").

ANSWER:   Defendants admit that on April 1, 2020, Motorsport entered into a promissory

note with Motorsport Network in which, as disclosed in Motorsport's SEC filings, Motorsport

Network advanced over $8 million in 2018 and 2019.  Defendants further admit that the remaining

allegations in Paragraph 93 purport to quote, in part, the April 2020 Note; Defendants deny those

allegations to the extent they inaccurately or incompletely quote the relevant terms of the April

2020 Note and refer the Court to such document for its full and complete terms.

94.     The April 2020 Note was made available, and intended, to fund the acquisition of minority investors' holdings in the Company. According to the Motorsport Prospectus, "The principal amount under the Promissory Note was primarily funded through one or more advances from Motorsport Network, including an advance in August 2020 *for purposes of acquiring an additional ownership interest in 704Games*" (emphasis added).

ANSWER:   Defendants admit that the allegations in Paragraph 94 purport to paraphrase the April 2020 Note and quote, in part, the Motorsport Prospectus; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the April 2020 Note or quote the Motorsport Prospectus and refer the Court to such documents for their full and complete terms.  All remaining allegations in Paragraph 94 are denied.

95.   The April 2020 Note also provided Motorsport Network with a way to immediately profit off Motorsport's IPO by calling in the April 2020 Note, which would be immediately due and payable on demand, and deeming pre-IPO investments to be "Advances" under the note.

ANSWER:   Defendants admit that the allegations in Paragraph 95 purport to quote, in part, the April 2020 Note; Defendants deny those allegations to the extent they inaccurately or incompletely quote the relevant terms of the April 2020 Note and refer the Court to such document for its full and complete terms.  All remaining allegations in Paragraph 95 are denied.

96.   It is fair to infer that the $10 million face value of the April 2020 Note—which was explicitly given for the purpose of acquiring additional ownership interest in the Company— reflects Defendants' expectation that it would cost substantially more per share to acquire Company stock from its minority investors than the $1.2 million Motorsport ultimately paid for Plaintiffs' shares.

ANSWER:   Defendants deny the allegations in Paragraph 96.

97.   Defendants did not disclose the April 2020 Note, or the fact that they had secured a $10 million line of credit to fund investments and acquisitions, to Plaintiffs—yet another omission of important information altering the total mix of information made available to Plaintiffs in deciding to sell their shares. Plaintiffs learned of the April 2020 Note through public SEC filings in connection with the Motorsport IPO.

ANSWER:   Defendants admit only that Motorsport did not disclose the April 2020 Note or the $10 million line of credit to Plaintiffs and deny the remaining allegations in the first sentence of Paragraph 97.  Defendants lack sufficient information to either admit or deny the allegations in the second sentence of Paragraph 97, and therefore deny them.

98.   On June 4, 2020, after numerous requests for updated financial information from Plaintiffs, Michelle Baker Dillon of 704Games finally provided a spreadsheet purporting to show the 2019 Quarterly Financials for 704Games to Mr. Stahl, as representative of HC2 and Continental.

ANSWER: Defendants admit only that on June 4, 2020 Michelle Baker Dillon provided a spreadsheet of the 2019 Quarterly Financials for 704Games to Mr. Stahl. All remaining allegations in Paragraph 98 are denied.

99.     The 2019 Quarterly Financials show quarterly results for the Company in 2018 and 2019 and the variance year over year. These figures indicated that EBITDA losses increased by 684% in 2019 as compared to such losses in 2018 (from $512,500 in 2018 to $3,233,800 in 2019).

ANSWER: Defendants admit that the allegations in Paragraph 99 purport to summarize the 2019 Quarterly Financials; Defendants deny those allegations to the extent they inaccurately or incompletely describe the 2019 Quarterly Financials and refer the Court to such document for a complete and accurate statement of its content.

100.     The 2019 Quarterly Financials do not conform to GAAP and did not satisfy Defendants' disclosure obligations because they are simply overview EBITDA calculations, which are non-GAAP accounting measures, and do not include reconciliations showing net earnings according to GAAP.

ANSWER: Defendants deny the allegations in Paragraph 100.

101.     Mr. Stahl and Ms. Baker Dillon thereafter discussed the contents of the 2019 Quarterly Financials. Mr. Stahl reiterated Plaintiffs' rights to audited financial results prepared in accordance with the requirements of GAAP and asked when those would be provided. Ms. Baker Dillon could not provide an answer as to when audited GAAP financials for 2019 would be available.

ANSWER: Defendants lack sufficient information to either admit or deny the allegations in Paragraph 7, and therefore deny them.

102.     Also on June 4, 2020, Amanda LeCheminant, VP and Deputy General Counsel of Motorsport Network, sent an email to the directors and stockholders of 704Games, including Plaintiffs, attaching a Meeting Agenda and Presentation for the Company board meeting set to take place on June 5, 2020. Ms. LeCheminant also attached the minutes of the November 12, 2019 meeting of the 704Games Board of Directors for approval.

ANSWER: Defendants admit the allegations in Paragraph 102.

103.     The June 2020 BOD Presentation included a slide entitled "CEO Remarks" from Kozko on page 3, claiming that there was "bad community sentiment" about the Company's imminently forthcoming video game, NASCAR Heat 5, that the game's "pre-sales are struggling", and estimating that the Company would "***run out of money next year*** around launch [of a new product], ***even if we hit our current projections***" (emphasis added).

ANSWER:  Defendants admit that the allegations in Paragraph 103 purport to quote, in part, a slide from the 2020 BOD Presentation; Defendants deny those allegations to the extent they inaccurately or incompletely quote the 2020 BOD Presentation and refer the Court to such document for a complete and accurate statement of its contents.

104.    The discussion of "NASCAR HEAT 5 Pre Orders" on page 6 of the June 2020 BOD Presentation noted that, as of the preceding week, such pre orders were "-27% behind [the game's predecessor, NASCAR Heat 4] with 6 weeks to launch" and included a graph showing NASCAR Heat 5's pre orders trailing pre orders of NASCAR Heat 4 and NASCAR Heat 2 for the entire period from eleven weeks before their respective release dates through six weeks before those dates.

ANSWER:  Defendants admit that the allegations in Paragraph 104 purport to quote, in part, and/or paraphrase a slide from the 2020 BOD Presentation; Defendants deny those allegations to the extent they inaccurately or incompletely quote or describe the 2020 BOD Presentation and refer the Court to such document for a complete and accurate statement of its contents.

105.    The 2019 Financials reflected on page 13 of the June 2020 BOD Presentation indicated that the Company ran a deficit of EBITDA of $3,234,000 in 2019, dramatically worse than in 2018, and noted that "Expenses [are] almost flat, EBITDA drop is primarily due to Console Revenue."

ANSWER:  Defendants admit that the allegations in Paragraph 105 purport to quote, in part, and/or paraphrase a slide from the 2020 BOD Presentation; Defendants deny those allegations to the extent they inaccurately or incompletely quote or describe the 2020 BOD Presentation and refer the Court to such document for a complete and accurate statement of its contents.

106.    The Q1-20 Financials reflected on page 14 of the June 2020 BOD Presentation indicated that EBITDA was positive for that quarter, due in part to the "quarantine impact in March", but noted a decrease in mobile revenue with the explanation "Mobile game content needs a refresh" and that a number of expenses had been cut in the first quarter of 2020, including dramatic decreases in the categories of "Development Costs", "Sales & Marketing", and "T&E".

ANSWER:  Defendants admit that the allegations in Paragraph 106 purport to quote, in part, and/or paraphrase a slide from the 2020 BOD Presentation; Defendants deny those allegations to

the extent they inaccurately or incompletely quote or describe the 2020 BOD Presentation and

refer the Court to such document for a complete and accurate statement of its contents.

107.    The 2021 Monthly Forecast on page 16 of the June 2020 BOD Presentation indicated that, even assuming all product launches and sales targets were accomplished, the Company would hit a major cash shortfall in July 2021.

ANSWER:   Defendants admit that the allegations in Paragraph 107 purport to paraphrase a

slide from the 2020 BOD Presentation; Defendants deny those allegations to the extent they

inaccurately or incompletely describe the 2020 BOD Presentation and refer the Court to such

document for a complete and accurate statement of its contents.

108.    Page 17 of the June 2020 BOD Presentation, titled "CASH SHORTFALL PROJECTIONS", indicated that, even with no delays, there would be a cash shortfall of $1,190,000. In high impact scenarios, including risks such as "[m]iss[ing] sales targets" because "states will have exited stay at home orders" or "GameStop hesitant to place orders while stores are still closed/limited", the cash shortfall estimate was $4,705,000.

ANSWER:   Defendants admit that the allegations in Paragraph 108 purport to quote, in part,

and/or paraphrase a slide from the 2020 BOD Presentation; Defendants deny those allegations to

the extent they inaccurately or incompletely quote or describe the 2020 BOD Presentation and

refer the Court to such document for a complete and accurate statement of its contents.

109.    At the meeting of the Board of Directors on June 5, 2020, which Mr. Barr and Mr. Stahl attended on behalf of HC2 and Continental, Defendants reiterated that there would likely be a capital call in the near future because of the predicted cash shortfall. Defendants continued to project a pessimistic view of the prospects of the Company.

ANSWER:   Defendants admit the allegations in the first sentence of Paragraph 109.

Defendants deny the allegations in the second sentence of Paragraph 109.

110.    Leo was informed of the June 5, 2020 meeting as a minority stockholder with observer rights under the Stockholders' Agreement but was unable to attend. Leo received a copy of the June 2020 BOD Presentation used at that meeting, including the content described in Paragraphs 103 through 108 above.

ANSWER:   Defendants admit the allegations in the first sentence of Paragraph 111, except

that Defendants lack sufficient information to either admit or deny the allegation that Leo was

"unable" to attend the June 5, 2020 meeting, and therefore denies it. Defendants admit the remaining allegations in Paragraph 110, except to the extent such allegations reference Paragraphs 103 through 108 which purport to quote, in part, and/or paraphrase slides from the 2020 BOD Presentation; Defendants deny those allegations to the extent they inaccurately or incompletely quote or describe the 2020 BOD Presentation and refer the Court to such document for a complete and accurate statement of its contents.

111.    Based on the facts alleged, Plaintiffs believe that the June 2020 BOD Presentation was not accurate and included material misstatements and omissions of material facts regarding the financial condition of the Company and the prospects for the finances of the Company going forward, including, in particular, the repeated indications of a cash shortfall even if the Company achieved all of the goals set forth in the June 2020 BOD Presentation. This misrepresentation, like Defendants' other misrepresentations and omissions alleged herein, concerned important information and altered the total mix of information made available to Plaintiffs in deciding to sell their shares.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 111 as to Plaintiffs' beliefs, and therefore deny them. All remaining allegations in Paragraph 111 are denied.

112.    Plaintiffs have formed this belief about the June 2020 BOD Presentation based on the Company's actual reported 2020 performance, the success of the IPO, and the Kozko Employment Agreement, all of which are inconsistent and irreconcilable with Defendants' dire portrayal of the Company in the June 2020 BOD Presentation.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 112 as to Plaintiffs' beliefs, and therefore deny them. All remaining allegations in Paragraph 112 are denied.

113.    On June 11, 2020, Defendant New, the CFO and principal financial and accounting officer of Motorsport, sent an email to the stockholders of 704Games, including Plaintiffs, identifying an alleged revenue overstatement for 2018 of $1.1 million and requesting that the other stockholders either (1) consent to Motorsport Network (Motorsport's parent company) withdrawing $1.1 million from the Company's accounts or (2) contribute 15% additional equity to Motorsport pursuant to the August 2018 Stock Purchase Agreement by which Motorsport had acquired its interest in the Company. New provided only five days for Plaintiffs to respond.

27

ANSWER:   Defendants admit that the allegations in Paragraph 113 purport to paraphrase an email sent by Defendant New; Defendants deny those allegations to the extent they inaccurately or incompletely describe the email sent by Defendant New and refer the Court to such email for a complete and accurate statement of its contents.

114.    On June 15, 2020, Mr. Stahl replied, disputing that any money or equity was owed to Motorsport or its parent company.

ANSWER:   Defendants admit that the allegations in Paragraph 114 purport to paraphrase an email sent by Mr. Stahl; Defendants deny those allegations to the extent they inaccurately or incompletely describe the email sent by Mr. Stahl and refer the Court to such email for a complete and accurate statement of its contents.

115.    On June 18, 2020, Mr. New replied to Mr. Stahl's email and requested a phone call.

ANSWER:   Defendants admit that the allegations in Paragraph 113 purport to paraphrase an email sent by Defendant New; Defendants deny those allegations to the extent they inaccurately or incompletely describe the email sent by Defendant New and refer the Court to such email for a complete and accurate statement of its contents.

116.    Defendants also failed to disclose that, via the April 2020 Note, Motorsport Network had recently agreed to extend additional credit to Motorsport, rather than require the cash payment suggested by New.

ANSWER:   Defendants deny the allegations in Paragraph 116.

117.    Defendants' sudden assertion in June 2020 that revenue had been overstated was self-serving and highly aggressive, especially in light of the fact that ***Defendants themselves*** controlled the accounting for the Company and had never raised any problem with the 2018 financials prior to summer 2020.

ANSWER:   Defendants deny the allegations in Paragraph 117.

118.    Defendants' extortionate demand highlighted Defendants' failure to disclose material information to Plaintiffs. In response to News's demand, Mr. Stahl specifically requested "backup and cites to GAAP supporting a restatement of financials" and noted that "in Section 7.1 of the Investor Rights Agreement, the company is currently in breach in that it has failed to provide [audited financial statements] for 2019. As such, we request an update to the timing of AFS for 2019." Defendants never provided sufficient information supporting their demand, in violation of

(a) Defendants' fiduciary obligation to disclose all material facts to minority stockholders, and (b) the Company's contractual obligation, under Defendants' management, to provide audited financial statements.

ANSWER:    Defendants deny the allegations in Paragraph 188, except to admit that the allegations in Paragraph 118 purport to quote, in part, an email from Mr. Stahl; Defendants deny those allegations to the extent they inaccurately or incompletely quote the email from Mr. Stahl and refer the Court to such email for a complete and accurate statement of its contents. Additionally, Defendants state that the allegations in Paragraph 118 are irreconcilable with Plaintiffs' representations in Paragraph 4(h) of the respective Stock Purchase Agreement that Plaintiffs had

> sufficient knowledge and experience with about Buyer . . . and the Company in order to be fully familiar with Buyer, the Company, and its current business, operations, assets, finances, financial results, financial condition, and prospects and so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement, (ii) has full access to all books and records of the Company and all of its contracts, agreements and documents, and (iii) has had an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company, and its current business, operations assets, financing, operating results, financial condition and prospects in order to make an informed decisions to sell the Shares.

Defendants also state that the allegations in Paragraph 118 are irreconcilable with Plaintiffs' representations in Paragraph 9 of the respective Stock Purchase Agreement that "[e]ach Seller . . . hereby releases and forever discharges the Company, Buyer, Buyer's members, shareholders, managers, officers, directors . . . from any and all claims, debts, obligations and liabilities, whether known or unknown . . . ."

119.    New's representation that a revenue overstatement necessitated consent from Plaintiffs to Motorsport Network withdrawing $1.1 million from the Company's accounts or Plaintiffs to contribute additional equity to Motorsport constituted material misstatements and entailed omissions of material facts regarding the financial conditions of the Company, as no such consent or contribution was required.

ANSWER:   Defendants deny the allegations in Paragraph 119.

120.    It is fair to infer that Defendants' demand for additional cash or equity was designed to—and did—place pressure on Plaintiffs to sell their shares to Motorsport. The pressure was intensified by the fact that, as the controlling majority stockholder of the Company, Motorsport had control over the information provided to Plaintiffs and had the power to hold Plaintiffs' investment hostage if Plaintiffs did not agree to Defendants' demands.

ANSWER:   Defendants deny the allegations in Paragraph 120.

121.    Plaintiffs have formed these beliefs about Defendants' demand for additional cash or equity based on the Company's actual reported 2020 performance, the success of the IPO, and the Kozko Employment Agreement, all of which are utterly inconsistent and irreconcilable with Defendants' inaccurate portrayal of the Company in the June 2020 BOD Presentation.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 121 as to Plaintiffs' belief, and therefore deny them.  Defendants deny all remaining allegations in Paragraph 121.

122.    Moreover, as shown by the New Employment Agreement, New had been hired specifically in anticipation of preparing the Company for a profitable IPO and stood to gain a windfall upon the consummation of such an IPO (plus an additional bonus at Kozko's discretion), giving New a financial motive to acquire Plaintiffs' shares to maximize Defendants' ownership of the Company and prospect of IPO profits based on the Company, as Motorsport's only significant asset.

ANSWER:   Defendants deny the allegations in Paragraph 122.

123.    As early as December 26, 2019, Kozko informed Mr. Stahl, as representative of HC2 and Continental, that the Company would likely require additional investment in order to succeed.

ANSWER:   Defendants admit the allegations in Paragraph 123.

124.    At the June 5, 2020 Board of Directors meeting, Defendants, including at least Kozko for himself and on behalf of Motorsport, indicated to HC2 and Continental that the Company was facing a cash shortfall and that a capital call was likely. The same information was reflected on page 16 of the written materials circulated to all Plaintiffs on June 4, 2020.

ANSWER:    Defendants admit the allegations in the first sentence of Paragraph 124. Defendants further admit that the allegations in the second sentence of Paragraph 124 purport to paraphrase the 2020 BOD Presentation; Defendants deny those allegations to the extent they

inaccurately or incompletely describe the 2020 BOD Presentation and refer the Court to such document for a complete and accurate statement of its contents.

125.    On June 23, 2020, Mr. Stahl had another call with Zoi and New. On that call, Zoi and New indicated to Mr. Stahl that there would be a capital call in the near future, and that HC2 and Continental, as the largest of the Company's minority stockholders, should be aware of this. They also suggested to Mr. Stahl that if HC2 and Continental were not going to participate in a capital call, perhaps Motorsport should acquire their interest in the Company.

ANSWER:   Defendants admit the allegations in Paragraph 125.

126.    On June 23, 2020, after their phone call, Zoi sought to capitalize on the pressure on HC2 and Continental by sending a formal offer letter to Mr. Stahl. The offer letter again indicated that a capital call would occur in the near-term and suggested that HC2 and Continental should sell their interests in the Company to Motorsport in lieu of making a capital contribution. A copy of that letter is attached hereto as Exhibit 6.

ANSWER:   Defendants deny the allegations in Paragraph 126, except to admit that the allegations in Paragraph 126 purport to paraphrase the formal offer letter sent to Mr. Stahl; Defendants deny such allegations to the extent they inaccurately or incompletely describe the relevant terms of the formal offer letter and refer the Court to such letter for a complete and accurate statement of its contents.

127.    Based on the facts alleged, Plaintiffs believe that Defendants' representations about the need for additional investment, including, in particular, New's representation that there would be a capital call for the Company in the near future, were not accurate and were material misstatements regarding the financial conditions of the Company and the prospects for the finances of the Company going forward, and no such capital call was required or occurred. The New Employment Agreement's financial incentives upon the consummation of an IPO shows that, contrary to anticipating a cash shortfall and capital call, New had every reason to expect an imminent IPO, and no need for a capital call.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in the first sentence of Paragraph 127 as to Plaintiffs' belief, and therefore deny them.  All remaining allegations in Paragraph 127 are denied.

128.    Plaintiffs have formed this belief about these representations, and in particular this representation by New, based on the absence of such a capital call, Motorsport's reported 2020 performance of $19 million in revenue, which New publicly stated was "primarily due to the release of NASCAR Heat 5 in July of 2020 which saw sales surpassing the release of NASCAR Heat 4 in 2019", the success of the IPO, the Kozko Employment Agreement, the New Employment

Agreement, and the April 2020 Note extending in which Motorsport Network extended additional credit to Motorsport, all of which are utterly inconsistent and irreconcilable with the Company requiring a capital call after June 23, 2020.

ANSWER:  Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 128 as to Plaintiffs' belief, and therefore deny them.  Defendants admit that the

allegations in Paragraph 218 purport to quote, in part, Motorsport's March 24, 2021 Press Release;

Defendants deny those allegations to the extent they inaccurately or incompletely quote the press

release and refer the Court to such document for a complete and accurate statement of its contents.

All remaining allegations in Paragraph 128 are denied.

129.    Moreover, the timing of Motorsport's proposal to acquire HC2 and Continental's respective shares, when coupled with Defendants' misleading portrayal of the Company as a financial disaster, and with Motorsport's sudden extortionate demands for additional cash or equity, strongly suggest that Defendants' pressure campaign was designed to induce HC2 and Continental to sell their Company stock at a low valuation.

ANSWER:  Defendants deny the allegations of Paragraph 129.

130.    In the midst of negotiations to acquire Plaintiffs' stock at a bargain basement valuation, all Defendants continued to conceal the true prospects of the Company, prepare for a lucrative IPO, and divert corporate opportunities to their own benefit.

ANSWER:  Defendants deny the allegations in Paragraph 130.

131.    On July 7, 2020, a full six weeks before Motorsport acquired HC2 and Continental's respective shares, and four months before Motorsport acquired Leo's shares, the Company released NASCAR Heat 5 Gold Edition, followed shortly by the standard edition release of NASCAR Heat 5 on July 10, 2020.

ANSWER:  Defendants admit the allegations in Paragraph 131.

132.    Demand and sales of NASCAR Heat 5 significantly exceeded sales of the Company's prior NASCAR Heat games. Despite knowing that the Company therefore would be in a much better financial position than the June 2020 BOD Presentation had indicated (with its portrayal of NASCAR Heat 5 as "struggling" with pre orders and having "bad community sentiment"), Defendants did not share this good news with Plaintiffs, who at that time still owned nearly 30% of the Company and to whom Motorsport owed fiduciary duties as the controlling majority stockholder. Instead, Defendants did not disclose any updated information about the pre-orders or sales of NASCAR Heat 5—which information materially altered the financial condition and fair market value of the Company, and which they had a duty to disclose—to Plaintiffs prior to acquiring Plaintiffs' stock in the Company.

ANSWER:  Defendants deny the allegations in Paragraph 132, except to admit the allegations

in Paragraph 132 purport to quote, in part, the 2020 BOD Presentation; Defendants deny those

allegations to the extent they inaccurately or incompletely quote the 2020 BOD Presentation and

refer the Court to such document for a complete and accurate statement of its contents.

133.   On July 20, 2020, less than one month before Motorsport acquired HC2 and
Continental's respective shares, and before Motorsport even offered to acquire Leo's shares,
Motorsport entered into a confidential Promotional Services Agreement with Fernando Alonso
Diaz, a prominent Formula One racecar driver (the "Alonso Agreement").

ANSWER:  Defendants admit the allegations in Paragraph 133.

134.   The Alonso Agreement provided that Alonso would "promote the Company and its
affiliated entities", which included 704Games—Motorsport's only material subsidiary affiliate.

ANSWER:  Defendants admit that the allegations in Paragraph 134 purport to quote, in part,

the Alonso Agreement; Defendants deny those allegations to the extent they inaccurately or

incompletely quote the relevant terms of the Alonso Agreement and refer the Court to such

agreement for its full and complete terms.  All remaining allegations in Paragraph 134 are denied.

135.   The Alonso Agreement provided that Alonso would not provide services until
Motorsport had consummated an IPO, and that Alonso's compensation would take the form of a
grant of "3% of the Company's issued and outstanding Class A Stock as of the effective date of
the IPO".

ANSWER:  Defendants admit that the allegations in Paragraph 134 purport to quote, in part,

and/or paraphrase the Alonso Agreement; Defendants deny those allegations to the extent they

inaccurately or incompletely quote or describe the relevant terms of the Alonso Agreement and

refer the Court to such agreement for its full and complete terms.

136.   By entering into the Alonso Agreement, Defendants both (a) commandeered a
business opportunity belonging to the Company for their own benefit, and (b) ensured that
Plaintiffs would not realize any benefit from the Alonso relationship prior to, or as a part of, their
stock sale to Motorsport.

ANSWER:  Defendants deny the allegations in Paragraph 136.

137.   Defendants did not disclose the Alonso Agreement to Plaintiffs prior to acquiring
Plaintiffs' stock.  In fact, the Alonso Agreement contained a strict confidentiality provision

providing for legal remedies against Alonso if he were to disclose the existence of the Alonso Agreement to any person without Motorsport's written consent.

ANSWER:   Defendants admit that Defendants did not disclose the Alonso Agreement to Plaintiffs as such disclosure was not required. Defendants further state that Motorsport's relationship with Alonso was publicly disclosed on the Motorsport website since at least March 18, 2019. Defendants also admit that the allegations in the second sentence in Paragraph 137 purport to paraphrase the Alonso Agreement; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the Alonso Agreement and refer the Court to such agreement for its full and complete terms.

138.    Section 4.1 of the Stockholders' Agreement bound Motorsport to a covenant not to compete. Although that covenant is subject to certain definitions and limitations, nothing in it allowed Motorsport to pursue the Alonso Agreement to the detriment of the Company, and nothing in the Stockholders' Agreement excuses Motorsport from the obligation to disclose a self-interested transaction.

ANSWER:  Defendants admit that the allegations in Paragraph 138 purport to paraphrase the Stockholders' Agreement; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the Stockholders' Agreement and refer the Court to such agreement for its full and complete terms. All remaining allegations in Paragraph 138 are denied.

139.    The existence of the Alonso Agreement—a high-profile promotional agreement with a world-famous racecar driver to promote Motorsport and the Company—was squarely contrary to the image of a struggling Company that Defendants were portraying to Plaintiffs, and knowledge of the Alonso Agreement would have been material to Plaintiffs' decision whether to sell their stock at the price paid by Motorsport.

ANSWER:   Defendants deny the allegation in Paragraph 139.

140.    It is fair to infer that, concurrent with Motorsport's negotiations to acquire Plaintiffs' stock in the Company, Motorsport was also in the process of obtaining the exclusive licenses to develop multi-platform games for Automobile Club de l'Ouest, including games based on the FIA World Endurance Championship and the 24 Hours of Le Mans.

ANSWER:   Defendants deny the allegations in Paragraph 140.

34

141.    On January 25, 2021, Motorsport did, in fact, enter into an Amendment of its existing Le Mans Esports Series Ltd. Joint Venture Agreement with Automobile Club de l'Ouest and a series of related license agreements, which together enable Motorsport to develop games related to, themed as, or containing the FIA World Endurance Championship and the 24 Hours of Le Mans (together, the "Le Mans Agreements").

ANSWER:    Defendants admit that on January 25, 2021, Motorsport entered into an Amendment of its existing Le Mans Esports Series Ltd. Joint Venture Agreement and a series of related license agreements.  Defendants further admit that the remaining allegations in Paragraph 141 purport to paraphrase the Le Mans Agreements; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the Le Mans Agreements and refer the Court to such agreements for their full and complete terms.

142.    The original Le Mans Esports Series Ltd. Joint Venture Agreement with Automobile Club de l'Ouest included only an agreement to facilitate the Le Mans Esports Series and not the rights to develop video games related to Le Mans.

ANSWER:  Defendants admit that the allegations in Paragraph 142 purport to paraphrase the original Le Mans Esports Series Ltd. Joint Venture Agreement; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the original agreement and refer the Court to such agreement for its full and complete terms.

143.    The Le Mans Agreements are for development of racing video games. Based on publicly available information, Plaintiffs believe that, as of the date of the Le Mans Agreements, Motorsport had no assets or relationships that related to video game development other than its ownership of 704Games.

ANSWER:    Defendants admit the allegations in the first sentence of Paragraph 143. Defendants lack sufficient information to either admit or deny the allegations in the second sentence of Paragraph 143, which relate to Plaintiffs' belief, and therefore deny them.  Defendants deny all remaining allegations in Paragraph 143.

144.    By entering into the Le Mans Agreements, Defendants both (a) commandeered a business opportunity belonging to the Company for their own benefit, and (b) ensured that Plaintiffs would not realize any benefit from the Automobile Club de l'Ouest relationship prior to, or as a part of, their stock sale to Motorsport.

ANSWER:  Defendants deny the allegations in Paragraph 144.

145.    Defendants did not disclose to Plaintiffs that Defendants were pursuing the Le Mans Agreements prior to acquiring Plaintiffs' stock.

ANSWER:  Defendants admit the allegations in Paragraph 145.

146.    Nothing in Motorsport's covenant not to compete in Section 4.1 of the Stockholders' Agreement allowed Motorsport to pursue the Le Mans Agreement to the detriment of the Company, and nothing in the Stockholders' Agreement excuses Motorsport from the obligation to disclose a self-interested transaction.

ANSWER:  Defendants deny the allegations in Paragraph 146.

147.    Defendants' pursuit of the Le Mans Agreements—an agreement to develop games related to two world-famous race events that would open up significant new revenue opportunities and new markets for Motorsport and the Company—was squarely contrary to the image of a struggling Company that Defendants were portraying to Plaintiffs, and knowledge of negotiations for the Le Mans Agreements would have been material to Plaintiffs' decision whether to sell their stock at the price paid by Motorsport.

ANSWER:  Defendants deny the allegations in Paragraph 147.

148.    Contemporaneous documents and subsequent events indicate that Defendants made the material misstatements and omissions alleged above with the intent to deceive, manipulate, and defraud Plaintiffs, and are inconsistent with any plausible innocent explanation for Defendants' actions.

ANSWER:  Paragraph 148 states conclusions of law to which no response is required.  To

the extent a response is required, Defendants deny the allegations in Paragraph 148.

149.    It is fair to infer that Defendants knowingly and intentionally (or at the very least recklessly) made the material misrepresentations and omissions alleged above in connection with the Company's November 2019 Board of Directors Meeting, the Company's 2020 Consolidated Budget, the Company's 2019 Quarterly Financials, and Defendants' June 2020 BOD Presentation, and, through Defendants Zoi, Kozko, and New, made the statements alleged above concerning the need for additional investment by Plaintiffs, a revenue overstatement, and a looming capital call for the Company, to induce Plaintiffs to sell their ownership interests in the Company to Motorsport for what Defendants knew to be a fraction of their fair market value.

ANSWER:  Defendants deny the allegations in Paragraph 149.

150.    Contrary to Defendants' repeated misrepresentations that the Company would only be modestly profitable in 2020 and was in dire financial straits that would require significant additional capital in the near-term, the timeline of the Motorsport IPO indicates that Defendants were already planning a public offering or other liquidity event for Motorsport, based on the value of the Company as its only significant asset, at a much higher valuation.

ANSWER:   Defendants deny the allegations in Paragraph 150.

151.   Defendants filed their first draft prospectus with the SEC on September 8, 2020, only 3 weeks after they purchased HC2 and Continental's stock in the Company, and prior to acquiring Leo's stock in the Company. It is fair to infer that Defendants had been preparing the draft prospectus and making other preparations for the IPO for weeks, if not months, prior to their initial SEC filing.

ANSWER:   Defendants admit the allegations in the first sentence of Paragraph 151.

Defendants deny the allegations in the second sentence of Paragraph 151.

152.   Defendants selectively disclosed to HC2 and Continental that they wanted to pursue a liquidity event or initial public offering of the parent company. Based on Defendants' representations that the Company was Motorsport's only significant asset and Defendants' representations regarding the poor financial condition of the Company, HC2 and Continental believed that such a liquidity event could not be successful unless Defendants planned a liquidity event for Motorsport Network, the parent company of Motorsport, or for Motorsport after contribution of significant additional assets by Motorsport Network.

ANSWER:   Defendants admit that Defendants disclosed to HC2 and Continental that they

wanted to purse a liquidity event or initial public offering of the parent company.  Defendants lack

sufficient information to either admit or deny the remaining allegations in Paragraph 152 as to

Plaintiffs' belief, and therefore deny them.   Defendants deny the remaining allegations in

Paragraph 152.

153.   In making their self-serving and selective disclosure, Defendants concealed that the transaction would be based almost exclusively on the value of 704Games, and that the Company had significantly better prospects than indicated to Plaintiffs. They similarly failed to disclose any facts regarding the timeline for such a liquidity event or the anticipated value of that event.

ANSWER:   Defendants deny the allegations in Paragraph 153.

154.   Despite having already filed a confidential proposed prospectus with the SEC on September 8, 2020, Defendants included only a *pro forma* reference to a planned liquidity event in the Leo SPA, omitting material details about the nature and timing of the IPO. In particular, Defendants failed to disclose that the planned IPO was already in process and that the valuation of Motorsport would be based almost entirely on the value of the Company, Motorsport's only material asset. Leo only learned the specifics of the IPO after the closing of the Leo SPA, when the related SEC filings were made public.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in the last sentence of Paragraph 154, and therefore deny them.   The remaining allegations in Paragraph 154 are denied.

155.    As alleged above, the Kozko Employment Agreement was contemporaneous with Defendants' provision of their misleading 2020 Consolidated Budget to HC2 and Continental, preceded Defendants' other material misstatements and omissions alleged above, and may even have been negotiated prior to or contemporaneously with Defendants' misleading financial review of the Company at the Company's November 2019 Board of Directors meeting.

ANSWER:   Defendants deny the allegations in Paragraph 155..

156.    The Kozko Employment Agreement's contemplation of an IPO valuing Motorsport at "at least One Hundred Million ($100,000,000)", and potentially over $1 billion, Ex. 5 § 5.3(a)–(b), cannot be reconciled with Defendants' portrayal of the Company in 2020 as losing millions of dollars and being in imminent danger of running out of money.

ANSWER:   Defendants admit that the allegations in Paragraph 156 purport to quote, in part, the Kozko Employment Agreement; Defendants deny those allegations to the extent they inaccurately or incompletely quote the relevant terms of the Kozko Employment Agreement and refer the Court to such agreement for its full and complete terms.   All remaining allegations in Paragraph 156 are denied.

157.    Similarly, the New Employment Agreement states that its terms, and the specific financial incentives for a successful IPO, were discussed with New prior to his January 3, 2020 employment start date. New's pressure campaign, his contentions that the Company required a capital call, and his demands for immediate agreements to transfer cash or equity to Motorsport Network, all occurred at the same time that New *knew for a certainty* that he would be rewarded for a successful IPO.

ANSWER:   Defendants admit that the allegations in Paragraph 157 purport to paraphrase the New Employment Agreement; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the New Employment Agreement and refer the Court to such agreement for its full and complete terms.   All remaining allegations in Paragraph 157 are denied.

158.    Defendants' actions in the weeks and months following their fraudulently induced purchase of Plaintiffs' ownership interests in the Company are equally impossible to reconcile

with their dire portrayal of the Company's financial status to Plaintiffs. On September 8, 2020—mere weeks after acquiring HC2's and Continental's shares in the Company and while negotiating the acquisition of Leo's shares—Motorsport had already filed a confidential draft prospectus with the SEC for the IPO.

ANSWER:   Defendants admit only that by September 8, 2020, Motorsport had filed a confidential draft prospectus with the SEC for Motorsport's IPO.  All remaining allegations in Paragraph 158 are denied.

159.   Based on Motorsport's public disclosures, on January 8, 2021, Motorsport converted from a Florida limited liability company to a Delaware corporation pursuant to a statutory conversion in preparation for the IPO. As a result of the corporate conversion, Motorsport Network became the sole holder of the Class A common stock and Class B common stock of Motorsport Games Inc.

ANSWER:   Defendants admit the allegations in Paragraph 159.

160.   On January 13, 2021, Motorsport filed the Motorsport Prospectus with the SEC pursuant to Rule 424(b)(4) under the Securities Act of 1933 (the "Securities Act"), codified at 17 C.F.R. § 230.424(b)(4).

ANSWER:   Defendants admit the allegations in Paragraph 160.

161.   Contrary to Defendants' misrepresentations to Plaintiffs about the Company, the Motorsport Prospectus reported positive EBITDA of $3,279,706 for the nine months ended September 30, 2020.

ANSWER:   Defendants admit that the allegations in Paragraph 161 purport to paraphrase the Motorsport Prospectus, and Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the Motorsport Prospectus and refer the Court to such document for a complete and accurate statement of its contents.  All remaining allegations in Paragraph 161 are denied.

162.   The wildly successful results of Motorsport's January 13, 2021 IPO speak for themselves and belie Defendants' prior representations about the Company to Plaintiffs in inducing Plaintiffs to sell their Company stock.

ANSWER:   Defendants admit only that the results of Motorsport's January 13, 2021 IPO speak for themselves.  All remaining allegations in Paragraph 162 are denied.

163.    The Motorsport Prospectus indicates that essentially all of the assets of Motorsport are derived from its interest in the Company, and that the value of Motorsport is approximately equivalent to its 82.2% interest in the Company.

ANSWER:   Defendants deny the allegations in Paragraph 163.

164.    Per the Motorsport Prospectus, following the IPO there would be approximately 10 million shares of Class A common stock and 7 million shares of Class B common stock outstanding, of which Motorsport Network owns approximately 96.3% of the combined voting power.

ANSWER:   Defendants admit that the allegations in Paragraph 164 purport to paraphrase the Motorsport Prospectus; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the Motorsport Prospectus and refer the Court to such document for a complete and accurate statement of its contents.

165.    On January 13, 2021, Defendants successfully launched the IPO, which was priced at $20.00 per share.

ANSWER:   Defendants admit the allegations in Paragraph 165.

166.    The IPO raised more than $60 million in proceeds for 3 million shares of Motorsport. The price immediately skyrocketed, reaching $38 per share on the first day of trading.

ANSWER:   Defendants admit only that the Motorsport IPO raised more than $60 million in proceeds for 3 million shares of Motorsport and that the Motorsport shares at some point, traded at $38.00 per share.  The remaining allegations in Paragraph 166 are denied.

167.    At the $20 per share IPO price, multiplied by the 17 million authorized shares, the implied value of Motorsport would be approximately $340 million. At the $38.00 peak trading price on January 13, 2021, the implied value of Motorsport is approximately $646 million.

ANSWER:   Defendants deny the allegations in Paragraph 167.

168.    The implied value of the Company, based on the fact that Motorsport's profitability was based upon its 82.2% ownership of the Company, is approximately $414 million based on the IPO price, or $786 million based on the peak trading price on January 13, 2021.

ANSWER:   Defendants deny the allegations in Paragraph 168.

169.    The statutory safe harbor provided by the Private Securities Litigation Reform Act ("PSLRA") for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

ANSWER:   Paragraph 169 states conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 169.  All remaining factual allegations in Paragraph 169 are denied.

170.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

ANSWER:   Paragraph 170 states conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 170.  All remaining factual allegations in Paragraph 170 are denied.

171.    The PSLRA safe harbor also does not apply because the claims alleged herein are covered by statutory exceptions to the safe harbor, including 15 U.S.C. § 77z–2(b)(2) because the statements were made in connection with an initial public offering, insofar as Defendants' misstatements and omissions were made in anticipation of the planned IPO.

ANSWER:   Paragraph 171 states conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 171.  All remaining factual allegations in Paragraph 171 are denied.

172.    To the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking statements, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

ANSWER:   Paragraph 172 states conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 172.  All remaining factual allegations in Paragraph 172 are denied.

173.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by individuals who knew that the statement was false when made.

<u>ANSWER</u>:   Paragraph 173 states conclusions of law to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 173.  All remaining factual allegations in Paragraph 173 are denied.

174.   Plaintiffs did not wish to contribute to a capital call for the Company, which they believed, based on the material misrepresentations and omissions by Defendants alleged above, to be unprofitable and to have limited prospects for future profitability.

<u>ANSWER</u>:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 174 as to Plaintiffs' belief or whether Plaintiffs did not wish to contribute to a capital call, and therefore deny them.  All remaining allegations in Paragraph 174 are denied.

175.   Plaintiffs, as non-controlling minority stockholders, were not positioned to ascertain independently the truth, falsity, or completeness of Defendants' representations concerning the Company's results and prospects.

<u>ANSWER</u>:   Defendants deny the allegations in Paragraph 175.  Additionally, the allegations in Paragraph 175 are irreconcilable with Plaintiffs' representations in Paragraph 4(h) of the respective Stock Purchase Agreement that Plaintiffs had

> sufficient knowledge and experience with about Buyer . . . and the Company in order to be fully familiar with Buyer, the Company, and its current business, operations, assets, finances, financial results, financial condition, and prospects and so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement, (ii) has full access to all books and records of the Company and all of its contracts, agreements and documents, and (iii) has had an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company, and its current business, operations assets, financing, operating results, financial condition and prospects in order to make an informed decisions to sell the Shares.

176.   Plaintiffs relied on the material misrepresentations and omissions by Defendants alleged above, including, in particular, New's statement about an upcoming capital call and the projection of a cash shortfall in the June 5, 2020 Board Presentation in determining that it would be best to sell Plaintiffs' ownership interests in the Company.

ANSWER:   Defendants deny the allegations in Paragraph 176.  Additionally, the allegations in Paragraph 176 are irreconcilable with Plaintiffs' representations in Paragraph 4(h) of the respective Stock Purchase Agreement that Plaintiffs had

> sufficient knowledge and experience with about Buyer . . . and the Company in order to be fully familiar with Buyer, the Company, and its current business, operations, assets, finances, financial results, financial condition, and prospects and so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement, (ii) has full access to all books and records of the Company and all of its contracts, agreements and documents, and (iii) has had an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company, and its current business, operations assets, financing, operating results, financial condition and prospects in order to make an informed decisions to sell the Shares.

177.   On July 14, 2020, HC2 reached out to Defendant Kozko to resume discussions regarding a potential sale of HC2's and Continental's interests in the Company. HC2 also spoke with Defendant Zoi on July 15, 2020 to reach agreement on the price for the purchase of HC2 and Continental's respective shares. HC2 and Continental asked to delay closing until October 2020, in order to determine whether Motorsport would acquire other minority interests at a higher price. Defendants refused to wait.

ANSWER:   Defendants deny the allegations in the last sentence of Paragraph 177. All remaining allegations in Paragraph 177 are admitted.

178.   It is plausible that Defendants resisted a delay in closing because, at the time they initiated the purchase of HC2's and Continental's shares, Defendants already knew that a lucrative IPO was imminent and were well under way in preparing for the IPO. Indeed, Defendants filed their initial draft registration statement with the SEC on September 8, 2020, only three weeks after executing the SPA to acquire HC2's and Continental's shares.

ANSWER:   Defendants admit only that Motorsport filed its draft registration statement with the SEC on September 8, 2020, which was three weeks after executing the SPA to acquire HC2's and Continental's shares.  All remaining allegations in Paragraph 178 are denied.

179.   On July 24, 2020, counsel for Defendants at Snell & Wilmer L.L.P. provided a draft Stock Purchase Agreement to HC2 and Continental.

ANSWER:   Defendants admit the allegations in Paragraph 179.

180.    Defendant Zoi was intimately involved in structuring the deal, engaging via email and phone calls with HC2 and Continental and the parties' respective counsel.

ANSWER:   Defendants admit only that Defendant Zoi was involved in structuring the SPA, and this included engaging via email and phone calls with HC2 and Continental and their respective counsel. All remaining allegations in Paragraph 180 are denied.

181.    HC2, Continental, and Motorsport thereafter entered into the SPA effective as of August 18, 2020, pursuant to which HC2 and Continental sold all of their shares in the Company to Motorsport at a price of just $11.2881 per share.

ANSWER:   Defendants admit that HC2, Continental, and Motorsport entered into the SPA effective as of August 18, 2020, pursuant to which HC2 and Continental sold their shares in 704Games to Motorsport at $11.2881 per share.  All remaining allegations in Paragraph 181 are denied.

182.    Section 4(h) of the SPA included a representation by HC2 and Continental (defined therein as "Seller" or "Sellers") regarding HC2's and Continental's access to information about Motorsport and the Company:

> The Seller (i) has sufficient knowledge and experience with and information about Buyer (including Buyer's business objective and current efforts to consummate a liquidity event or an initial public offering of Buyer as soon as practicable) and the Company in order to be fully familiar with Buyer, the Company and its current business, operations, assets, finances, financial results, financial condition and prospects and so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement, (ii) has full access to all books and records of the Company and all of its contracts, agreements and documents and (iii) has had an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company and its current business, operations, assets, financing, operating results, financial condition and prospects in order to make an informed decision to sell the Shares.

Ex. 2 § 4(h).

ANSWER:   Defendants admit that the allegations in Paragraph 182 purports to quote, in part, and/or paraphrase Section 4(h) of the SPA, and Defendants deny those allegations to the extent they inaccurately or incompletely quote or describe the relevant terms of the SPA and Defendants refer the Court to such agreement for its full and complete terms.

183.    As of the date of that representation in the SPA, HC2 and Continental mistakenly believed, in reliance on, and due to, Defendants' false and misleading statements and material omissions, that the contemplated "liquidity event or an initial public offering of Buyer" would be an offering of Motorsport's parent company and/or would include substantial assets other than those of the Company.

ANSWER:    Defendants deny the allegations in Paragraph 183, except to admit that the allegations in Paragraph 183 purport to quote, in part, the SPA; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the SPA and refer the Court to such agreement for its full and complete terms.

184.    As of the date of that representation in the SPA, HC2 and Continental mistakenly believed, in reliance on, and due to, Defendants' false and misleading statements and material omissions regarding the unavailability of audited financials, and the information that Defendants did provide, that HC2 and Continental did, in fact, have access to the same information known to Defendants, and therefore access to all the information necessary to make a decision to sell HC2 and Continental's respective shares in the Company.

ANSWER:    Defendants deny the allegations in Paragraph 184.

185.    On August 19, 2020, just one day after signing the SPA with HC2 and Continental, Defendant Alex Rothbert, the Vice President of Finance for Motorsport Network, sent an email to Randy Rissman, principal of Leo ("Mr. Rissman"), attaching an offer to purchase Leo's shares in the Company (the "Leo Offer Letter"). The letter represented that "Motorsport recently entered into a transaction with HC2 and CGI to purchase all shares held by HC2 and CGI at a price of $11.2881 per share" and offered to purchase Leo's shares at the same price per share. The Leo Offer Letter also stated that "[t]his offer is open only until 5:00 p.m. (EST) time on August 26, 2020 (the 'Acceptance Deadline')."

ANSWER:    Defendants admit the allegations in the first sentence of Paragraph 185. Defendants further admit that the allegations in the second sentence of Paragraph 185 purport to quote, in part, the Leo Offer Letter, and Defendants deny those allegations to the extent they inaccurately or incompletely quote the relevant terms of the Leo Offer Letter and refer the Court to such letter for its full and complete terms.

186.    It is fair to infer that Defendants included the Acceptance Deadline in the Leo Offer Letter to put additional pressure on Leo to decide to sell quickly and without further investigation.

ANSWER:    Defendants deny the allegations in Paragraph 186.

187.    On August 20, 2020, Mr. Rissman reached out to Brooks to inquire as to whether PlayFast had received a similar offer and seek Brooks' opinion on the offer. Brooks offered to look into the matter further and relay information about the offer to Mr. Rissman.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 187, and therefore deny them.

188.    Based on communications from Brooks to Mr. Rissman, it is fair to infer that on August 21, 2020, Brooks had a call with Kozko, during which Brooks requested information about the status of the Company and the offers to purchase shares from certain minority stockholders of the Company. According to Brooks' account of the interaction, Kozko represented to Brooks that Motorsport purchased HC2's shares because HC2 was in need of cash. This statement, if made, was false. According to Brooks, Kozko further represented that there were no 2019 audited financials for the Company and that there would likely be a capital call or other additional investment needed for the Company to succeed.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 188, and therefore deny them.

189.    Shortly after his call with Kozko, Brooks replied to Mr. Rissman and relayed the substance of that call, including Kozko's representations regarding the financial condition of the Company and the likelihood of a capital call.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 189, and therefore deny them.

190.    Also on August 21, 2020, Brooks forwarded to Mr. Rissman two spreadsheets that Brooks had received from Defendant Rothbert, representing historical financials for the Company (the "Historical Financials") and a forecast as of August 20, 2020 (the "August 2020 Forecast").

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 190, and therefore deny them.

191.    The Historical Financials include profit and loss calculations for 2019 and the first 6 months of 2020. The Historical Financials are not audited financial statements, nor are they in the format required by the Stockholders' Agreement. They show that the Company finished 2019 with a loss of $4,332,906. For the first seven months of 2020, the Company had positive net income of $3,286,652, but this was in large part based on a $5 million increase in revenue in July 2020, when two of the Company's products, NASCAR HEAT 5 and HEAT5 Gold Edition, were launched.

ANSWER:   Defendants admit that the allegations in Paragraph 191 purport to paraphrase the

Historical Financials and Stockholders' Agreement; Defendants deny such allegations to the extent

46

they inaccurately or incompletely describe the Historical Financials or Stockholders' Agreement and refer the Court to such documents for a complete and accurate statement of their contents.

192.    The August 2020 Forecast indicated a net income of approximately $2,841,000. This projection, coupled with the results through July 2020 in the Historical Financials, indicated that the July 2020 results were an anomaly and that the Company was anticipated to lose money for the remainder of 2020.

ANSWER:  Defendants admit that the allegations in Paragraph 192 purports to paraphrase the August 2020 Forecast and the Historical Financials; Defendants deny such allegations to the extent they inaccurately or incompletely describe the August 2020 Forecast or the Historical Financials and refer the Court to such documents for a complete and accurate statement of their contents. The remaining allegations in Paragraph 192 are denied.

193.    It is fair to infer that the August 2020 Forecast was false and misleading because they projected poor performance of NASCAR Heat 5, which by August 2020 all Defendants knew was a great success.

ANSWER:  Defendants admit that the allegations in Paragraph 193 purport to paraphrase the August 2020 Forecast; Defendants deny those allegations to the extent they inaccurately or incompletely describe the August 2020 Forecast and refer the Court to such document for a complete and accurate statement of its contents. All remaining allegations in Paragraph 193 are denied.

194.    On August 24, 2020, Mr. Rissman emailed Rothbert and indicated that Leo would be willing to sell Leo's shares of the Company to Motorsport.

ANSWER:  Defendants admit the allegations in Paragraph 194.

195.    Leo and Motorsport thereafter entered into the Leo SPA effective as of October 6, 2020, pursuant to which Leo sold all of its shares in the Company to Motorsport at a price of just $11.2881 per share.

ANSWER:   Defendants admit only that Leo and Motorsport entered into the Leo SPA on October 6, 2020, pursuant to which Leo sold its shares in 704Games to Motorsport for $11.2881 per share. All remaining allegations in Paragraph 195 are denied.

47

196.    Section 4(h) of the Leo SPA included a representation by Leo (defined therein as "Seller") regarding Leo's access to information about Motorsport and the Company:

> The Seller (i) has sufficient knowledge and experience with and information about Buyer (including Buyer's business objective and current efforts to consummate a liquidity event or an initial public offering of Buyer as soon as practicable) and the Company in order to be fully familiar with Buyer, the Company and its current business, operations, assets, finances, financial results, financial condition and prospects and so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement, (ii) has full access to all books and records of the Company and all of its contracts, agreements and documents and (iii) has had an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company and its current business, operations, assets, financing, operating results, financial condition and prospects in order to make an informed decision to sell the Shares.

Ex. 3 § 4(h).

ANSWER:  Defendants admit that the allegations in Paragraph 196 purport to quote, in part, and/or paraphrase Section 4(h) of the Leo SPA; Defendants deny those allegations to the extent they inaccurately or incompletely quote or describe the relevant terms of the Leo SPA and refer the Court to such agreement for its full and complete terms.

197.    As of the date of that representation in the Leo SPA, Leo mistakenly believed, in reliance on, and due to, Defendants' false and misleading statements and material omissions regarding the unavailability of audited financials, and the information that Defendants did provide, that Leo did, in fact, have access to the same information known to Defendants, and therefore access to all the information necessary to make a decision to sell Leo's shares in the Company.

ANSWER:  Defendants deny the allegations in Paragraph 197.

198.    Defendants fraudulently induced Plaintiffs to accept just $1.3 million for their 29.2% stake in the Company. At the peak trading price on Motorsport's first day of trading, that stake is actually worth at least approximately $230 million.

ANSWER:  Defendants deny the allegations in Paragraph 198.

199.    Plaintiffs would not have entered into the SPA and the Leo SPA had they been aware that the financial condition of the Company indicated a much higher fair market value than the price per share that Defendants offered and paid for Plaintiffs' shares in the Company, or that Defendants intended to offer shares in Motorsport (the only substantial asset of which is the Company) in the impending IPO.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 199 to the extent such allegations address what Plaintiffs would have done, and therefore deny them. All remaining allegations in Paragraph 199 are denied.

200.   Plaintiffs would have retained their ownership interests in the Company if Defendants had not represented to Plaintiffs, mere months before the IPO, that the Company was in dire financial condition and that a capital call was forthcoming.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 200 to the extent such allegations address what Plaintiffs would have done, and therefore deny them. All remaining allegations in Paragraph 200 are denied.

201.   Defendants' material misstatements and omissions damaged Plaintiffs by causing Plaintiffs to sell their ownership interests in the Company for far less than fair market value, depriving Plaintiffs of the true value of those ownership interests.

ANSWER:   Defendants deny the allegations in Paragraph 201.

202.   On or about December 23, 2020, representatives of Ascend FS, Inc. ("Ascend") and PlayFast, both minority stockholders of the Company, sent a letter to Defendants alleging that the SPA and Leo SPA were made in breach of the Stockholders' Agreement. That letter also demanded certain documents relating to Motorsport.

ANSWER:   Defendants admit that on December 23, 2020, representatives of Ascend and PlayFast sent a letter to Defendants. Defendants further admit that the allegations in Paragraph 202 purport to paraphrase the letter sent to Defendants by Ascend and PlayFirst; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the letter and refer the Court to such letter for a complete and accurate statement of its contents.

203.   On December 29, 2020, Jennifer Hadley Catero of Snell & Wilmer L.L.P., counsel for Motorsport, replied via letter to Ascend and PlayFast, denying that the SPA or Leo SPA breached the Stockholders' Agreement and refusing to provide information about Motorsport.

ANSWER:   Defendants admit that the allegations in Paragraph 203 purport to paraphrase a letter sent to Ascend and PlayFast; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the letter and refer the Court to such letter for a complete and accurate statement of its contents.

204.    On January 11, 2021, Ascend filed a derivative suit on behalf of the Company against Motorsport and Kozko in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Local Case Number 2021-000705-CA-01, alleging breaches of fiduciary and contractual duties and theft of corporate opportunities from the Company in excess of $94 million, based on Motorsport's acquisition of stock in the Company from Plaintiffs and Leo via the SPA and Leo SPA transaction, respectively. Ascend's complaint alleged, among other things, that Motorsport purchased Plaintiffs' stock "at a 98.6% discount" and at a price "far below its value", which Motorsport anticipated would lead to "*a return of approximately 72 times* the price it paid" (emphasis in original). Ascend's complaint further alleged that Defendants "concealed . . . their inside information about the IPO from . . . minority shareholders until they were a *fait accompli*."

ANSWER:   Defendants admit only that on January 11, 2021, Ascend filed a derivative suit on behalf of 704Games against Motorsport and Kozko in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Local Case Number 2021-000705-CA-01. Defendants further admit that the remaining allegations in Paragraph 204 purport to quote, in part, and/or paraphrase the complaint; Defendants deny those allegations to the extent they inaccurately or incompletely quote or describe the allegations in the complaint and refer the Court to the complaint for a complete and accurate statement of its contents.

205.    On March 11, 2021, Motorsport and PlayFast entered into a share exchange agreement (the "PlayFast Exchange Agreement"), pursuant to which Motorsport agreed to acquire PlayFast's 30,903 shares of common stock in the Company in exchange for stock in Motorsport and cash, for a total transaction value of approximately $10.75 million.

ANSWER:   Defendants admit only that Motorsport and PlayFast entered into the PlayFast Exchange Agreement on March 11, 2021. Defendants further admit that the remaining allegations in Paragraph 205 purport to paraphrase the PlayFast Exchange Agreement; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the PlayFast Exchange Agreement and refer the Court to such agreement for its full and complete terms.

206.    The PlayFast Exchange Agreement transaction value indicated a per-share value of the Company at $347.862 per share. This share value is *more than 30 times* the amount that Motorsport paid to Plaintiffs in August and October 2020, only months earlier.

ANSWER:   Defendants admit that the allegations in Paragraph 206 purport to paraphrase the PlayFast Exchange Agreement; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the PlayFast Exchange Agreement and refer the Court to such agreement for its full and complete terms. The remaining allegations in Paragraph 206 are denied.

207.   On March 14, 2021, Motorsport and Ascend entered into a share exchange agreement (the "Ascend Exchange Agreement"), pursuant to which Motorsport agreed to acquire Ascend's 41,204 shares of common stock in the Company in exchange for stock in Motorsport and cash, for a total transaction value of approximately $14.6 million.

ANSWER:   Defendants admit only that Motorsport and Ascend entered into the Ascend Exchange Agreement on March 14, 2021. Defendants further admit that the remaining allegations in Paragraph 206 purport to paraphrase the Ascend Exchange Agreement; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the Ascend Exchange Agreement and refer the Court to such agreement for its full and complete terms.

208.   The Ascend Exchange Agreement transaction value indicated a per-share value of the Company at $354.335 per share. This share value is *more than 31 times* the amount that Motorsport paid to Plaintiffs in August and October 2020, only months earlier.

ANSWER:   Defendants admit that the allegations in Paragraph 208 purport to paraphrase the Ascend Exchange Agreement; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the Ascend Exchange Agreement and refer the Court to such agreement for its full and complete terms. The remaining allegations in Paragraph 208 are denied.

209.   On April 1, 2021, Motorsport and PlayFast entered into an amendment of the PlayFast Exchange Agreement, and Motorsport and Ascend entered into an amendment of the Ascend Exchange Agreement (together, the "Amended Exchange Agreements"). In these Amended Exchange Agreements, Motorsport agreed with PlayFast and Ascend to delay the closing of the PlayFast Exchange Agreement and the Ascend Exchange Agreement, respectively, and create a new entity, "Newco" that would merge with the Company.

ANSWER:   Defendants admit only that on April 1, 2021 Motorsport and PlayFast and Motorsport and Ascend entered into amendments to their respective exchange agreements. Defendants further admit that the remaining allegations in Paragraph 209 purport to paraphrase the PlayFast and Ascend Exchange Agreements; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the exchange agreements and refer the Court to such agreements for their full and complete terms.

210.   On April 20, 2021, Motorsport announced that it had closed the transactions contemplated by the PlayFast Exchange Agreement and the Ascend Exchange Agreement, each as amended by the Amended Exchange Agreements. As contemplated by the Amended Exchange Agreements, the Company merged with and into a newly formed Delaware limited liability company called 704Games LLC.

ANSWER:   Defendants admit the allegations in Paragraph 210.

211.   According to the public disclosure, the merger consideration issued to (i) PlayFast in connection with the Merger with respect to the shares of common stock of 704Games it surrendered in such merger consisted of 366,542 newly issued shares of Class A common stock of Motorsport and $1,542,519 in cash and (ii) Ascend in connection with the Merger with respect to the shares of common stock of 704Games it surrendered in such merger consisted of 488,722 newly issued shares of Motorsport and $2,056,692 in cash.

ANSWER:   Defendants admit that the allegations in Paragraph 211 purport to paraphrase the public disclosure; Defendants deny those allegations to the extent they inaccurately or incompletely describe the public disclosure and refer the Court to such document for a complete and accurate statement of its contents.

212.   The per-share consideration paid to each of PlayFast and Ascend under the Amended Exchange Agreements remains the same as under the PlayFast Exchange Agreement and the Ascend Exchange Agreement—giving PlayFast and Ascend more than 30 times the value that Plaintiffs received for their shares in the same Company only months earlier.

ANSWER:   Defendants deny the allegations in Paragraph 212.

213.   Under the PlayFast Exchange Agreement, as amended, and the Ascend Exchange Agreement, as amended, Motorsport and its affiliates, without admitting any liability by any party, were released from all claims that Ascend or PlayFast could allege or assert against Motorsport as minority stockholders of 704Games. Pursuant to the Ascend Exchange Agreement, as amended, the parties agreed that the derivative legal action commenced by Ascend against Motorsport and certain of its affiliates will be dismissed with prejudice.

ANSWER:  Defendants admit that the allegations in Paragraph 213 purport to paraphrase the PlayFast Exchange Agreement, as amended, and the Ascend Exchange Agreement, as amended; Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the exchange agreements and refer the Court to such agreements for their full and complete terms.

214.    The difference in value between the amount paid for Plaintiffs' stock in August 2020 and October 2020 and the amount paid to PlayFast and Ascend in April 2020 shocks the conscience and puts the lie to any claim that Motorsport paid fair market value for Plaintiffs' stock.

ANSWER:  Defendants deny the allegations in Paragraph 214.

215.    On March 24, 2021, Motorsport announced its financial results for 2020.

ANSWER:  Defendants admit the allegations in Paragraph 215.

216.    Based on the facts alleged, it is fair to infer that the financial results that Motorsport reported on March 24, 2021 are based almost entirely on the financials of the Company, as the controlling stake in the Company was the only material asset of Motorsport as of December 31, 2020.

ANSWER:  Defendants deny the allegations in Paragraph 216.

217.    Defendant New identified "considerable revenue growth driven by NASCAR Heat sales" as a major factor in Motorsport's improved financial condition between 2019 and 2020.

ANSWER:  Defendants admit that the allegations in Paragraph 217 purport to quote, in part, a statement made by Defendant New; Defendants deny those allegations to the extent they inaccurately or incompletely quote Defendant New's statement and refer the Court to such statement for a complete and accurate statement of its contents.

218.    Revenues increased 60% in 2020 compared to 2019. Motorsport's press release stated that "The increase was primarily due to the release of NASCAR Heat 5 in July of 2020 which saw sales surpassing the release of NASCAR Heat 4 in 2019."

ANSWER:  Defendants admit 704Games revenues increased in 2020 as compared to 2019. Additionally, Defendants admit that the allegations in the second sentence of Paragraph 218 purport to quote, in part, Motorsport's press release; Defendants deny those allegations to the

extent they inaccurately or incompletely quote the press release and refer the Court to such document for a complete and accurate statement of its contents.

219.    Motorsport, NASCAR, and analysts alike have treated Motorsport as if it owned all of 704Games—and made it clear that Motorsport owned nothing else of note. The value of Motorsport is based primarily on the value of its ownership of 704Games.

ANSWER:  Defendants deny the allegations in Paragraph 219.

220.    As early as May 2020 NASCAR's press release about the upcoming release of NASCAR Heat 5 said that "NASCAR Heat 5 will be published by Motorsport Games."

ANSWER:  Defendants admit that the allegations in Paragraph 220 purport to quote, in part, NASCAR's May 2020 press release, and Defendants deny those allegations to the extent they inaccurately or incompletely quote NASCAR's May 2020 press release and refer the Court to such document for a complete and accurate statement of its contents.

221.    Similarly, analysts treat the companies as interchangeable. For example, a February 8, 2021 report from Canaccord Genuity Capital Markets noted that "Motorsport Games historically has been driven by a single console game franchise, NASCAR Heat." A report from The Benchmark Company of the same date noted that "MSGM currently develops and publishes games based only from their NASCAR license"—a license that actually belongs to 704Games—and includes a graphic for NASCAR Heat 5 with the label "Figure 1: MSGM – 704Games".

ANSWER:  Defendants lack sufficient information to either admit or deny the allegations in the first sentence of Paragraph 221, and therefore deny them. Defendants admit that the remaining allegations in Paragraph 221 purport to quote, in part, two separate reports, and Defendants deny those allegations to the extent they inaccurately or incompletely quote the reports and refer the Court to such reports for a complete and accurate statement of their contents.

222.    After the successful IPO based on the value of Motorsport's ownership in the Company, Defendants used the capital raised to enter into a series of acquisitions.

ANSWER:  Defendants admit that following the IPO of Motorsport, Motorsport entered into a series of acquisitions. All remaining allegations in Paragraph 222 are denied.

223.    On February 19, 2021, Motorsport entered into a binding term sheet with Black Delta Holdings PTY and its affiliates to purchase all assets related to the KartKraft Game for $1 million. This binding term sheet resulted in an asset sale and purchase agreement dated as of March

18, 2021, which closed on March 22, 2021. KartKraft is a leading kart racing simulator for PC, with a development team based in Australia.

ANSWER:   Defendants admit that on February 19, 2021, Motorsport entered into a term sheet with Black Delta Holdings PTY to purchase all assets related to the KartKraft Game that resulted in a March 18, 2021 asset sale and purchase agreement. Defendants lack sufficient information to either admit or deny the allegations in the last sentence of Paragraph 223, and therefore deny them. Defendants further admit that the remaining allegations in Paragraph 223 purport to paraphrase the term sheet and/or asset sale and purchase agreement, and Defendants deny those allegations to the extent they inaccurately or incompletely describe the term sheet or asset sale and purchase agreement and refer the Court to such documents for their full and complete terms.

224.   The acquisition brought Motorsport not only a new video game title but also development capabilities, which Motorsport previously did not have except through its ownership of the Company. According to Motorsport's February 19, 2021 press release, "the new Motorsport Games Australia team will bring additional knowledge and expertise to Motorsport Games, specifically in Epic Games' trademark game Unreal Engine, as well as vehicle physics and driving simulation. ***They will play an integral role in the development of our future products***" (emphasis added).

ANSWER:   Defendants admit that the allegations in Paragraph 224 purport to quote, in part, and/or paraphrase the term sheet and Motorsport's February 19, 2021 press release, and Defendants deny those allegations to the extent they inaccurately or incompletely quote or describe the term sheet or Motorsport's February 19, 2021 press release and refer the Court to such documents for a complete and accurate statement of their contents. All remaining allegations in Paragraph 224 are denied.

225.   On February 25, 2021, Motorsport entered into a binding term sheet with Luminis International BV to acquire its subsidiary Studio397 BV for $16 million. This binding term sheet resulted in a share purchase agreement dated as of April 1, 2021.

ANSWER:   Defendants admit that on February 25, 2021 Motorsport entered into a term sheet with Luminis International BV that resulted in a share purchase agreement dated April 1, 2021.

Defendants further admit that the remaining allegations in Paragraph 225 seek to paraphrase the term sheet and/or the share purchase agreement, and Defendants deny those allegations to the extent they inaccurately or incompletely describe the terms sheet or share purchase agreement and refer the Court to such documents for a complete and accurate statement of their contents.

226.    The acquisition of Studio397, which publishes the rFactor 2 racing simulation platform, also uses the proceeds from the IPO to expand Motorsport's previously nonexistent development capabilities. According to Motorsport's March 3, 2021 press release, "[t]he acquisition will see Studio397 continue its work on rFactor 2 while also developing the physics and handling models for Motorsport Games' forthcoming projects."

ANSWER:   Defendants admit that the allegations in Paragraph 226 purport to quote, in part, and/or paraphrase Motorsport's March 3, 2021 press release, and Defendants deny those allegations to the extent they inaccurately and incompletely quote or describe Motorsport's March 3, 2021 press release and refer the Court to such document for a complete and accurate statement of its contents. All remaining allegations in Paragraph 226 are denied.

227.    On March 24, 2021, Motorsport entered into a binding term sheet to acquire Digital Tales USA LLC. Digital Tales USA LLC is the developer of mobile games for the FIM Superbike World Championship. This third acquisition once again adds to Motorsport's development capabilities, which previously were limited to the resources of the Company.

ANSWER:    Defendants admit the allegations in the first sentence of Paragraph 227. Defendants lacks sufficient information to either admit or deny the allegations in the second sentence of Paragraph 227, and therefore deny them. The allegations in the third sentence of Paragraph 227 are denied.

228.    Motorsport acquired nearly one-third of the Company from Plaintiffs at an artificially low value, based on inaccurate statements and material omissions about the condition of the Company. Defendants have now leveraged the value of the Company to build a multi-million-dollar racing game licensing and development portfolio at Plaintiffs' expense.

ANSWER:   Defendants deny the allegations in Paragraph 228.

## COUNT I
## FOR VIOLATION OF EXCHANGE ACT § 10(b)
## AND RULE 10b-5 THEREUNDER
## (AGAINST MOTORSPORT)

229.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

ANSWER:  Defendants incorporate by reference the paragraphs set forth above as if each

were separately restated herein.

230.    Defendant Motorsport, in its capacity as the majority stockholder of the Company, and by the use of various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, intentionally made untrue statements of material facts to Plaintiffs relating to the financial condition and future prospects of the Company.

ANSWER:  Defendants deny the allegations in Paragraph 230.

231.    In the course of using various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, Defendant also intentionally or recklessly omitted to state material facts relating to the financial condition and future prospects of the Company that were necessary in order to make Defendants' statements made concerning the Company, in the light of the circumstances under which they were made, not misleading.

ANSWER:  Defendants deny the allegations in Paragraph 231.

232.    At each time Defendants made the false statements and omissions of material fact alleged herein, Defendants knew, or recklessly disregarded, that such statements were false and/or incomplete, and that Plaintiffs would rely on those statements.

ANSWER:  Defendants deny the allegations in Paragraph 232.

233.    Plaintiffs justifiably relied upon the statements by Defendants in deciding to sell their ownership interests in the Company to Motorsport at a price of $11.2881 per share.

ANSWER:  Paragraph 233 states conclusions of law to which no response is required. To the

extent a response is required, Defendants deny the allegations in Paragraph 233.

234.    Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact. At least with respect to several of the allegations, the claims primarily allege omissions where there was an affirmative duty to disclose information.

ANSWER:   Paragraph 234 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 234.

235.   But for Defendants' material false statements and omissions of material fact, Plaintiffs would not have been induced to sell their shares in the Company for $11.2881 per share.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 235 to the extent such allegations address what Plaintiffs would have done, and therefore deny them. All remaining allegations in Paragraph 235 are denied.

236.   Plaintiffs have been injured and have suffered economic losses because the fair market value of Plaintiffs' ownership interests in the Company greatly exceeded $11.2881 per share.

ANSWER:   Defendants deny the allegations in Paragraph 236.

237.   Defendants' material false statements and omissions of material fact were the proximate cause of Plaintiffs' injuries and economic losses.

ANSWER:   Paragraph 237 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 237.

238.   Defendants' material false statements and omissions of material fact alleged herein constituted devices, schemes, and artifices to defraud Plaintiffs and acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with the purchase of securities in the Company from Plaintiffs, all in violation of Rule 10b-5.

ANSWER:   Paragraph 238 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 238.

239.   Defendants' material false statements and omissions of material fact alleged herein constituted manipulative and deceptive devices and contrivances in connection with the purchase of securities from Plaintiffs, in contravention of Rule 10b-5 and, thus, in violation of Exchange Act Section 10(b).

ANSWER:   Paragraph 239 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 239.

## COUNT II
### FOR VIOLATION OF § 10(b) OF THE EXCHANGE ACT AND RULE 10b-5(a) AND (c) THEREUNDER (AGAINST ALL DEFENDANTS)

240.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

<u>ANSWER:</u>   Defendants incorporate by reference the paragraphs set forth above as if each were separately restated herein.

241.     This Count is brought solely and exclusively under the provisions of Rule 10b- 5(a) and (c). Accordingly, Plaintiffs need not allege in this Count nor prove in this case that each of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

<u>ANSWER:</u>  Paragraph 241 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 241.

242.     Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did deceive Plaintiffs into selling their shares for artificially low prices, lower than the fair value of those shares, by misleading, creating the perception that 704 was failing, required capital, and was expecting poor performance, by creating urgency through the supposed need for a capital call and capital contribution, and by timing the transaction to close prior to the public disclosure of Motorsport's IPO and prior to the disclosure of the Company's strong performance due to NASCAR Heat 5's successful launch. This course of conduct, in whole and in part, was a fraudulent scheme in that it intentionally created and exploited information asymmetries in order to induce sales at an unfairly low price.

<u>ANSWER:</u>   Defendants deny the allegations in Paragraph 242.

243.     As alleged herein, Defendants also engaged in a fraudulent scheme to the extent they deceptively participated in a course of conduct to convey misleading information or withhold truthful information, regardless of whether they personally made statements to Plaintiffs.

<u>ANSWER:</u>   Defendants deny the allegations in Paragraph 243.

244.     In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.

<u>ANSWER:</u>   Paragraph 244 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 244.

245.     Plaintiffs were unaware of the Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs known of Defendants' unlawful scheme and unlawful course of conduct, they would not have sold their securities, or if they had, would not have done so at the artificially low prices paid for such securities.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 245 to the extent the allegations address what Plaintiffs were aware of or what Plaintiffs

would have done, and therefore deny them. All remaining allegations in Paragraph 245 are denied.

246.   As a direct and proximate result of the Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs suffered damages in connection with their sale of their shares.

ANSWER:   Paragraph 246 states conclusions of law to which no response is required. To the

extent a response is required, Defendants deny the allegations in Paragraph 246.

247.   By reason of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder and are liable to Plaintiffs for damages suffered in connection with their sale of their shares.

ANSWER:   Paragraph 247 states conclusions of law to which no response is required. To the

extent a response is required, Defendants deny the allegations in Paragraph 247.

## COUNT III
### FOR JOINT AND SEVERAL LIABILITY UNDER EXCHANGE ACT § 20(a) FOR MOTORSPORT'S VIOLATION OF EXCHANGE ACT § 10(b) AND RULE 10b-5 THEREUNDER (AGAINST ZOI, KOZKO, AND NEW)

248.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

ANSWER:   Defendants incorporate by reference the paragraphs set forth above as if each

were separately restated herein.

249.   Defendants Zoi, Kozko, and New, in their capacities as controlling executives of Defendant Motorsport (and, with it, the Company), and by the use of various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, intentionally made untrue statements of material facts to Plaintiffs relating to the financial condition and future prospects of the Company.

ANSWER:   Defendants deny the allegations in Paragraph 249.

250.   In the course of using various means and instrumentalities of interstate commerce, including without limitation telephone calls, emails, and videoconferences, Defendants Zoi, Kozko, and New also intentionally or recklessly omitted to state material facts relating to the financial condition and future prospects of the Company that were necessary in order to make Defendants' statements made concerning the Company, in the light of the circumstances under which they were made, not misleading.

ANSWER:   Defendants deny the allegations in Paragraph 250.

251.    At each time Defendants Zoi, Kozko, and New made the material false statements and omissions of material fact alleged herein, they knew, or recklessly disregarded, that such statements were false and/or incomplete, and that Plaintiffs would rely on those statements.

ANSWER:   Defendants deny the allegations in Paragraph 251.

252.    Plaintiffs justifiably relied upon the statements by Defendants Zoi, Kozko, and New in deciding to sell their ownership interests in the Company to Motorsport at a price of $11.2881 per share.

ANSWER:   Paragraph 252 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 252.

253.    But for Defendants Zoi, Kozko, and New's material false statements and omissions of material fact, Plaintiffs would not have been induced to sell their shares in the Company for $11.2881 per share.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 253 to extent the allegations address what Plaintiffs would have done, and therefore deny them. All remaining allegations in Paragraph 253 are denied.

254.    Plaintiffs have been injured and have suffered economic losses because the fair market value of Plaintiffs' ownership interests in the Company greatly exceeded $11.2881 per share.

ANSWER:   Defendants deny the allegations in Paragraph 254.

255.    Defendants Zoi, Kozko, and New's material false statements and omissions of material fact on behalf of Motorsport were the proximate cause of Plaintiffs' injuries and economic losses.

ANSWER:   Paragraph 255 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 255.

256.    Defendants Zoi, Kozko, and New's material false statements and omissions of material fact on behalf of Motorsport alleged herein constituted devices, schemes, and artifices to defraud Plaintiffs and acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with the purchase of securities in the Company from Plaintiffs, all in violation of Rule 10b-5.

ANSWER:   Paragraph 256 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 256.

257.   Defendants Zoi, Kozko, and New's material false statements and omissions of material fact on behalf of Motorsport alleged herein constituted manipulative and deceptive devices and contrivances in connection with the purchase of securities from Plaintiffs, in contravention of Rule 10b-5 and, thus, in violation of Exchange Act Section 10(b).

ANSWER:   Paragraph 257 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 257.

258.   As Manager of Motorsport Network, the sole owner of Defendant Motorsport from its inception until the IPO on January 13, 2021 and the controlling stockholder of Defendant Motorsport at all times, Defendant Zoi has had the direct or indirect power to direct or cause the direction of the management and policies, and to control the general business affairs, of Motorsport since at least August 2018.

ANSWER:   Defendants deny the allegations in Paragraph 258.

259.   In his capacity as the Manager of Motorsport Network, the sole owner of Defendant Motorsport from its inception until January 13, 2021, Zoi has had the requisite direct or indirect power to control the specific corporate actions resulting in the liability alleged herein—namely, Motorsport's actions as the controlling stockholder of the Company during the times in which Defendants' materially false statements and omissions alleged herein, including statements by Zoi, were made.

ANSWER:   Defendants deny the allegations in Paragraph 259.

260.   Based on the facts alleged, Defendant Zoi did not act in good faith, but instead directly or indirectly induced Defendants' materially false statements and omissions alleged herein, which constitute this cause of action under the Exchange Act and Rule 10b-5 thereunder.

ANSWER:   Defendants deny that Defendant Zoi did not act in good faith and that any materially false statements or omissions were made. The remaining allegations in Paragraph 260 state conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 260.

261.   Based on the facts alleged, and, in particular, in light of the substantial individual financial incentive provided by Defendant Zoi's ownership interest in Defendant Motorsport (via his ownership of Motorsport Network), Plaintiffs believe that Defendant Zoi was an active, culpable participant in Motorsport's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder alleged herein.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in

Paragraph 261 as to Plaintiffs' belief, and therefore deny them. All remaining allegations in

Paragraph 261 are denied.

262.    Pursuant to Exchange Act Section 20(a), therefore, Defendant Zoi, as a "control person" of Motorsport, is liable jointly and severally with Motorsport and to the same extent as Motorsport is liable to Plaintiffs for Plaintiffs' claims under Exchange Act Section 10(b) and Rule 10b-5.

ANSWER:   Paragraph 262 states conclusions of law to which no response is required. To the

extent a response is required, Defendants deny the allegations in Paragraph 262.

263.    As Chief Executive Officer and Executive Chairman of Motorsport, Defendant Kozko has had the direct or indirect power to direct or cause the direction of the management and policies, and to control the general business affairs, of Motorsport since at least January 2020.

ANSWER:   Defendants deny the allegations in Paragraph 263.

264.    In his capacity as Chief Executive Officer of Motorsport since January 2020, Kozko has had the requisite direct or indirect power to control the specific corporate actions resulting in the liability alleged herein—namely, Motorsport's actions as the controlling stockholder of the Company during the times at which Defendants' material false statements and omissions alleged herein, including statements by Kozko, were made.

ANSWER:   Defendants deny the allegations in Paragraph 264.

265.    Based on the facts alleged, Defendant Kozko did not act in good faith, but instead directly or indirectly induced Defendants' material false statements and omissions alleged herein, which constitute this cause of action under the Exchange Act and Rule 10b-5.

ANSWER:   Defendants deny that Defendant Kozko did not act in good faith and that any

materially false statements or omissions were made. The remaining allegations in Paragraph 265

state conclusions of law to which no response is required. To the extent a response is required,

Defendants deny the remaining allegations in Paragraph 265.

266.    Based on the facts alleged, and, in particular, in light of the substantial individual financial incentive provided by the Kozko Employment Agreement, Plaintiffs believe that Defendant Kozko was an active, culpable participant in Motorsport's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder alleged herein.

ANSWER:   Defendants lack sufficient information to either admit or deny the allegations in Paragraph 266 as to Plaintiffs' belief, and therefore deny them. All remaining allegations in Paragraph 266 are denied.

267.   Pursuant to Exchange Act Section 20(a), therefore, Defendant Kozko, as a "control person" of Motorsport, is liable jointly and severally with Motorsport and to the same extent as Motorsport is liable to Plaintiffs for Plaintiffs' claims under Exchange Act Section 10(b) and Rule 10b-5.

ANSWER:   Paragraph 267 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 267.

268.   As Chief Financial Officer of Motorsport, Defendant New has had the direct or indirect power to direct or cause the direction of the management and policies, and to control the general business affairs, of Motorsport since at least January 2020.

ANSWER:   Defendants deny the allegations in Paragraph 268.

269.   In his capacity as Chief Financial Officer of Motorsport since January 2020, New has had the requisite direct or indirect power to control the specific corporate actions resulting in the liability alleged herein—namely, Motorsport's actions as the controlling stockholder of the Company during the times at which Defendants' material false statements and omissions alleged herein, including statements by New, were made.

ANSWER:   Defendants deny the allegations in Paragraph 269.

270.   Based on the facts alleged, Defendant New did not act in good faith, but instead directly or indirectly induced Defendants' material false statements and omissions alleged herein, which constitute this cause of action under the Exchange Act and Rule 10b-5.

ANSWER:   Defendants deny that Defendant New did not act in good faith and that any materially false statements or omissions were made. The remaining allegations in Paragraph 270 state conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 270.

271.   Based on the facts alleged, and, in particular, in light of the substantial individual financial incentive provided by the New Employment Agreement, Plaintiffs believe that Defendant New was an active, culpable participant in Motorsport's violation of Exchange Act Section 10(b) and Rule 10b-5 thereunder alleged herein.

ANSWER:  Defendants lack sufficient information to either admit or deny the allegations in Paragraph 271 as to Plaintiffs' belief, and therefore deny them. All remaining allegations in Paragraph 271 are denied.

272.    Pursuant to Exchange Act Section 20(a), therefore, Defendant New, as a "control person" of Motorsport, is liable jointly and severally with Motorsport and to the same extent as Motorsport is liable to Plaintiffs for Plaintiffs' claims under Exchange Act Section 10(b) and Rule 10b-5.

ANSWER:  Paragraph 272 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 272.

## COUNT IV
## FOR VIOLATION OF § 20A OF THE EXCHANGE ACT (AGAINST MOTORSPORT)

273.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

ANSWER:  Defendants incorporate by reference the paragraphs set forth above as if each were separately restated herein.

274.    This Claim is brought against Motorsport under §20A of the Exchange Act, 15 U.S.C. §78t-1.

ANSWER:  Paragraph 274 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 274.

275.    Motorsport possessed the true material undisclosed information, including information about the Company's true financial performance, the value of the Company (which Motorsport also knew would be the basis for the lucrative IPO of Motorsport), liquidity needs, the undisclosed employment contracts, licensing negotiations, and the planned IPO of Motorsport, at all relevant times. In addition, the information was, in each case, considered confidential by 704Games as it was corporate information that was not publicly disclosed.

ANSWER:  Defendants deny the allegations in Paragraph 275.

276.    Motorsport knew, or recklessly disregarded, that it owed a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, to the Company and its stockholders to keep the information confidential.

ANSWER:  Defendants deny the allegations in Paragraph 276.

277.    Nevertheless, while in possession of material, non-public, adverse information, Motorsport bought Plaintiffs' shares of the Company without first disclosing that information, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

ANSWER:   Defendants deny that they were in possession of material, non-public, adverse information while Motorsport bought Plaintiffs' shares of 704Games without first disclosing that information. The remaining allegations in Paragraph 277 state conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 277.

278.    Plaintiffs sold their shares to Motorsport without access to this material adverse information.

ANSWER:   Defendants deny the allegations in Paragraph 278.

279.    Motorsport purchased Plaintiffs' shares contemporaneously with Plaintiffs' sales within the meaning of Section 20A of the Exchange Act.

ANSWER:   Paragraph 279 states conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 279.

280.    By virtue of possessing material non-public information, Motorsport had a duty to either disclose that information to Plaintiffs before purchasing their shares of the Company on the basis of that information or abstain from engaging in that transaction. By trading while in possession of such information, it violated this duty and infringed upon the relationship of trust and confidence that it had with Plaintiffs as investors in the Company.

ANSWER:   Paragraph 280 states conclusions of law to which no response is a required. To the extent a response is required, Defendants deny the allegations in Paragraph 279. All remaining factual allegations in Paragraph 280 are denied.

281.    Accordingly, under Section 20A of the Exchange Act, Motorsport's purchase of the Company shares while knowingly in possession of material, positive, and non-public information makes it liable to Plaintiffs for all profits gained and losses avoided as a result of such stock sales.

ANSWER:    Defendants deny that Motorsport was knowingly in possession of material, adverse, and non-public information. The remaining allegations in Paragraph 281 state conclusions

66

of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 281.

282.    Motorsport is required to account for all such stock sales and disgorge its profits or ill-gotten gains.

ANSWER:   Defendants deny the allegations in Paragraph 282.

## COUNT V
## BREACH OF CONTRACT
## (AGAINST MOTORSPORT)

283.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

ANSWER:   Defendants incorporate by reference the paragraphs set forth above as if each were separately restated herein.

284.    The Stockholders' Agreement is a valid and enforceable contract to which Plaintiffs and Motorsport are parties.

ANSWER:  Defendants admit that Plaintiffs and Motorsport are parties to the Stockholders' Agreement. The remaining allegations in Paragraph 284 state conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 284.

285.    Motorsport knowingly and voluntarily entered into the Stockholders' Agreement.

ANSWER:   Defendants admit the allegations in Paragraph 285.

286.    Section 7.1 of the Stockholders' Agreement obligated Motorsport to provide to Plaintiffs quarterly and annual financial statements prepared in accordance with GAAP.

ANSWER:   Defendants admit that the allegations in Paragraph 286 purport to paraphrase Section 7.1 of the Stockholders' Agreement, and Defendants deny those allegations to the extent they inaccurately or incompletely describe the relevant terms of the Stockholders' Agreement and refer the Court to such agreement for its full and complete terms, including subsections (a)(i)-(vii) of Section 7.1 of the Stockholders' Agreement.

287.   Motorsport breached Section 7.1 of the Stockholders' Agreement by providing financial statements that contained material misstatements and omitted material facts, thus rendering such statements inaccurate and not prepared in accordance with GAAP.

<u>ANSWER:</u>   Defendants deny the allegations in Paragraph 287.

288.   Plaintiffs have been injured by Motorsport's breach of Section 7.1 of the Stockholders' Agreement because Plaintiffs did not have access to complete and accurate financial information about the Company, thus causing Plaintiffs to severely undervalue their ownership interests in the Company and sell their shares of the Company to Motorsport for a fraction of their fair market value.

<u>ANSWER:</u>   Defendants deny the allegations in Paragraph 288.

289.   Had Defendants complied with their obligations under the Stockholders' Agreement, Plaintiffs would not have sold their ownership interests in the Company to Motorsport at the price of $11.2881 per share.

<u>ANSWER:</u>   Defendants deny that they failed to comply with their obligations under the Stockholders' Agreement. Defendants lack sufficient information to either admit or deny the remaining allegations in Paragraph 289, which relate to what Plaintiffs would have done, and therefore deny them.

## COUNT VI
## FRAUD IN THE INDUCEMENT
## (AGAINST ALL DEFENDANTS)

290.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

<u>ANSWER:</u>   Defendants incorporate by reference the paragraphs set forth above as if each were separately restated herein.

291.   Defendant Motorsport knowingly and voluntarily entered into the SPA and the Leo SPA.

<u>ANSWER:</u>   Defendants admit the allegations in Paragraph 291.

292.   Based on the facts alleged, in negotiating the SPA and the Leo SPA, Defendants misrepresented the financial condition and future prospects of the Company.

<u>ANSWER:</u>   Defendants deny the allegations in Paragraph 292.

293.    Based on the facts alleged, in negotiating the SPA and the Leo SPA, Defendants misrepresented the profitability, cash reserves, future prospects, and likelihood of a capital call for the Company.

ANSWER:    Defendants deny the allegations in Paragraph 293.

294.    It is fair to infer that Defendants knew or recklessly disregarded that the misrepresentations to Plaintiffs alleged herein were false and that Defendants intended to purchase Plaintiffs' ownership interests in the Company for a price far below the true fair market value of those shares.

ANSWER:    Defendants deny the allegations in Paragraph 294.

295.    It is fair to infer that Defendants knew or recklessly disregarded that a fair market price for the shares of the Company was a material term of both the SPA and the Leo SPA, and that Plaintiffs would not have entered into the SPA or the Leo SPA at the price of $11.2881 per share had Plaintiffs been aware of the truth regarding the financial condition, future prospects, and likelihood of a capital call for the Company.

ANSWER:    Defendants admit only that the fair market price for the shares of 704Games was

a material term of both the SPA and the Leo SPA. Defendants lack sufficient information to either

admit or deny the remaining allegations in Paragraph 295, which relate to what Plaintiffs would

have done, and therefore deny them.

296.    Based on the facts alleged, it is fair to infer that Defendants intentionally or recklessly deceived Plaintiffs to induce Plaintiffs to enter into the SPA and the Leo SPA in order for Defendants to acquire Plaintiffs' ownership interests in the Company at a deep discount.

ANSWER:    Defendants deny the allegations in Paragraph 296.

297.    Based on the facts alleged, it is fair to infer that Defendants intentionally or recklessly deceived Plaintiffs as to the completeness of their disclosures to Plaintiffs to induce Plaintiffs to mistakenly make the representations in Section 4(h) of each of the SPA and the Leo SPA.

ANSWER:    Defendants deny the allegations in Paragraph 297.

298.    Based on the facts alleged, it is fair to infer that Defendants intentionally or recklessly deceived Plaintiffs to induce Plaintiffs to agree to the releases in Section 9 of each of the SPA and the Leo SPA.

ANSWER:    Defendants deny the allegations in Paragraph 298.

299.   Based on the facts alleged, it is fair to infer that Defendants intentionally or recklessly deceived Plaintiffs to induce Plaintiffs to agree to the provisions in Section 12 of each of the SPA and the Leo SPA.

ANSWER:   Defendants deny the allegations in Paragraph 299.

300.   Defendants' misrepresentations and omissions alleged herein were willful and intentional and reckless and involved a breach of trust or confidence.

ANSWER:   Paragraph 300 state conclusions of law to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 317.

301.   The misrepresentations and omissions alleged herein injured Plaintiffs because Plaintiffs reasonably relied upon those misrepresentations. Had Plaintiffs known those representations were false, Plaintiffs would not have entered into the SPA or the Leo SPA with Motorsport.

ANSWER:   Defendants deny the allegations in the first sentence of Paragraph 301. Defendants lack sufficient information to either admit or deny the allegations in the second sentence of Paragraph 301, which relate to what Plaintiffs would have done, and therefore deny them.

## COUNT VII
## BREACH OF FIDUCIARY DUTIES
## (AGAINST ALL DEFENDANTS)

302.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

ANSWER:   Defendants incorporate by reference the paragraphs set forth above as if each were separately restated herein.

303.   Defendant Motorsport has been the controlling majority stockholder of the Company at all times relevant to Plaintiffs' allegations herein.

ANSWER:   Defendants admit the allegations in Paragraph 303.

304.   Defendant Zoi has been the Manager of Motorsport Network, the sole owner of Defendant Motorsport from its inception until January 13, 2021, since at least August 2018.

ANSWER:   Defendants admits the allegations in Paragraph 304.

305.    Defendant Kozko has been a member of the Board of Directors of the Company at all times relevant to Plaintiffs' allegations herein and the Chairman of the Company's Board since at least June 2020.

ANSWER:   Defendants admit the allegations in Paragraph 305.

306.    Defendant New has acted as chief financial officer for the Company since January 2020.

ANSWER:   Defendants admit the allegations in Paragraph 306.

307.    Defendant Rothbert has acted as controller for Motorsport Network, the sole owner of Motorsport from its inception until January 13, 2021, since at least July 2014.

ANSWER:   Defendants admit the allegations in Paragraph 307.

308.    By virtue of their respective roles as controlling majority stockholder, Manager and owner of the controlling majority stockholder's corporate parent, member and Chairman of the Company's Board, acting chief financial officer for the Company, and controller of the controlling majority stockholder's corporate parent, Defendants Motorsport, Zoi, Kozko, New, and Rothbert each owed fiduciary duties to the Company, Plaintiffs, and other minority stockholders, including the duties of care and loyalty.

ANSWER:    Defendants deny the allegations in Paragraph 308, except to admit that

Motorsport, as majority stockholder, owed fiduciary duties to the Company and the Company's

minority stockholders.

309.    Defendants breached their fiduciary duties to Plaintiffs by the repeated acts of disloyalty, bad faith, and other misconduct alleged herein, including, without limitation, (a) Defendants' failure to provide accurate and complete financial statements of the Company to Plaintiffs, (b) Defendants' material misstatements and omissions of material fact regarding a cash shortfall and likely capital call for the Company, (c) Defendants' pursuit and consummation of the acquisition of Plaintiffs' shares in the Company for far less than a fair market price; (d) Defendants' theft of corporate opportunities in connection with the Alonso Agreement and Le Mans Agreements and delay of the IPO until after acquiring Plaintiffs' stock at a deeply discounted price; and (e) Defendants' purchase of Plaintiffs' shares without disclosing material non-public information.

ANSWER:   Defendants deny the allegations in Paragraph 309.

310.    Defendants' breaches of their fiduciary duties to Plaintiffs resulted in damages to Plaintiffs. Had Plaintiffs known the true financial condition and likelihood of a capital call for the Company, Plaintiffs would not have sold their ownership interests in the Company to Motorsport for $11.2881 per share.

ANSWER:   Defendants deny the allegations in the first sentence of Paragraph 310. Defendants lack sufficient information to either admit or deny the allegations in the second sentence of Paragraph 310, which relate to what Plaintiffs would have done, and therefore deny them.

311.   Defendants' material misstatements and omissions were willful and wanton and were made for the purpose of injuring Plaintiffs by acquiring Plaintiffs' ownership interests in the Company for far less than their fair market value.

ANSWER:   Defendants deny the allegations in Paragraph 311.

### COUNT VIII
### UNJUST ENRICHMENT AND CONSTRUCTIVE TRUST (AGAINST ALL DEFENDANTS)

312.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

ANSWER:   Defendants incorporate by reference the paragraphs set forth above as if each were separately restated herein.

313.   Defendants defrauded Plaintiffs and fraudulently induced Plaintiffs to enter into the SPA and the Leo SPA.

ANSWER:   Defendants deny the allegations in Paragraph 313.

314.   Defendants also breached their contractual obligations and fiduciary duties of care, loyalty, disclosure, candor, and good faith.

ANSWER:   Defendants deny the allegations in Paragraph 314.

315.   Defendants' wrongdoing injured and impoverished Plaintiffs by depriving Plaintiffs of the value of their shares of Company stock.

ANSWER:   Defendants deny the allegations in Paragraph 315.

316.   Defendants' wrongdoing enriched Defendants by permitting them to obtain approximately 29.2 percent of the Company's stock for less than one percent of its true value, and by permitting Defendants to keep for themselves all distributions that would otherwise have been due to Plaintiffs if not for the SPA and the Leo SPA.

ANSWER:   Defendants deny the allegations in Paragraph 316.

317.    Defendants' breaches of fiduciary duty, fraud, and self-enrichment at the expense of plaintiffs were unjustified.

ANSWER:   Defendants deny any wrongdoing. The remaining allegations in Paragraph 317 state conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 317.

318.    As a result of Defendants' wrongdoing, a constructive trust exists in favor of Plaintiffs with respect to 29.2 percent of the Company's value.

ANSWER:   Defendants deny any alleged wrongdoing. The remaining allegations in Paragraph 318 state conclusions of law to which no response is required. To the extent a response is required, Defendants deny the remaining allegations of Paragraph 318.

## PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to any relief.

## AFFIRMATIVE DEFNSES

Pending further investigation and discovery, Defendants assert the following affirmative defenses to the Amended Complaint. Defendants' investigation continues, and Defendants reserve the right to amend or supplement this Answer to assert other and additional defenses, counterclaims, and third party claims as additional information is obtained. Defendants do not assume any burden of proof, persuasion, or production with respect to any issue where the applicable law places the burden upon the Plaintiff.

## FIRST DEFENSE

The Amended Complaint and each purported cause of action fails to state claims upon which relief may be granted.

## SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' alleged damages are wholly speculative, conjectural, unreasonably excessive and/or arbitrary and capricious.

73

**THIRD DEFENSE**

Plaintiffs fail to plead with particularity the circumstances constituting the alleged misrepresentations or omissions for purposes of its fraud in the inducement claim.

**FOURTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs knew, or in the exercise of reasonable care should have known, of some or all of the material facts and information relating to the claims, statements, and/or omissions alleged in the Amended Complaint at the time Plaintiffs sold their shares to Motorsport, and thus assumed the risk of the injuries alleged.

**FIFTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, under the doctrines of release, waiver, and estoppel.

**SIXTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, under the doctrines of ratification, acquiescence, and affirmation.

**SEVENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Defendants at all times acted in good faith. Defendants had reasonable grounds to believe and did believe that their statements were accurate and not misleading when made, and did not become inaccurate or misleading during the relevant time period alleged in the Amended Complaint. Defendants had reasonable grounds to believe and did believe that there was no omission to state a material fact necessary to make any of its statements therein not misleading.

**EIGHTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, under the due diligence defense as articulated by *Straub v. Vaisman & Co.*, 540 F.2d 591 (3d Cir. 1976), and its progeny.

74

**NINTH DEFENSE**

To the extent there is a finding that Plaintiffs' sale of their 704Games shares to Motorsport was for less than fair market value, then such sale did not comply with Plaintiffs' obligations, both to 704Games and the other stockholders of 704Games, under the Right of First Refusal provisions set forth in Section 3.2 of the Stockholders' Agreement and thus, pursuant to Section 3.1(c) of the Stockholders' Agreement, Plaintiffs' sale of 704Games stock to Motorsport is "void ab initio and of no force or effect." In the event of such determination, Plaintiffs would be deemed to have never sold their 704Games shares to Motorsport and would be obligated to return to Motorsport the price paid for such shares by Motorsport. The Stockholders' Agreement, in the event the sale to Motorsport was for less than fair market value, requires a return to the status quo.

**WHEREFORE**, having fully answered the Amended Complaint, Defendants request that the Court enter judgment in its favor on all counts, that Defendants be awarded their attorneys' fees, costs, expenses and for such other relief as the Court deems appropriate.

## COUNTERCLAIM

Defendant/Counter-plaintiff Motorsport Games Inc. (f/k/a Motorsport Gaming US LLC) for its Counterclaim against Plaintiffs/Counter-defendants HC2 Holdings 2 (n/k/a Innovate 2, Corp) ("Innovate 2"), Continental General Insurance Company ("Continental"), and Leo Capital Holdings LLC ("Leo"), state, claim and allege as follows:

**STATEMENT OF FACTS**

**The Parties, Jurisdiction, and Venue**

1.      Counter-plaintiff Motorsport is a Delaware corporation with its principal place of business at 5972 NE 4th Avenue, Miami, Florida 3337.

2.      Upon information and belief, Counter-defendant Innovate 2 is Delaware corporation with its principal place of business at 450 Park Avenue, 29th Floor, New York, NY 10022.

3.      Upon information and belief, Counter-defendant Continental is a Texas insurance company with its principal place of business at 11001 Lakeline Boulevard, Suite 120, Austin, Texas 78717.

4.      Upon information and belief, Counter-defendant Leo is an Illinois limited liability company with its principal place of business at 400 Skokie Boulevard, Suite 410, Northbrook, Illinois 60062.

5.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is diversity of citizenship of the parties.

6.      Alternatively, this Court has supplemental jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1367(a).

7.      Venue is proper in this Court with respect to all Counter-defendants pursuant to 28 U.S.C. § 1391(b)(3) and pursuant to the exclusive forum selection clause agreed to by Counter-defendants in Section 17 of the Stock Purchase Agreements dated August 18, 2020 and October 6, 2020. Since this Court has personal jurisdiction over Defendants with respect to this action and proceeding in this Court is consistent with the Stock Purchase Agreements' exclusive forum selection clause, this Court is the most appropriate venue for this action.

### Factual Allegations

8.      Motorsport entered into a Stock Purchase Agreement dated August 18, 2020 with Counter-defendants Innovate 2 and Counter-defendant Continental ("SPA"), pursuant to which Counter-defendants Innovate 2 and Continental sold their shares in 704Games to Motorsport.

Pursuant to the SPA, Innovate 2 sold its 54,807 shares and Continental sold its 51,500 shares in 704Games to Motorsport for total price of $1,200,000.

9.　　Motorsport entered into a Stock Purchase Agreement dated October 6, 2020 with Counter-defendant Leo ("Leo SPA"), pursuant to which Counter-defendant Leo sold its 10,301 shares in 704Games to Motorsport for $116,279.

10.　　In the Amended Complaint, Counter-defendants now allege that based on purported representations made by Defendants, Counter-defendants sold their shares in 704Games to Motorsport for less than fair market value.

11.　　Counter-defendants Innovate 2 and Continental represented and warranted in Section 4(h) of the SPA the following:

> Seller acknowledges that the Seller is under no compulsion to sell the Shares to Buyer and is (h)completing the sale of the Shares on the Seller's own free will.  The Seller (i) has sufficient knowledge and experience with and information about Buyer (including Buyer's business objective and current efforts to consummate a liquidity event or an initial public offering of Buyer as soon as practicable) and the Company in order to be fully familiar with Buyer, the Company and its current business, operations, assets, finances, financial results, financial condition and prospects and so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement, (ii) has full access to all books and records of the Company and all of its contracts, agreements and documents and (iii) has had an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company and its current business, operations, assets, financing, operating results, financial condition and prospects in order to make an informed decision to sell the Shares.

12.　　Counter-defendant Leo similarly represented and warranted in Section 4(h) of the Leo SPA the following:

> Seller acknowledges that the Seller is under no compulsion to sell the Shares to Buyer and is (h) completing the sale of the Shares on the Seller's own free will.  The Seller (i) has sufficient knowledge and experience with and information about Buyer (including

Buyer's business objective and current efforts to consummate a liquidity event or an initial public offering of Buyer as soon as practicable) and the Company in order to be fully familiar with Buyer, the Company and its current business, operations, assets, finances, financial results, financial condition and prospects and so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement, (ii) has full access to all books and records of the Company and all of its contracts, agreements and documents and (iii) has had an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company and its current business, operations, assets, financing, operating results, financial condition and prospects in order to make an informed decision to sell the Shares.

13.     In their Amended Complaint, Counter-defendants now allege facts that, based on purported representations made by Defendants, (1) they mistakenly believed the contemplated "liquidity event or an initial public offering of Buyer" would be an offering of Motorsport's parent company and/or would include substantial assets other than those of the 704Games and (2) they mistakenly believed that they had access to the same information known to Defendants, and therefore access to all the information necessary to make a decision to sell Innovate 2's and Continental's respective shares in the Company.  Each of these foregoing allegations by Counter-defendants constitute allegations that the representations and warranties they each made in Section 4(h) of the SPA and the Leo SPA were false at the time Counter-defendants made these representations and warranties.

14.     Counter-defendants Innovate 2 and Continental also represented in Section 9 of the SPA the following:

Release.   Seller, for itself and on behalf of Seller's affiliates, successors and assigns, shareholders, officers, directors, employees, contractors, affiliates, agents and their successors and assigns (collectively, the "Seller Releasors") hereby releases and forever discharges the Company, Buyer, Buyer's members, shareholders, managers, officers, directors, contractors, affiliates, heirs, successors, predecessors, assigns, agents, the Company's post-Closing shareholders, and all persons acting by, through or under

each of them (collectively, the "Buyer Releasees"), of and from any and all claims, debts, obligations and liabilities, whether known or unknown, contingent or non-contingent, at law or in equity, in each case directly or indirectly arising from or in connection with, or relating to, the Company, the Company's business, the Shares or any agreements or obligations of the Company and/or Seller's ownership of the Company or resulting from Seller or any of its Related Parties having been a director, officer or employee of the Company, which the Seller Releasors or any of them now have or had or may hereafter have against either the Company or the Buyer Releasees, or any them; provided, however, that nothing in this Section 9 shall terminate or release Buyer's obligations to Seller under this Agreement (or under any other agreement or instrument to be executed in conjunction with this Agreement in order to consummate the transactions contemplated herein).

15.     Counter-defendant Leo similarly represented in Section 9 of the Leo SPA the following:

Release.   Seller, for itself and on behalf of Seller's affiliates, successors and assigns, shareholders, officers, directors, employees, contractors, affiliates, agents and their successors and assigns (collectively, the "Seller Releasors") hereby releases and forever discharges the Company, Buyer, Buyer's members, shareholders, managers, officers, directors, contractors, affiliates, heirs, successors, predecessors, assigns, agents, the Company's post-Closing shareholders, and all persons acting by, through or under each of them (collectively, the "Buyer Releasees"), of and from any and all claims, debts, obligations and liabilities, whether known or unknown, contingent or non-contingent, at law or in equity, in each case directly or indirectly arising from or in connection with, or relating to, the Company, the Company's business, the Shares or any agreements or obligations of the Company and/or Seller's ownership of the Company or resulting from Seller or any of its Related Parties having been a director, officer or employee of the Company, which the Seller Releasors or any of them now have or had or may hereafter have against either the Company or the Buyer Releasees, or any them; provided, however, that nothing in this Section 9 shall terminate or release Buyer's obligations to Seller under this Agreement (or under any other agreement or instrument to be executed in conjunction with this Agreement in order to consummate the transactions contemplated herein).

16.     In their Amended Complaint, Counter-defendants Innovate 2 and Continental have alleged various claims that they agreed to release and forever discharge pursuant to Section 9 of

the SPA. Similarly, Counter-defendant Leo has alleged various claims in the Amended Complaint that it agreed to release and forever discharge pursuant to Section 9 of the Leo SPA.

17.   In Section 7 of the SPA, Counter-defendants Innovate 2 and Continental agreed to "indemnify and hold harmless" Counter-plaintiff "from and against any and all losses, costs, damages, liabilities or expenses actually incurred, including without limitation, reasonable and documented attorneys' fees or other legal expenses or expert fees …arising out of: (a) any breach in any representation or warranty made by [Seller] in this Agreement[.]"

18.   In Section 7 of the Leo SPA, Counter-defendant Leo similarly agreed to "indemnify and hold harmless" Counter-plaintiff "from and against any and all losses, costs, damages, liabilities or expenses actually incurred, including without limitation, reasonable and documented attorneys' fees or other legal expenses or expert fees …arising out of: (a) any breach in any representation or warranty made by [Seller] in this Agreement[.]"

**COUNT I**
**BREACH OF CONTRACT**
**(AGAINST INNOVATE 2 AND CONTINENTAL)**

19.   Counter-plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

20.   The SPA is a valid and enforceable contract to which Counter-plaintiff and Counter-defendants Innovate 2 and Continental are parties.

21.   Pursuant to the SPA, Counter-plaintiff performed its obligations when it paid Counter-defendant Innovate 2 the sum of $618,664.81 in exchange for 54,807 shares of 704Games stock and Counter-defendant Continental the sum of $58,335.19 in exchange for 51,500 shares of 704Games stock.

22.   In Section 4(h) of the SPA, Counter-defendants Innovate 2 and Continental represented and warranted that they had "sufficient knowledge and experience with and

information about Buyer (including Buyer's business objective to consummate a liquidity event or initial public officer of the Buyer as soon as possible) and the Company … so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement … full access to all books and records of the Company and all of its contracts, agreements and documents and … an opportunity to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company and its current business, operations, assets, financing, operating results, financial condition and prospects in order to make an informed decision to sell the Shares."

23.     Despite these representations, Counter-defendants  Innovate 2 and Continental now allege in the Amended Complaint that (1) they mistakenly believed the contemplated "liquidity event or an initial public offering of Buyer" would be an offering of Motorsport's parent company and/or would include substantial assets other than those of the 704Games and (2) they mistakenly believed that they had access to the same information known to Defendants, and therefore access to all the information necessary to make a decision to sell Innovate 2's and Continental's respective shares in the Company.

24.     Counter-defendants' allegations are in stark contrast with and amount to breach of the representations and warranties made in Section 4(h) of the SPA.

25.     In Section 9 of the SPA, Counter-defendants Innovate 2 and Continental agreed to "release[] and forever discharge[] … Buyer, Buyer's members, shareholders, managers, officers, directors, contractors, affiliates, heirs, successors, predecessors, assigns, agents, the Company's post-Closing shareholders, and all persons acting by, through or under each of them … of and from any and all claims, debts, obligations and liabilities, whether known or unknown, contingent or non-contingent, at law or in equity … arising from or in connection with, or relating to, the

Company, the Company's business, the Shares … which the Seller Releasors or any of them now have or had or may hereafter have against … the Buyer Releasees".

26.     In direct violation of this broad release provision, Counter-defendants Innovate 2 and Continental initiated this action asserting claims that they agreed to release and forever discharge.

27.     Thus, by bringing this action Counter-defendants Innovate 2 and Continental have breached Section 9 of the SPA.

28.     Counter-defendants Innovate 2's and Continental's breach of Sections 4(h) and 9 of the SPA has directly and proximately caused Counter-plaintiff to incur, and continue to incur damages in the form of attorneys' fees, costs, and expenses associated with this litigation.

**COUNT II**
**BREACH OF CONTRACT**
**(AGAINST LEO)**

29.     Counter-plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

30.     The Leo SPA is a valid and enforceable contract to which Counter-plaintiff and Counter-defendant Leo are parties.

31.     Pursuant to the Leo SPA, Counter-plaintiff performed its obligations when it paid Counter-defendant Leo the sum of $116,279 in exchange for 10,301 shares of 704Games stock.

32.     In Section 4(h) of the Leo SPA, Counter-defendant Leo represented and warranted that it had "sufficient knowledge and experience with and information about Buyer (including Buyer's business objective to consummate a liquidity event or initial public officer of the Buyer as soon as possible) and the Company … so as to be able to evaluate the risks and merits of consummating the transactions contemplated by this Agreement … full access to all books and records of the Company and all of its contracts, agreements and documents and … an opportunity

to ask questions of, and receive answers from, representatives of Buyer and the Company regarding Buyer, the Company and its current business, operations, assets, financing, operating results, financial condition and prospects in order to make an informed decision to sell the Shares."

33.     Despite these representations, Counter-defendant Leo now alleges in the Amended Complaint that (1) it mistakenly believed the contemplated "liquidity event or an initial public offering of Buyer" would be an offering of Motorsport's parent company and/or would include substantial assets other than those of the 704Games and (2) it mistakenly believed that it had access to the same information known to Defendants, and therefore access to all the information necessary to make a decision to sell its shares in the Company.

34.     Counter-defendants' allegations are in stark contrast with and amount to breach of the representations and warranties made in Section 4(h) of the Leo SPA.

35.     In Section 9 of the Leo SPA, Counter-defendant Leo agreed to "release[] and forever discharge[] … Buyer, Buyer's members, shareholders, managers, officers, directors, contractors, affiliates, heirs, successors, predecessors, assigns, agents, the Company's post-Closing shareholders, and all persons acting by, through or under each of them … of and from any and all claims, debts, obligations and liabilities, whether known or unknown, contingent or non-contingent, at law or in equity … arising from or in connection with, or relating to, the Company, the Company's business, the Shares … which the Seller Releasors or any of them now have or had or may hereafter have against … the Buyer Releasees".

36.     In direct violation of this broad release provision, Counter-defendant Leo initiated this action asserting claims that it agreed to release and forever discharge.

37.      Thus, by bringing this action Counter-defendant Leo has breached Section 9 of the Leo SPA.

38.     Counter-defendant Leo's breach of Sections 4(h) and 9 of the Leo SPA has directly and proximately caused Counter-plaintiff to incur, and continue to incur, damages in the form of attorneys' fees, costs, and expenses associated with this litigation.

## PRAYER FOR RELIEF

WHEREFORE, Counter-plaintiff respectfully requests that this Court enter judgment against Counter-defendants as follows:

a.     Award Counter-plaintiff damages, including its attorneys' fees under the SPA and Leo SPA;

b.     Award Counter-plaintiffs all costs and fees, including pre- and post-judgment interest associated with this matter; and

c.     Such additional and further relief as is deemed just and appropriate.


Dated:  April 25, 2022

VENABLE LLP

*/s/ Daniel A. O'Brien*
Daniel A. O'Brien (No. 4897)
1201 N. Market Street, Suite 1400
Wilmington, DE 19801
Tel: (302) 298-3523
Fax: (302) 298-3550
daobrien@venable.com

*Counsel for Defendants*

OF COUNSEL:

Brian L. Schwalb
George Kostolampros
VENABLE LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001

## **<u>CERTIFICATE OF SERVICE</u>**

I, Daniel A. O'Brien, hereby certify that on this 25th day of April 2022, a copy of the

foregoing document was electronically filed with the court and served via CM/ECF, on parties

with counsel of record identified on the Court's docket.


*/s/ Daniel A. O'Brien*
Daniel A. O'Brien (No. 4897)